Practitioner's response to the identified issues will be shared with the individual(s) conducting the review of the clinical concerns.

4.  Administrative Denial of Privileges Pending the Outcome of an Investigation

    a.  If a Practitioner's privileges are due to expire during a Summary Suspension, they must still be asked to submit information required for re-credentialing and request all privileges that were held prior to the Summary Suspension. Failure to request all privileges previously held will be considered a voluntary relinquishment of privileges during an investigation and may be reportable to the NPDB if the Practitioner is a physician or dentist.

    b.  The service chief and Professional Standards Board to Executive Committee of the Medical Staff (CEB) may recommend an Administrative Denial of Privileges Pending the Outcome of an Investigation rather than recommending the granting or denial of privileges before all relevant information to make such a determination is available.

    c.  The Practitioner will be notified in writing of the decision to administratively deny the privileges pending outcome of the investigation. The notification will also inform the provider that they remain under investigation. The notification will also inform the provider that they remain under investigation and that this action is not reportable to NPDB as it is an administrative action and not "for cause".

    d.  The Practitioner's privileges will lapse on the expiration date (cannot be extended for any reason) and the Practitioner will not hold privileges at this facility until the investigation has concluded and there is a decision based upon the outcome as to whether the requested privileges will be granted or denied.

    e.  An administrative denial of privileges may be taken on one or more privileges depending upon the circumstances. If the summary suspension was not for all privileges, the recommendation may be to grant select privileges and administratively deny those that are under investigation.

    f.  If the requested privileges are subsequently denied after the Investigation has concluded, subsequent appointment and Human Resource actions will be considered accordingly.

5.  Review Process:

    a.  When sufficient evidence exists, based on the preliminary fact finding, that a Practitioner may have demonstrated substandard care, professional misconduct or professional incompetence that impacts the Practitioner's ability to deliver safe, high quality patient care, the Chief of Staff will normally appoint one or more impartial clinical care reviewers to complete a comprehensive focused -clinical care review of the concerns(s) or issues(s). The clinical care reviewers may be from other VHA healthcare facilities as required for involvement of a peer of same specialty with similar privileges and to ensure objectivity in the review.

    b.  The Chief of Staff will determine the appropriate methodology and membership for conducting a review. The individual(s) tasked with performing this review must conduct it in a fair and objective manner, and may be selected from the Practitioner's facility or another facility at the discretion of the Chief of Staff and/or Medical Center Director.

    c.  If the Practitioner (applies only Physicians/Dentists) is not summarily suspended as indicated in paragraph 3 of this Part, the Practitioner will be issued a letter informing the Practitioner that he/she is under Investigation and notifies the Practitioner that if he/she resigns or retires while the review is being conducted, the Practitioner may be reported to the National Practitioner Data Bank (NPDB).

    d.  The individual(s) who are conducting the comprehensive focused clinical care review have the discretion to meet with the Practitioner to discuss or explain the clinical care concerns. This meeting does not constitute a Hearing and none of the procedural rules set forth in Article X of these Bylaws apply thereto. An investigation initiated at the direction of the Chief of Staff is an administrative matter and not an adversarial Hearing. A record of such meeting is made and included with the reviewers' findings, conclusions and recommendations reported to the Professional Standards Board (PSB).

e. The comprehensive focused-clinical care review is typically completed within 30-calendar days but may be extended if circumstances warrant a longer review period. Documentation in support of an extension should be maintained, and the Practitioner should be notified on regular intervals of the status of the review and the Practitioner being investigated will be apprised of the extension.

f. The reviewer(s) may review any documentation needed to fully assess the issues (except for those exempt in paragraph 2 above) and/or interview witnesses, including the Practitioner, at their discretion. The reviewer(s) should be asked if the provider met the standard of care (yes or no) and if not, why the standard was not met.

g. The report of the comprehensive focused clinical care review will be made to the PSB within 14 days after the reviewers have completed the investigation. The PSB will assess the results and make a recommendation to the Medical Center Director regarding the appropriate action to be taken. The PSB has the discretion to meet with the Practitioner within 10 calendar days after receipt of the evidence to ask him/her questions about the findings before reaching a conclusion regarding their recommendations. The PSB is not required to meet with the Practitioner, and if the Practitioner fails to meet with the PSB within a reasonable period of time, which is typically 14 days calendar days after the meeting is requested, the PSB must submit its recommendation for action without the Practitioner's input. This proceeding does not constitute a hearing, and there is no entitlement to any procedural rules set forth in Article X of these Bylaws or any other VA regulations. The PSB is not required to share the report or any supporting documentation in advance of the proceeding or during the proceeding with the Practitioner. A record of such proceedings will be made and included with the reviewers' findings, conclusions and recommendations that are submitted to the Director.

6. Recommendations Following the Review:

a. The PSB can make the following recommendations to the Director based on the evidence gathered before, during and after the review:

   i. No action;

   ii. Initiation of a Focus Peer Performance Evaluation (FPPE) for cause;

   iii. Revocation of privileges; or

   iv. Reduction in privileges.

b. Within five (5) business days, the Medical Center Director will review the recommendation of the PSB, and forward it to the Chief of Staff for appropriate administrative action, if applicable.

c. No action: If the Medical Center Director concurs with the PSB's recommendation for no action, the Practitioner will be notified in writing within five calendar days and, if applicable, be notified that privileges are restored.

d. FPPE for Cause:

   i. If the recommendation is for an FPPE for Cause to be initiated, privileges will be reinstated upon the creation and issuance of the FPPE for Cause. The FPPE for Cause will provide appropriate notification to the Practitioner of the areas of weakness and develop a plan under which the Practitioner can improve in order to successfully complete the FPPE for Cause and demonstrate the requisite skill and knowledge in those areas of clinical issues identified as a concern. *(NOTE: An FPPE for Cause will normally be for a minimum of 60-calendar days. In general, extension of the FPPE for Cause is discouraged.)*

   ii. Upon completion of the FPPE for Cause, results will be reported back to the CEB.

   iii. FPPE for Cause is an opportunity for the privileged practitioner to demonstrate competency and improved performance. It is not an adverse action, is not considered an investigation, and is not reportable as an adverse action to the National Practitioners Data Bank. If the Practitioner is unable to demonstrate competency and improved

34

performance, the FPPE for Cause may be stopped at any point by the supervisor to ensure patient safety and an adverse privileging action may result.

e.   Revocation of Privileges:

i.   If the PSB recommends that the Practitioner's privileges be revoked, or if a Practitioner fails an FPPE and the PSB subsequently recommends the revocation of privileges, the Chief of Staff will assess the evidence and coordinate the separation of the Practitioner with Human Resources Management Service, unless management offers the practitioner a position at the facility that does not require the Practitioner to have clinical privileges.

ii.   If the Practitioner is appointed as a full-time permanent employee under the provisions of 38 U.S.C. 7401(1), the Chief of Staff will issue a proposed removal and proposed revocation of privileges in accordance with VA Handbook 5021, Part II, unless other separation procedures under VA Handbook 5021, Part VI are applicable. If the Practitioner is separated and the Practitioner's privileges are revoked for issues involving professional conduct or competence, the Practitioner will be afforded the opportunity to file a proper appeal to a Disciplinary Appeals Board, if applicable.

iii.   If the Practitioner is appointed under the provisions of 38 U.S.C 7405(a)(1), the Medical Center Director will issue a discharge notice in accordance with VA Handbook 5021, Part VI, unless other separation procedures under VA Handbook 5021 are applicable. The Practitioner will subsequently be notified of the right to a fair hearing after the separation is imposed in accordance with Part X of the Bylaws. The fair hearing is limited to a determination as to whether or not the reason(s) for the separation are due to substandard care, professional misconduct, or professional incompetence, which would result in reporting to the NPDB. The hearing will not serve as an appeal to be reemployed by the agency.

iv.   If the Practitioner is a full-time employee serving a probationary period under 38 U.S.C. 7403, the procedures in VA Handbook 5021, Part III will be followed unless other separation procedures under VA Handbook 5021, Part VI are applicable. If the Practitioner is separated following these procedures, the Practitioner will be afforded the opportunity for a fair hearing after the separation is imposed in accordance with Part X of the Bylaws. The fair hearing is limited to a determination as to whether or not the reason(s) for the separation are due to substandard care, professional misconduct, or professional incompetence, which would result in reporting to the NPDB. The hearing will not serve as an appeal to be reemployed by the agency.

v.   If the Practitioner is appointed through a contract, the contracting officer will be notified of the recommendation for revocation of clinical and privileges and need to remove the Practitioner from the facility. The Practitioner will be separated and subsequently be notified of the right to a fair hearing after separation in accordance with Part X of the Bylaws. The fair hearing is limited to a determination as to whether or not the reason(s) for the separation are due to substandard care, professional misconduct, or professional incompetence, which would result in reporting to the NPDB. The hearing will not serve as an appeal to be reappointment to the medical center

f.   Reduction of Privileges:

i.   If the PSB recommends that the Practitioner's privileges be reduced, or if a Practitioner fails an FPPE for Cause and the PSB subsequently recommends the reduction of privileges, the Chief of Staff will assess the evidence and coordinate the reduction of the Practitioner's privileges with Human Resources Management Service.

ii.   If the Practitioner is appointed as a full-time permanent employee under the provisions of 38 U.S.C. 7401(1), the Chief of Staff will issue a proposed reduction of privileges and proposed reduction in grade or basic pay in accordance with VA Handbook 5021, Part II, if the Practitioner's change in privileges will result in a reduction in grade or basic pay. If the Practitioner's grade or basic pay and privileges are reduced for issues involving

35

professional conduct or competence, the Practitioner will be afforded the opportunity to file a proper appeal to a Disciplinary Appeals Board.

iii. If the Practitioner is appointed under the provisions of 38 U.S.C 7405(a)(1), the Medical Center Director must determine if the Practitioner's services are still needed given the reduction in privileges.

    a. If it is determined that the Practitioner's services are still needed, management will follow the procedures for modifying a Practitioner's privileges.

    b. If the Practitioner's services are no longer needed then the Practitioner will be issued a discharge notice in accordance with VA Handbook 5021, Part VI, unless other separation procedures under VA Handbook 5021 are applicable. The Practitioner will subsequently be notified of right to a fair hearing after separation in accordance with Article X of the Bylaws. The fair hearing is limited to a determination as to whether or not the reason(s) for the separation are due to substandard care, professional misconduct, or professional incompetence, which would result in reporting to the NPDB. The hearing will not serve as an appeal to be reemployed by the agency.

iv. If the Practitioner is a full-time employee serving a probationary period under 38 U.S.C. 7403, the Practitioner may be assigned to duties that do not require a reduction in privileges or the procedures in VA Handbook 5021, Part III will be followed, unless other separation procedures under VA Handbook 5021, Part VI are applicable. (*NOTE:* Probationary employees cannot be issued a major adverse action, and thus a suspension, transfer of function, reduction in grade or basic pay is not an option.) If the Practitioner is separated, he/she will be afforded the opportunity for a fair hearing after separation in accordance with Part X of the Bylaws. The fair hearing is limited to a determination as to whether or not the reason(s) for the separation are due to substandard care, professional misconduct, or professional incompetence, which would result in reporting to the NPDB. The hearing will not serve as an appeal to be reemployed by the agency.

v. If the Practitioner is appointed through a contract, the contracting officer will be notified of the recommendation for reduction of clinical and privileges. If the Practitioner's services are no longer needed, the Practitioner will be separated from the contract and subsequently be notified of the right to a fair hearing after separation in accordance with Part X of these Bylaws. The fair hearing is limited to a determination as to whether or not the reason(s) for the separation from the contract is for substandard care, professional misconduct, or professional incompetence, which would result in reporting to the NPDB. If it is determined that the Practitioner's services are still needed, management will notify the Practitioner of the right to a fair hearing of the reduction of clinical privileges in accordance with Part X of the Bylaws. The fair hearing is limited to a determination as to whether or not the reason(s) for the reduction are due to substandard care, professional misconduct, or professional incompetence, which would result in reporting to the NPDB.

7. <u>Automatic Suspension of Privileges:</u>

    a. An automatic suspension of privileges occurs immediately under the occurrence of an event that may include, but is not limited to, the following:

        i. The Practitioner is being investigated or was indicted for a misdemeanor or felony. The privileges may only be reinstated after the outcome of the legal issue is finalized and after a determination is made regarding the nexus between the legal issue and the mission of VA.

        ii. The Practitioner is being investigated for conduct or behavior issues that do not have an impact on patient care but management has determined it could negatively impact the work environment.

36

      iii.    The Practitioner is being investigated for the fraudulent use of Government equipment or a Government-issued credit card.

      iv.    The Practitioner fails to maintain the mandatory requirements for membership to the medical staff.

      v.    The Practitioner being on leave for an extended period of time such as chronic illness.

  b.    Immediately upon the imposition of an automatic suspension, the Service Chief or the Chief of Staff will ensure that alternate medical coverage for the Practitioner's patients is provided.

  c.    The Medical Center Director may initiate an appropriate review of the concern(s) or issues(s) resulting in the automatic suspension to include recommendations for appropriate administrative action.

  d.    If there are more than three automatic suspensions of privileges in 1 calendar year, or more than 20 days of automatic suspension in 1 calendar year, a thorough assessment of the need for the Practitioner's services must be performed, documented in writing, and appropriate action taken.

8.    <u>Actions Not Constituting Corrective Action</u>:  The comprehensive clinical care reviewers responsible for conducting reviews are not deemed to have proposed an adverse recommendation or action, or to have made such a recommendation, or to have taken such an action, and the right to a hearing under Article X or a Disciplinary Appeals Board (DAB) will not have arisen in any of the following circumstances:

  a.    The appointment of an ad hoc committee investigation committee;

  b.    The conduct of an investigation into a matter;

  c.    The making of a request or issuance of a directive to an applicant or a Practitioner to appear at an interview, conference, or proceeding before the PSB, any ad hoc investigating committee, the Chief of Staff, or any other committee or sub-committee with appropriate jurisdiction in connection with any investigation conducted prior to a proposed adverse recommendation or action;

  d.    The failure to obtain or maintain any mandatory requirement for Medical Staff membership;

  e.    The imposition of proctoring or observation on a Medical Staff member, which does not restrict clinical privileges or the delivery of professional services to patients;

  f.    Corrective counseling;

  g.    A recommendation that the Practitioner be directed to obtain retraining, additional training, continued education, or placement on an FPPE; or

  h.    Any recommendation or action not "adversely affecting" (as such term is defined in Section 431(1) of the Health Care Quality Improvement Act) any applicant or Practitioner, or which is not based on a subjective determination of the professional competency or conduct of the applicant or Practitioner.

## ARTICLE X FAIR HEARING AND APPELLATE REVIEW *

### Section 10.01 Reduction of Privileges

1.    <u>Reduction of Privileges</u>:  Reference VHA Credentialing and Privileging Handbook 1100.19

  a.    Prior to any action or decision by the Director regarding reduction of privileges, the Practitioner will receive written notice of the proposed changes in privileges from the Chief of Staff.  The notice will include:

USA1978

1978

(1) A description of the reason(s) for the change.

(2) A statement of the Practitioner's right to be represented by counsel or a representative of the individual's choice, throughout the proceedings.

b.  The Practitioner will be allowed to review all evidence not restricted by regulation or statute upon which proposed changes are based.  Following that review, the Practitioner may respond in writing to the Chief of Staff's written notice of intent.  The Practitioner must submit a response within 10 workdays of the Chief of Staff's written notice.  If requested by the Practitioner, the Chief of Staff may grant an extension for a brief period, normally not to exceed 10 additional workdays except in extraordinary circumstances.

c.  Information will be forwarded to the Director for decision.  The Director will make a decision on the basis of the record.  If the Practitioner disagrees with the Director's decision, a hearing may be requested.  The Practitioner must submit the request for a hearing within five (5) workdays after receipt of decision of the Director.

d.  A proposed action taken to reduce a Practitioners privileges will be made in accordance with VHA Handbook 1100.19.  In instances where reduction of privileges is proposed for permanent Title 38 employees appointed under Section 7401(1) of Title 38 United States Code, the proposed reduction of privileges will be combined with a major adverse action (e.g. suspension, reduction in basic pay, reduction in grade, transfer, etc.) in accordance with Section 7451 7454 of Title 38, United States Code and VA Handbook 5021 Employee/Management Relations.  *Note:* A major adverse action may not be proposed against a 38 U.S.C. Section 7403 or Section 7405 (except nurses) employee, or a contractor.

2.  <u>Convening a Panel</u>:

a.  A panel is not convened if a reduction in clinical privileges is combined with a major adverse action, such as a suspension, reduction in grade, or a reduction in basic pay, due to substandard care, professional misconduct or professional incompetence.  A reduction in basic pay may occur when a physician's salary is reduced by a pay panel as a result in a reduction in privileges.  In those instances, the proposed reduction and proposed major adverse action are taken together in accordance with the provisions of VA Handbook 5021, Part II.

b.  In the case of a reduction in clinical privileges that does not constitute a major adverse action or is not combined with a major adverse action in accordance with VA Handbook 5021, the facility Director must appoint a review panel of at least three unbiased professionals, within 5 business days after receipt of the Practitioner's request for a hearing.  These professionals will conduct a review and hearing.  At least two members of the panel must be members of the same profession.  If specialized knowledge is required, at least one member of the panel must be a member of the same specialty.  This review panel hearing is the only hearing process conducted in connection with the reduction of privileges.  Any other review processes must be conducted on the basis of the record.  The hearing will proceed as follows:

   i)  The Practitioner must be notified in writing of the date, time, and place of the hearing.  The date of the hearing must not be less than 20 business days and not more than 30 business days from the date of notification letter.

   ii)  During such hearing, the Practitioner has the right to:
       (a)  Be present throughout the evidentiary proceedings.
       (b)  Be represented by an attorney or other representative of the Practitioner's choice.
       **NOTE:**  If the Practitioner is represented, this individual is allowed to act on behalf of the Practitioner including questioning and cross-examination of witnesses.
       (c)  Cross-examine witnesses.

**NOTE:**  The Practitioner has the right to purchase a copy of the transcript or tape of the hearing.

38

3. The panel must complete the review and submit the report within 15 business days from the date of the close of the hearing. The panel may request in writing that the facility Director grant additional time for extraordinary circumstances or cause.

    a. The panel's report, including findings and recommendations, must be forwarded to the facility Director, who has authority to accept, reject, accept in part, or modify the review panel's recommendations.

    b. The facility Director must issue a written decision within 10 business days of the date of receipt of the panel's report. If the Practitioner's privileges are reduced, the written decision must indicate the reason(s). The signature of the facility Director constitutes a final action and the reduction is reportable to the NPDB.

    c. If the Practitioner wishes to appeal the Director's decision, the Practitioner may appeal to the appropriate VISN Director within 5 business days of receipt of the facility Director's decision. This appeal option will not delay the submission of the NPDB report. If the Director's decision is overturned on appeal, the report to the NPDB must be withdrawn.

    d. The VISN Director must provide a written decision, based on the record, within 20 business days after receipt of the Practitioner's appeal.

    NOTE: The decision of the VISN Director is not subject to further appeal.

4. The hearing panel chair shall do the following:
    a. Act to ensure that all participants in the hearing have reasonable opportunity to be heard and to present oral and documentary evidence subject to reasonable limits on the number of witnesses and duration of direct and cross examination, applicable to both sides, as may be necessary to avoid cumulative or irrelevant testimony or to prevent abuse of the hearing process.

    b. Prohibit conduct or presentation of evidence that is cumulative, excessive, irrelevant, or abusive, or that causes undue delay. In general, it is expected that a hearing will last no longer than a total of 15 hours.
    c. Maintain decorum throughout the hearing.
    d. Have the authority and discretion to make rulings on all questions that pertain to matters of procedure and to the admissibility of evidence.
    e. Act in such a way that all information reasonably relevant to the continued appointment or clinical privileges of the individual requesting the hearing is considered by the hearing panel when formulating its recommendations.
    f. Conduct argument by counsel on procedural points and do so outside the presence of the hearing panel.
    g. Seek legal counsel when he or she feels it is appropriate. Regional Counsel to the facility should advise the panel chair.

5. Practitioner Rights:

    a. The Practitioner has the right to be present throughout the evidentiary proceedings, represented by counsel or a representative of Practitioner's choice, (provided that this representative does not have a conflict of interest) cross-examine witnesses, and to purchase a copy of the transcript or tape of the hearing.
    b. The Practitioner may submit a written appeal to the VISN Director within 5 business days of receipt of the Director's decision, if he/she is in disagreement with the decision rendered.
    c. If a Practitioner surrenders or voluntarily accepts a restriction of his/her clinical privileges, or resigns or retires from his/her medical staff position with the Department of Veterans Affairs while the Practitioner's professional competence or professional conduct is under investigation to avoid

investigation, for greater than 30 days such action is reported without further review or due process to the NPDB and the appropriate state licensing boards.

### Section 10.02 Revocation of Privileges

6.    Revocation of Privileges:

a.    Proposed action taken to revoke a Practitioner's privileges will be made in accordance with VHA Handbook 1100.19, and the following regulations are applicable:

   i)    In instances where revocation of privileges is proposed for permanent Title 38 employees appointed under Section 7401(1) of Title 38 United States Code, the proposed revocation will be combined with action to discharge the employee under Section 7461-7464 of Title 38, United States Code and VA Handbook 5021 Employee/Management Relation.

   ii)    For probationary employees appointed under 38 U.S.C. 7401(1) and part-time temporary registered nurses appointed under 38 U.S.C. 7405; the Professional Standard Board (PSB) will convene in accordance with the procedures outlined in VA Handbook 5021, Employee/Management Relations. If separation is recommended and the recommendation from the PSB is based in whole, or in part, for reasons of substandard care, professional incompetence, or professional misconduct, the Director, or designee, may separate the Practitioner as prescribed in VA Handbook 5021. Separation constitutes an automatic revocation of clinical privileges, which is reportable to the NPDB, if the Practitioner is a physician or dentist, but only after being afforded due process. All practitioners, whether reportable to the NPDB or not, are entitled to due process. Refer to Article X, Section 10.01, para 2 for due process procedures.

   iii)    In instances where the Practitioner is appointed through a contract or other "at will" appointment, including but not limited to part-time (excluding part-time temporary registered nurses who are covered under the procedures in para 5(a)(ii), fee basis, without compensation, or intermittent appointment, separation may occur immediately, but separation constitutes an automatic revocation of clinical privileges and is reportable to the NPDB if the Practitioner is a physician or dentist, and the revocation is for substandard care, professional incompetence, or professional misconduct. A report to the NPDB may not be filed until the Practitioner has been afforded a limited fair hearing to determine if the resulting revocation of privileges was due to substandard care, professional misconduct, or professional incompetence. The contractor has no other right to appeal.

b.    Revocation procedures will be conducted in a timely fashion. Revocation of clinical privileges may not occur unless the Practitioner is also discharged, separated during probation, or the appointment is terminated. However, in extremely rare cases, there may be a credible reason to reassign the Practitioner to a position not requiring clinical privileges. Such an action may still result in reporting to the NPDB if the Practitioner is a physician or dentist and the revocation of privileges and subsequent reassignment constitutes a major adverse action due to a reduction in grade or basic pay, is for reasons of substandard care, professional incompetence, or professional misconduct (e.g., a surgeon's privileges for surgery may be revoked, and the surgeon may be reassigned to a non-surgical area when doing so is beneficial to meeting other needs of the facility). Any recommendation by the Executive Committee of the Medical Staff for the reduction, suspension, or revocation of clinical privileges, or for the suspension or revocation of Medical Staff membership, entitles the Practitioner to the rights set forth in Article X, section 10.01, para 2 of these Bylaws.

7.    Reporting to the National Practitioner Data Bank[1]:

a.    Tort ("malpractice") claims are filed against the United States government, not individual Practitioners. There is no direct financial liability for named or involved Practitioners.

---

[1] Reference VHA Handbook 1100.17.

40

1981

Government attorneys (Regional Counsel, General Counsel, considers the allegations, and deny, settle, or defend the case. Claims that are denied may subsequently go to litigation.

b.  When a claim is settled or a judgment is made against the Government (and a payment made), a VA review is conducted to determine if the involved Practitioners should be reported to the NPDB. The review must determine that there was substandard care, professional incompetence, or professional misconduct and if so, is attributable to a licensed Practitioner in order to meet reporting requirements.

c.  Practitioners are also identified and notified at the time a tort claim is filed so that they may assist regional and general counsel in defending the case and in decisions concerning denial or settlement.

d.  Post payment reviews are performed nationally by the office of Medical-Legal Affairs. Accordingly, a letter is now sent to physicians involved in the plaintiff's case when a tort claim settlement is submitted for review.

e.  VA only reports adverse privileging actions that adversely affect the clinical privileges of Physician and Dentists after a professional review action or if the Practitioner surrenders clinical privileges while under investigation. The professional review action is the due process (e.g. fair hearing and appeal process) afforded the Practitioner for a reduction or revocation of clinical privileges.  The reference for this is 38 CFR part 46.4 The notice of summary suspension to the Practitioner must include a notice that if a final action is taken, based on professional competence or professional conduct, both the summary suspension, if greater than 30 days, and the final action will be reported to the NPDB.  After the final action, the reduction or revocation as well as the summary suspension if greater than 30 days will be reported.

8.  Reporting to State Licensing Boards:  VA has a responsibility to report to state licensing boards appointed or suspended members of the Medical Staff whose behavior or clinical practice so substantially fails or failed to meet generally accepted standards of clinical practice as to raise reasonable concern for the safety of patients.

9.  Management Authority:  Nothing in these procedures restricts the authority of management to detail or reassign, on a temporary basis, an employee to non-patient care areas or activities, thus suspending privileges, during the pendency of any proposed reduction of privileges or discharge, separation, or termination proceedings. Further, the Director, on the recommendation of the Chief of Staff, may summarily suspend privileges, on a temporary basis, when there is sufficient concern regarding patient safety or specific practice patterns.  Individuals appointed under authority of 38 U.S.C.7401(1) and 7405 may be terminated when this is determined to be in the best interest of VA in accordance with provisions of VHA Handbook 5021 Employee/Management Relations.

## ARTICLE XI RULES AND REGULATIONS *

1.  As may be necessary to implement more specifically the general principles of conduct found in these Bylaws and to identify the level of clinical practice that is required of each member of the Medical Staff and of all others with delineated clinical privileges or practicing under a Scope of Practice, Medical Staff Rules and Regulations may be adopted.  Rules and Regulations may be adopted, amended, repealed or added by a majority vote of the members (as determined by the Facility) of the Medical Staff present and voting at any meeting of that Committee where a quorum exists, provided that written recommendations concerning the proposed amendments were received and reviewed by the members of the Committee prior to the meeting.  Medical Staff Rules and Regulations must be approved by the Director.

## ARTICLE XII AMENDMENTS *

1.  The Bylaws are reviewed at least every two years, revised as necessary to reflect current practices with respect to Medical Staff organization and functions, and dated to indicate the date of last review. Proposed amendments to the Bylaws may be submitted in writing to the Chief of Staff by any member of the Medical Staff.  Recommendations for change come directly from Medical Staff

41

Meeting.  Changes to the bylaws are amended, adopted and voted on by the Organized Medical Staff as a whole and then approved by the Director. The Bylaws are amended and adopted by 51% endorsement of the active medical staff.

2.  The Executive Committee may provisionally adopt and the Director may provisionally approve urgent amendments to the Rules and Regulations that are deemed and documented as such, necessary for legal or regulatory compliance without prior notification to the medical staff.  After adoption, these urgent amendments to the Rules and Regulations will be immediately communicated back to the Organized Medical Staff for retrospective review and comment on the provisional amendment.  If there is no conflict, the adoption of the urgent amendment will stand approved.  Should a conflict arise, the Conflict Management process noted in Article III, Section 3.04 should be followed.

3.  Written text, delivered via e-mail or notice of posting to local VA home page, of proposed significant changes is to be provided to Medical Staff members and others with clinical privileges.  Medical Staff members will be given time to review proposed changes and are notified of the date proposed changes are to be considered.

4.  All changes to the Bylaws require action by both the Organized Medical Staff and Facility Director. Neither may unilaterally amend the Bylaws.

5.  Changes are effective when approved by the Director.

## ARTICLE XIII ADOPTION *

These Bylaws shall be adopted upon recommendation of the Organized Medical Staff at any regular or special meeting of the Organized Medical Staff at which a quorum is present.  They shall replace any previous Bylaws and shall become effective when approved by the Director.

If the voting members of the organized medical staff propose to adopt a rule, regulation, or policy or an amendment thereto, they must first communicate the proposal to the Executive Committee.  If the Executive Committee proposes to adopt a rule, regulation or policy or an amendment thereto, they must first communicate the proposal to the medical staff.  When the Executive Committee adopts a policy or amendment thereto, it must communicate this to the medical staff.

RECOMMENDED

_____            8/24/2018
Dean Shoucair, D.O., MPH                    Date
Chief of Staff

APPROVED

_____            8/29/2018
Kelley Sermak, MSHSA, BSN, RN, CENP         Date
Acting Director

42

## MEDICAL STAFF RULES

1. **GENERAL**

   a. The Rules relate to role and/or responsibility of members of the Medical Staff and individuals with clinical privileges in the care of any and all patients.

   b. Rules of Departments or Services will not conflict with each other, rules and policies of the Medical Staff, or with requirements of the Governing Body.

   c. The Medical Staff as a whole shall hold meetings at least annually.

   d. The Clinical Executive Board serves as the executive committee of the Medical Staff and between the annual meetings, acts in their behalf. The Committee is responsible for continually reviewing the quality of the clinical care carried out in the facility.

   e. Each of the clinical Services shall conduct meetings at least quarterly to consider findings from ongoing monitoring and evaluation of the quality and appropriateness of patient care and treatment. Minutes must reflect discussion by medical staff and responsible party of patient care issues, with resultant significant conclusions, recommendations, action taken, and evaluation of follow-up actions.

   f. Information used in quality improvement as referenced in Article IX, cannot be used when making adverse privileging decisions.

2. **PATIENT RIGHTS \***

   a. <u>Patient's Rights and Responsibilities</u>: This Organization supports the rights of each patient and publishes policy and procedures to address rights including VA Illiana Health Care System Medical Center Memorandums outlining:

      i) Patient Rights, Grievances, Responsibilities and Conduct (MCM 12-12)

      ii) Informed Consent (MCM 11-34)

      iii) Advance Directives (Withholding, Withdrawal Life Sustaining Treatment) (MCM 11-55)

      iv) Patient CPR Status and Treatment Preferences (MCM 11-51)

3. **RESPONSIBILITY FOR CARE\***

   a. Conduct of Care

      i) Management of the patient's general medical condition is the responsibility of a qualified member of the Medical Staff.

         (1) The attending Staff Physician is responsible for the preparation and completion of a complete medical record for each patient. This record shall include a medical examination, an updated problem list, identification data, chief complaints, personal history, family history, history of present illness, physical examination, special reports such as consultations, clinical laboratory, x-ray and others, provisional diagnosis, medical and/or surgical treatment, operative report with pre/post-operative progress notes, pathological findings, progress notes, doctor's discharge instructions sheet, including condition on discharge (discharge note) and final diagnosis, and final summary.

         (2) A complete inpatient admission H&P examination will be available in accordance with time frames noted in VHA Policy, State laws, and regulations of admission. In a Community Living Center (CLC), an H&P will be available in accordance with time frames noted in VHA Policy, State laws, and regulations of admission, including any co-signature that may be required. For all PRRTP (Psychosocial Residential Rehabilitation Treatment Program) admissions, the H&P will be available within 7 days. For specialty programs such as HBPC (Home Based Primary Care) and MHICM (Mental Health Intensive Care Management), specific guidelines will be followed. All H&P's completed by a resident, or

43

1984

Advanced Practice Professionals will be co-signed in accordance with time frames noted in VHA Policy, State laws, and regulations of entry in the medical record.  If a delay in placement on the chart is expected (i.e., admission on weekend or holiday when no transcription staff are available), the provider will assure compliance with time standards by typing the H&P directly into CPRS.  The H&P will be documented electronically under the Physicians/History and Physical title.  The H&P will contain (MCM 11-29, The Medical Record):

- Chief complaint of patient
- History of present illness
- Past medical history (The history will contain the required information for the patient who is a former POW, claims exposure to herbicides, military nuclear ionizing radiation, environmental contaminants, claims service connection for post-traumatic stress disorder, and/or indicates that medical care was rendered during active duty status.)
- Social/Family history
- Review of systems/physical exam, including nutritional assessment
- Treatment plan
- Conclusion/Impressions

(3)  When the patient is readmitted and/or has surgery in accordance with time frames noted in VHA Policy, State laws, and regulations of performance of a previous H&P exam, an interval H&P exam reflecting any changes may be used, providing the original exam is readily available, and it is professionally determined that such an examination, in conjunction with the prior examination, is adequate to reflect a comprehensive current physical assessment.  The interval H&P must comply with time standards for completion.

(4)  An interval H&P examination, where used, will be entered electronically under the title Physicians/Interval History and Physical and will contain:

- A statement that the previous H&P examination has been reviewed and is accurate, including the date of the previous H&P; and
- An appropriate assessment was completed confirming the necessity for the procedure or care is still present; and
- A statement that there are pertinent additions to the history and/or subsequent changes in the physical findings, which will be specified, if applicable; OR
- A statement indicating there is no change noted in the review of the previous H&P.

(5)  A patient remaining on inpatient status for a year or longer will be given an annual examination.  The comprehensiveness of this examination will be determined by the physician based upon the age, sex, and previous and current health status of the patient. The mental status of psychiatric patients will be reevaluated at the time of the annual examination.

(6)  When a patient is first seen on an ambulatory or outpatient care level, a relevant history of the illness or injury, and physical findings must be documented in the medical record. While on ambulatory and/or outpatient care status for a year, on the next visit, the patient must be given an annual physical or, if applicable, an assessment of the condition for which care is authorized.

(7)  In addition to the H&P, special protocols, as prescribed in current directives, will be followed for certain patients such as former POW's and those who have alleged exposure to:

44

      (a) Nuclear tests
      (b) Ionizing radiation
      (c) Agent Orange
      (d) Environmental contaminants, or
      (e) Other events, chemicals or substances as delineated by law.

(8) Food and nutrition products are administered only on the prescription or order of a Medical Staff member, an authorized house staff member, or other individual who has been granted authority to write such prescriptions or orders, within their scope of practice.

(9) Progress notes are used for recording pertinent, meaningful observations and information concerning the care of patients. Notes shall be documented, signed, and co-signed where applicable, in a timely manner, and at sufficient intervals to reflect the health care practitioner's ongoing assessment of the patient, as well as whether treatment regimen should continue as previously ordered, or whether changes or additions to care plan are indicated. Each progress note must be legible, coherent, in correct chronological sequence, and dated and authenticated by its author. Progress note entry will follow MCM 11-29, The Medical Record.

(10) Upon determination that a Do Not Resuscitate (DNR) order is appropriate, the order must be written or, at minimum, countersigned by the attending physician in the patient's medical record. There must be documentation of the order and how the decision was reached (e.g., discussed with patient or family), per MCM 11-51 Reflect CPR Status and Treatment Preferences at any time a DNR order is written, the patient's rights will be observed. Once the order has been entered, it is the responsibility of the attending physician to ensure that the order and its meaning are discussed with appropriate members of the Facility staff, particularly the nursing staff, so that all involved professionals understand the order and its implications.

(11) Patients will not be transferred out when the Facility has the means to provide adequate care. Patients who are medically stable for transport may be authorized for transfer only after authorization is given by the appropriate provider as defined in MCM 11-108, Managing Patient Flow, Transfers and Diversion.

(12) The attending Staff Physician will provide education to patients and families.

(13) The attending Staff Physician will coordinate the care, treatment, and services with other practitioners and hospital personnel, as relevant to the care, treatment, and services of an individual patient.

ii) Under similar clinical circumstances, the same quality of patient care is provided, by all individuals with delineated clinical privileges, within and across Departments and Services and between all staff members who have clinical privileges.

iii) There is to be a comparable level of quality of surgical and anesthesia care throughout the Facility.

b. Consultations:

i) Consultation: Except in an emergency, consultation with a qualified physician is desirable when in the judgment of the patient's physician:

(1) The patient is not a good risk for operation or treatment,

(2) The diagnosis is obscure, and/or

(3) There is doubt as to the best therapeutic measures to be utilized.

ii) Consultant: A consultant must be well qualified to give an opinion in the field in which his opinion is sought. The status of the consultant is determined by the Medical Staff and the Executive Committee of the Medical Staff on the basis of an individual's training, experience, and competence.

45

 iii) <u>Essentials of a Consultation</u>:  A satisfactory consultation includes examination of the patient and review of the medical record.  A written opinion signed by the consultant must be included in the medical record.  When operative procedures are involved, the consultation note, except in an emergency, shall be recorded prior to the operation.

 iv) <u>Responsibility for Requesting Consultations</u>:  The patient's physician, through the Chiefs of Services, shall make certain that members of the staff do not fail in the matter of providing consultation as needed.

 v) <u>Psychiatric Consultations</u>:  Psychiatric consultation must be requested for all patients who attempt suicide or take a chemical overdose.  If the patient refuses to see the consultant, this fact must be documented by the consultant in the medical record.

c. <u>Discharge Planning</u>:  Discharge planning is initiated as early as a determination of need is made.

 i) Discharge planning provides for continuity of care to meet identified needs.

 ii) Discharge planning is documented in the medical record.

 iii) Criteria for discharge are determined by the Multidisciplinary Treatment Team.

 iv) Discharge plans, including patient/caregiver education, medications, treatment, follow-up, and patient agreement are documented in the medical record.

d. Discharge

 i) Patients shall be discharged from the Facility only upon the written order of the physician and the discharge summary will be completed (signed) and available for review in CPRS within timeframes noted in accordance with VHA Policy, State laws, and regulations of discharge from the inpatient setting and within time frames in accordance with VHA Policy, State laws, and regulations for CLC residents.  At time of completing the final summary, the responsible member of the Medical Staff shall review the medical record to ensure that documents therein pertain to the patient and contain accurate data.  The record shall be completed within time frames noted in accordance with VHA Policy, State laws, and regulations of the discharge of the patient.  The physician or dentist shall complete his/her portion of the record within time frames in accordance with VHA Policy, State laws, and regulations including authentication.

 ii) Patients from Ambulatory Surgery/Procedure Unit can be discharged based upon order of Licensed Independent Practitioner familiar with the patient or when the Practitioner is not available, based on relevant medical staff approved criteria.  The Practitioner's name is recorded in the patient's medical record.

e. Autopsy

 i) Autopsy services are provided by Pathology and Laboratory Medicine Service.  The availability of these services will be made known to the family of each decedent and the Medical Staff will attempt to secure authorization for autopsy examination in all deaths.  The autopsy is a significant instrument for continuous monitoring activity as part of the Performance Improvement Program within the Facility.

 ii) There will be legal authorization by the next of kin for autopsy in all instances prior to the initiation of an autopsy, except as provided in 38 CFR 17-170.  Whenever possible, the physician responsible for the care of the patient at the time of death will be designated to request permission from the next of kin to perform an autopsy.

 iii) Autopsy examination may be performed for medico-legal reasons in cases of unexpected death upon compliance with 38 CFR 17-170, VHA Policy, State laws, and regulations *(See MCM #113-2, Quality Assurance Survey For Autopsy, which includes the Clinical Categories Targeted for Autopsies)*

 iv) <u>Autopsy Rates</u>.  Autopsies are encouraged as per VHA policy.

USA1987

1987

    v) <u>Autopsy Criteria</u>. VHA policy encourages autopsies be requested from next-of-kin for all deaths, with the request and response documented in the clinical record. Autopsy performance is tracked for quality management purposes. Those cases meeting criteria as Medical Examiner's cases per policy will be referred to the appropriate County Medical Examiner's Office in accordance with state statutes. *(See MCM #113-2; Quality Assurance Survey For Autopsy, which includes the Clinical Categories Targeted for Autopsies)*

    vi) Cases in which death was due to suspected negligence, incompetence, or criminal activity require referral to the Medical Examiner, as do all cases in which death may be due to occupational causes.

f. Standard precautions will be vigorously enforced for preventing transmission of infectious diseases.

## 4. PHYSICIANS' ORDERS *

a. General Requirements

    i) Orders are entered into the electronic medical record (EMR).

    ii) Verbal/telephone orders will be discouraged, but it is recognized that there will be times when they are appropriate. Verbal/telephone orders of authorized practitioners shall be accepted and transcribed by qualified personnel. The receiver of any verbal/telephone order will write down the complete order, then read back and receive confirmation from the practitioner who gave the order before entering into the computer system. Verbal/telephone orders will be entered into the computer by the responsible qualified personnel and flagged as verbal or telephone orders. These Verbal/Telephone orders will require the practitioner's signature. The responsible practitioner will authenticate verbal/telephone orders within 72hours. This policy is outlined in VAIHCS MCM 11-89, Processing of CPRS Order by Allied Health Professionals

b. Medication Orders

    All medications shall be administered by, or under the supervision of, appropriately licensed personnel in accordance with approved policy and procedure established with a Service and in accordance with VAIHCS MCM 119-15 Medication Management.

c. <u>Standardized Order Sets</u> (protocols): Standardized order sets are reviewed periodically by Service Chief and modified as needed. All standardized order sets in the EMR/medical record shall be authenticated by a Medical Staff member and are to be signed for each usage by medical staff. All concerned personnel shall be notified of revisions to standardized order sets by the Service Chief.

d. <u>Investigational Drugs</u>: Investigational Drugs are not currently used at VA Illiana Health Care system.

e. <u>Informed Consent</u>:

    i) Informed consent will be consistent with legal requirements and ethical standards, as described in VAIHCS MCM 11-34, Informed Consent.

    ii) Evidence of receipt of Informed consent, documented in the medical record, is necessary in the medical record before procedures or treatment for which it is required.

f. <u>Submission of Surgical Specimens</u>: The list of procedures which do not require a specimen submission for pathological analysis and the list of specimens that require only a gross diagnosis are made conjointly between the pathology department and the medical staff. The pathology department shall provide this list to the Surgical Case Review Committee annually and also following any revisions. (MCM 112-17)

USA1988

1988

g.  Special Treatment Procedures:

    i)  DNR (Do Not Resuscitate) and Withholding/Withdrawal of Life Sustaining Treatment

        (1)  A description of the role of the physician, family members and when applicable, other staff in decision.

        (2)  Mechanisms for reaching decisions about withholding of resuscitative services, including mechanisms to resolve conflicts in decision making.

        (3)  Documentation in the medical record.

        (4)  Requirements are described in MCM 11-55, Advance Directives (Withholding, Withdrawal of Life Sustaining Treatment), Medical Staff Bylaws, and these Rules.

    ii)  Sedation/Analgesia involves the administration of medications that have a risk for undesirable side effects, either immediately or delayed, and may be utilized only within the guidelines of an established protocol in the center policy related to Sedation/Analgesia and according to approved privileges. Only by those Practitioners with approved and current privileges to do so.

## 5.  ROLE OF ATTENDING STAFF *

a.  Supervision of Residents and Non-Physicians

    i)  Residents are supervised by members of the Medical Staff in carrying out their patient care responsibilities.

    ii)  Medical staff members who chose not to participate in the teaching program are not subject to denial or limitation of privileges for this reason alone, except that this may result in loss of faculty appointment.

    iii)  Advanced Practice Professionals and certain Allied Health Practitioners are supervised by the Medical Staff and are monitored under a Scope of Practice statement.

b.  Documentation of Supervision of Resident Physicians

    i)  Sufficient evidence is documented in the medical record to substantiate active participation in, and supervision of, the patient's care by the attending physician as described in Facility Policy Memoranda (MCM 142-16, Supervision of Residents), Medical Staff Bylaws, these Rules, and VHA Handbook 1400.1 Resident Supervision.

    ii)  Entries in the medical record made by residents or those non-physicians (e.g., PAs, ARNPs, etc.) that require countersigning by supervisory or attending medical staff members are covered by appropriate Facility policy and include:

        (1)  Medical history and physical examination.

        (2)  Discharge Summary.

        (3)  Operative Reports.

        (4)  Medical orders that require co-signature.

            (a)  DNR.

            (b)  Withdrawing or withholding life sustaining procedures.

            (c)  Certification of brain death.

            (d)  Research protocols.

            (e)  Investigational drug usage, ONLY permitted by named principal investigators or co-investigators previously designated in the study.

            (NOTE: Because medical orders in EMR do not allow a second signature (co-signature), the attending must either write the order for (1) through (5) above; or in an urgent/emergency situation, the house staff or non-physician must obtain verbal

concurrence from the attending, document in the progress notes the discussion and concurrence, and can write and sign the order.  The attending medical staff member must then co-sign the progress note noting the discussion and concurrence within time frames in accordance with VHA Policy, State laws, and regulations.)

    iii)   Residents are allowed to order laboratory studies, radiology studies, pharmaceuticals, and therapeutic procedures as part of their assigned levels of responsibility.  In addition, residents are allowed to certify and re-certify treatment plans as part of their assigned levels of responsibility.  These activities are considered part of the normal course of patient care and require no additional documentation on the part of the supervising Practitioner over and above standard setting-specific documentation requirements (VHA Handbook 1400 page 6).

   c.   Designated administrative staff will be authorized to make administrative entries as approved by the Chief of Staff.  These administrative entries can be for the purposes of: (1) creating electronic forms for the inclusion into the computerized patient record system, (2) administratively closing open requests or orders, (3) entering administrative progress notes, (4) entering notes to disposition consultation requests and (5) completing other requirements as requested by the Chief of Staff or his/her designee.

## 6.  MEDICAL RECORDS *

   a.   Completion of medical records is addressed in VAIHCS MCM 11-29, The Patient Health Record. Basic Administrative Requirements:

   b.   Entries must be electronically entered where possible, which automatically dates, times, authenticates with method to identify author, may include written signatures.

   c.   It is the responsibility of the medical Practitioner to authenticate and, as appropriate, co-sign or authenticate notes by Advanced Practice Professionals.

   d.   Final diagnosis and complications are recorded without use of abbreviations and symbols.  A list of abbreviations not to use can be found in related Facility policy, and is available in CPRS and VISTA.  Those abbreviations are not acceptable for use either handwritten or in the EMR.

   e.   Completion and filing of reports of diagnostic and therapeutic procedures must be accomplished within time frames noted in accordance with VHA Policy, State laws, and regulations.

   f.   Release of information is required per policy and standard operating procedures for the Facility.

   g.   All medical records are confidential and the property of the Facility and shall not be removed from the premises without permission (ROI from the Patient/consultation with the privacy officer as appropriate).  Medical records may be removed from the Facility's jurisdiction and safekeeping only in accordance with a court order, subpoena, or statute.  In case of readmission of a patient, all previous records on file shall be available for the use of Medical Staff.

   h.   Access to medical records of all patients shall be afforded to Medical Staff members for bona fide study and research, consistent with preserving patient confidentiality and privacy.  Specific confidentiality requirements are found in Title 38 U.S.C. 7332.

   i.   All Medical Records must contain:

    i)   Patient identification (name, address, DOB, next of kin).

    ii)   Medical history including history and details of present illness/injury.

    iii)   Observations, including results of therapy.

    iv)   Diagnostic and therapeutic orders.

    v)   Reports of procedures/operations, tests, their results and related pre/post-operative progress notes.

49

1990

    vi)  Progress notes.

    vii)  Consultation reports.

    viii)  Diagnostic impressions.

    ix)  Conclusions at termination of evaluation/treatment.

    x)  Informed consent before procedures or treatments undertaken and if not obtainable, the reason, as stated in Facility Policy Memorandum "Informed Consent."

j.  <u>Inpatient Medical Records</u>:  In addition the items listed in section i above, all inpatient records must contain, at a minimum:

    i)  A history that includes chief complaint, history of present illnesses, childhood illnesses, adult illnesses, operations, injuries, medications, allergies, social history (including occupation, military history, and habits such as alcohol, tobacco, and drugs), family history, chief complaint, and review of systems.

    ii)  A complete physical examination includes (but not limited to) general appearance, review of body systems, nutritional status, ambulation, self-care, mentation, social, review of the results of pertinent studies which includes but not limited to, laboratory, radiology tests, and other applicable findings based on the patient assessed personal history.  Key examination medical impressions will be documented in the note.  The note must be authenticated by provider at the earliest possible time, but always within time frames in accordance with VHA Policy, State laws, and regulations of being written in CPRS.

    iii)  If the H&P was completed prior to the admission or procedure, it must be updated the day of admission.  If it is more than time frames in accordance with VHA Policy, State laws, and regulations old, a new one must be completed.

    iv)  A complete inpatient admission H&P examination will be available within time frames in accordance with VHA Policy, State laws, and regulations.  In a Community Living Center (CLC), the H&P will be available within time frames in accordance with VHA Policy, State laws, and regulations, including any co-signature that may be required.  For all PRRTP (Psychosocial Residential Rehabilitation Treatment Program) admissions, the H&P will be available within time frames in accordance with VHA Policy, State laws, and regulations.  For specialty programs such as HBPC (Home Based Primary Care) and MHICM (Mental Health Intensive Care Management), specific guidelines will be followed.

    v)  A discharge plan (from any inpatient admission or PRRTP), including condition on discharge.

    vi)  Have a discharge summary signed (from inpatient or PRRTP) available for review in CPRS within time frames in accordance with VHA Policy, State laws, and regulations of discharge from the inpatient setting and time frames in accordance with VHA Policy, State laws, and regulations for CLC residents.

    vii)  Completed within time frames in accordance with VHA Policy, State laws, and regulations days of discharge.

k.  <u>Outpatient Medical Records</u>:  In addition the items listed in section B above, all outpatient records must contain, at a minimum:

    i)  A progress note for each visit.

    ii)  Relevant history of illness or injury and physical findings including vital signs.

    iii)  Patient disposition and instruction for follow-up care.

    iv)  Immunization status, as appropriate.

    v)  Allergies.

    vi)  Referrals and communications to other providers.

     vii) List of significant past and current diagnoses, conditions, procedures, drug allergies,

     viii) Medication reconciliation, problem, and any applicable procedure and operations on the Problem List

l. <u>Surgeries and Other Procedures</u>: All aspects of a surgical patient's care, including ambulatory surgery, pre-operative, operative and post-operative care, must be documented. Surgical interventions, diagnostic procedures, or other invasive procedures must be documented to the degree of specificity needed to support any associated coding data and to provide continuity of care.

m. <u>Preoperative Documentation</u>:

     i) In all cases of elective and/or scheduled major surgery and/or diagnostic and therapeutic procedures, and if circumstances permit, in cases of emergency surgery, the supervising or staff Practitioner must evaluate the patient and write a pre-operative (pre-procedural) note describing: the findings of the evaluation, diagnosis(es), treatment plan and/or choice of specific procedure to be performed; discussion with the patient and family of risks, benefits, potential complications; and alternatives to planned surgery and signed consent

     ii) Invasive procedures and surgeries involving local and/or moderate sedation require a focused history and physical or Subjective/Objective/Assessment/Plan (SOAP) note addressing pertinent positive/negative information, indications for the procedure, known risks related to the procedure, and a physical exam pertinent to the procedure. A formal consultation to the service for performing the procedure that includes all required content will serve as an H&P if done within time frames in accordance with VHA Policy, State laws, and regulations, but must be updated the day of the procedure.

     iii) Except in an emergency, no patient may go to the operating room without a complete history and physical examination recorded in his/her chart plus recorded results of lab work and x-rays.

     iv) A surgical operation shall be performed only with documented informed consent of the patient or his/her legal representative except in emergencies at which time the Chief of Staff holds jurisdiction.

n. <u>Immediate Post-Operative Documentation</u>: A post-operative progress note must be written, or directly entered into the patient's health record, by the surgeon immediately following surgery and before the patient is transferred to the next level of care. The immediate post-operative note must include:

     i) Pre-operative diagnosis,

     ii) Post-operative diagnosis,

     iii) Technical procedures used,

     iv) Surgeons,

     v) Findings,

     vi) Specimens removed, and

     vii) Complications.

     viii) The immediate post-operative note may include other data items; such as: Anesthesia, Drains, Tourniquet Time, or Plan.

o. <u>Post-Operative Documentation</u>: An operative report must be completed by the operating surgeon immediately following surgery. Immediately means upon completion of the operation or procedure, before the patient is transferred to the next level of care. The body of the report needs to contain the: indication for the procedure; operative findings; technical procedure used; specimens removed; post-operative diagnosis; names of the supervising Practitioner, primary surgeon, and assistants; and the presence and/or involvement of the supervising Practitioner.

51

p. Post Anesthesia Care Unit (PACU) Documentation: PACU documentation must include the patient evaluation on admission to, and discharge from, the post-anesthesia care unit, a time-based record of vital signs and level of consciousness (either paper or electronic), all drugs administered and their doses, type and amounts of intravenous fluids administered, including blood and blood products, any unusual events including post-anesthesia or post-procedural complications, and post-anesthesia visits.

q. The health record must document the name of the LIP responsible for the patient's release from the recovery room, or clearly document the discharge criteria used to determine release.

r. For inpatients, there needs to be at least one documented post-anesthesia visit after leaving the post-anesthesia care unit. The note needs to describe the presence or absence of anesthesia-related complications.

s. For outpatients, Ambulatory Surgery personnel (i.e., a nurse) must call the patient after surgery, to assess any complications, including anesthetic complications, as appropriate.

## 7. INFECTION CONTROL *

a. Isolation, standard precautions and reportable cases are outlined in MCM 11-21 Infection Control Program and Plan.

## 8. CONTINUING EDUCATION *

All Medical Staff members shall participate in their own individual programs of continuing medical education (CME) in order to keep themselves informed of pertinent new developments in the diagnostic and therapeutic aspects of patient care, to refresh them in various aspects of their basic education, and to meet requirements for re-licensure. Medical Staff members are responsible to see that their own participation in continuing education programs and conferences both in and outside the Facility are documented and verifiable at the time of reappraisal and re-privileging.

## 9. HEALTH STATUS AND IMPAIRED PROFESSIONAL PROGRAM *

The VHA recognizes its responsibility to assist impaired professionals and collaborate with available programs designed to intervene, monitor, refer to treatment, and advocate for physicians and dentists.

a. Where there is evidence that a Licensed Independent Practitioner's practice is impaired as a consequence of chemical dependence or mental or physical illness, the Chief of Staff's office will be notified. Practitioners are allowed to self-refer to a program for assistance for psychiatric, emotional, or physical problems. Assistance in the self-referral may be obtained from their Service Chief or Chief of Staff.

b. In cases of known or suspected impairment due to mental illness or substance use, the Chief of Staff may request an assessment by the Management of the Impaired Physician, Dentist, Optometrist, Podiatrist, and Licensed Independent Practitioner, see MCM 11-102. In cases of known or suspected impairment due to physical and/or mental illness, the Chief of Staff may request the Director to authorize a Special Physical Examination as authorized VA Handbook 5019, Part II, and applicable hospital policy. The Special Physical Examination will be tailored to the clinical circumstances and may involve a physical examination, imaging studies, neuropsychological testing, or other indicated measures. The fitness for duty examination will be conducted by or under the direction of the Occupational Health Program or outside medical examiner, which will assess the findings and make a recommendation on the Practitioner's fitness for duty based on such findings. If the determination is unfavorable to the Practitioner, or in cases of uncertainty, the findings will be presented to an ad hoc Physical Standards Board.

c. VA and Facility policies, responsibilities and procedures of the Employee Assistance Program and the VA Drug-Free Workplace Program are applicable for physicians, dentists, and other healthcare professionals.

USA1993

    d.  Confidentiality of the Practitioner seeking referral or referred for assistance will be kept, except as limited by law, ethical obligation, or when the safety of a patient is threatened. In all instances, every effort will be made to protect the confidentiality of the individual referred for assistance.

    e.  The hospital will sponsor periodic educational program regarding illness and impairment issues. Licensed independent Practitioners will be issued written information regarding illness issues at the time of initial appointment to the medical staff. Annual education will be provided at scheduled Medical Staff meetings.

## 10. PEER REVIEW *

    a.  All Medical Staff members shall participate in the facility protected peer review program established by the appropriate VHA policy and MCM 11-105, Peer Review Committee.

    b.  All Medical Staff members will complete ongoing required training associated with the associated VHA policy.

## 11. DISCLOSURE

    **a.**  All Medical Staff members shall follow VHA Directive 2008-002, Disclosure Policy and MCM 00QM-14, Disclosure of Adverse Events, to ensure they communicate adverse events openly and timely with their patient and/or the patient's representatives.

Adopted by the Medical Staff, VA Illiana Health Care System, Danville, IL this 15th day of August 2018.

RECOMMEND

_____
Dean Shoucair, D.O, MPH
Chief of Staff

_____
Date  8/24/2018

APPROVED

_____
Kelley Sermak, MSHSA, BSN, RN, CENP
Acting Director

_____
Date  8/29/2018

53

# TAB 66

# Delineation of Clinical Privileges

**Page 1 of 7**   Physician's Name: John Peterson, MD   © DO NOT COPY WITHOUT PERMISSION
Approved November 7, 2017

## DEPARTMENT OF VETERANS AFFAIRS
## VAMC – ILLIANA HEALTH CARE SYSTEM
## DANVILLE, ILLINOIS, 61832

Effective From: _01_ / _18_ / 20 _18_   to   _01_ / _17_ / 20 _20_

**CHRONIC PAIN DELINEATION OF CLINICAL PRIVILEGES**   ○ Initial Request   Renewal ☒

<u>Section I.</u> CHANGES FROM PREVIOUSLY APPROVED CLINICAL PRIVILEGES:

○ I do not currently hold clinical privileges at VAMC – Illiana.

☒ I currently hold clinical privileges at VAMC – Illiana. Privileges requested at this time are identical to privileges previously approved.

○ I currently hold clinical privileges at VAMC – Illiana. Privileges requested at this time are different from privileges previously approved, either in the level of privileges requested, procedural privileges requested, or both.

On the lines below, list all changes, additions, and deletions. Justify all additions on the basis of training and education, experience, and current competence. Briefly explain deletions. Attach supplemental information and additional pages as needed. A listing of your current clinical privileges is attached. For newly requested privileges for which special qualifications have been specified, the applicant must provide evidence of having met those qualifications

Additions:

_____

_____

_____

_____

*Deletions:*

_____

_____

_____

_____

Physician's Name: John Peterson, MD     © DO NOT COPY WITHOUT PERMISSION

Approved November 7, 2017

<u>Section II.</u> CORE CRITERIA FOR APPOINTMENT AND GRANTING OF CLINICAL PRIVILEGES:

1.    A physician appointed to Surgical Service must demonstrate evidence of the following:

2.    Current licensure: Evidence of a current full unrestricted license to practice medicine in any state will be verified by the Medical Staff Office from primary sources at the time of initial appointment and all reappointments.

3.    Relevant training or experience: Completion of an ACGME approved residency training program with board eligibility or certification. Physicians who are board certified are expected to maintain their certifications. Completion of an ACGME accredited fellowship in a specialty, which board eligibility or certification in the specialty, if applicable.

4.    Current competence:

    a.    For new appointments, evidence of current competence consists of recommendations by peers and supervisors, attesting to the applicant's ability to perform satisfactorily the privileges requested.

    b.    For reappointments, the granting of clinical privileges will be contingent upon satisfactory performance in departmental performance improvement activities, satisfactory performance in other monitoring functions such as drug usage or medical record documentation, favorable peer recommendations, and recommendation of your Service Chief.

    c.    Ability to perform privileges requested: The applicant must demonstrate a degree of physical and mental health that permits him or her to perform satisfactorily the privileges requested. The determination will be made by declaration of the applicant and concurrence by a physician designated by or acceptable to VAMC – Illiana, such as the employee health physician or physician supervisor from the individual's previous employment.   When needed, the consultation of other health care professionals will be obtained in the determination of the applicant's physical and mental health. Assessment of the applicant's ability to perform the requested clinical privileges will adhere to all applicable provisions of the Americans with Disabilities Act.

SPECIALTIES:

Request privileges only for those areas in which you have true clinical expertise and are qualified to act as a consultant. Acceptable evidence of expertise includes board certification or board eligibility by the American Board of Internal Medicine and / or the American Boar of Addiction Medicine, with expertise in the subspecialty field documented by board certification or eligible in the subspecialty field; or by documentation of training, skill, and expertise acceptable to the Chief, Surgical Service for advanced consultation in the subspecialty.

For procedural privileges, the applicant must have learned and performed the procedures satisfactorily during formal training (as attested to by the director of the training program); or have performed the procedures satisfactorily under delineated clinical privileges at another institution (as attested to by the chief of the clinical department); or have performed the procedures under delineated clinical privileges at this institution to a level of skill satisfactory to the Chief of the Surgical Service, Specialty Section Chief; or in special circumstances have performed an acceptable number of procedures under supervision; and, when applicable, have performed a sufficient number of the procedures satisfactorily during the biennial reappraisal period to meet Service criteria.

Some subspecialties contain privileges for official interpretations of diagnostic tests. Examples are electrocardiograms, cardiac exercise testing, and pulmonary function tests. All physicians informally interpret diagnostic tests in the course of clinical practice; an "official interpretation" refers to the interpretation of record. For example, only a radiologist with appropriate clinical privileges produces the interpretation of record of a chest radiograph, although many practitioners may view and assess the film.

NOTE: In an EMERGENCY, as a member of the Medical Staff, you are authorized to treat any disease and perform any procedure within the scope of medical licensure. An emergency for these purposes is defined as any situation in which any delay in your administering treatment would result in serious harm to the patient or would constitute an immediate threat to the life of the patient.

**Page 3 of 7**       Physician's Name: John Peterson, MD      © DO NOT COPY WITHOUT PERMISSION

Approved November 7, 2017

I confirm my ability to perform privileges requested in SECTION III including verification that no health problems exist that could affect my practice. I have received a current copy of the Medical Staff Bylaws and agree to remain in compliance and to provide continuous care of my patients.

_____     1/17/18
Applicant Signature                              Date

## SECTION IV:   APPROVAL

### 1. Service Chief
After careful review and consideration of the applicants credentials, clinical competence and health status, I:

O   Recommend approval as requested           O   Recommend disapproval

_____     1/18/18
Service Chief                                        Date

### 2.Chief Geriatrics Service
O   Recommend approval as requested           ⊗   Recommend disapproval

_____     1/18/19
Chief, Geriatrics Service                           Date

### 3. Executive Committee of the Medical Staff (ECMS)
O   Recommend approval of Service Chief recommendation           O   Recommend disapproval

_____     1/18-2018
Chair, ECMS                                        Date

### 4. Clinical Executive Board (CEB)
O   Recommend approval of ECMS recommendation           O   Recommend disapproval

_____     1/18/2019
Chair, CEB                                        Date

### 5. ACTION BY APPROVING AUTHORITY (Director)
O   Approve clinical privileges as recommended by the executive           O   Disapproved
committee of the medical staff, and the Clinical Executive Board.

_____     1-18-2018
Director                                        Date

Page 4 of 7          Physician's Name: John Peterson, MD      © DO NOT COPY WITHOUT PERMISSION

Approved November 7, 2017

## SECTION III.  REQUEST FOR CLINICAL PRIVILEGES:

**Pain Management and Addiction Medicine Core Privileges:**   I request clinical privileges for consultation, evaluation, perform history and physical examinations, interpret diagnostic tests, pre-operative and post-operative care of patients, procedures, or non-surgical management to correct or treat various conditions   If qualified by current training as specified in the relevant MCM,   privileges include conscious sedation.

**Pain Management and Addiction Medicine Core Privileges TeleHealth Privileges:**   Any privileges granted for "Core Privileges" or "Requested Privileges" include the privilege to provide the same care by using clinical video with the patient and provider, each in a different location.

**Pain Management and Addiction Medicine Core Privileges Requested Privileges:**   I request additional clinical privileges for the following procedures. I am qualified by training, experience and current competence.

**PRIVILEGES ARE LIMITED TO AMBULATORY BASIC LEVEL PROCEDURES AS LISTED IN THE CURRENT SURGICAL COMPLEXITY MATRIX CPT CODE LIST.**

**THE PROVIDER IS RESPONSIBLE FOR LIMITING THE LEVEL OF PROCEDURE SCHEDULED.**

**LOCATION OF THIS LIST:**   https://vaww.nso1.med.va.gov/vasqip/CPTLookup.aspx

Instructions:   apply for additional privileges by placing a mark [ ✔ ] in each of the seven requested locations for each procedure requested.

| CPT | PROCEDURE | Inpatient/Hospital | Outpatient Clinic | CBOC | CLC | PRRTP | OR / PACU / ENDOSCOPY | Urgent Care | HBPC | APPROVED BY: |
|---|---|---|---|---|---|---|---|---|---|---|
| | Core Privileges as defined above, if selected apply to all locations | X | X | X | X | X | | X | | ✓ |
| | **Integumentary System** | | | | | | | | | |
| | **Skin and Subcutaneous Structures** | | | | | | | | | |
| | **Biopsy** | | | | | | | | | |
| 11100 et al. | Perform and interpret skin biopsy | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |

Physician's Name: John Peterson, MD        © DO NOT COPY WITHOUT PERMISSION

Approved November 7, 2017

| CPT | PROCEDURE | Inpatient/Hospital | Outpatient Clinic | C.B.O.C | C.L.C | PRRTP | OR/PACU/ENDOSCOPY | Urgent Care | H.B.P.C | APPROVED BY |
|---|---|---|---|---|---|---|---|---|---|---|
| | **Musculoskeletal System** | | | | | | | | | |
| | **General** | | | | | | | | | |
| | **Excision** | | | | | | | | | |
| 20200 Thru 20206 | Perform and interpret muscle biopsy | | | | | | | | | |
| | **Introduction or Removal** | | | | | | | | | |
| 20526 Thru 20555 | Injection of trigger points, tendon sheath, with steroid or local anesthetic | | | | | | | | | |
| 20600 Thru 20615 | Aspiration and/or injection of joint, cyst, or bursa | | | | | | | | | |
| | **Nervous System** | | | | | | | | | |
| | **Spine and Spinal Cord** | | | | | | | | | |
| | **Injection, Drainage, Aspiration** | | | | | | | | | |
| 62270 Thru 62272 | Perform and interpret lumbar puncture. | | | | | | | | | |
| | **Excision** | | | | | | | | | |
| 64795 | Perform and interpret nerve biopsy | | | | | | | | | |

Physician's Name: John Peterson, MD    © DO NOT COPY WITHOUT PERMISSION
Approved November 7, 2017

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | **Special Otorhinolaryngologic Services** | | | | | | | | | |
| | **Audiologic Function Test** | | | | | | | | | |
| 92585 et al. | Perform and interpret evoked potential studies | | | | | | | | | |
| | **Neurology and Neuromuscular Procedures** | | | | | | | | | |
| | **Sleep Medicine Testing** | | | | | | | | | |
| 95807 et al. | Perform and interpret sleep studies | | | | | | | | | |
| | **Routine Electroencephalography** | | | | | | | | | |
| 95813 Thru 95829 | Perform and interpret sleep electroencephalogram | | | | | | | | | |
| | **Electromyography** | | | | | | | | | |
| 95860 et al. | Perform and interpret electromyograms | | | | | | | | | |
| | **Nerve Conduction Test** | | | | | | | | | |
| 95905 et al. | Perform and interpret nerve conduction studies | | | | | | | | | |
| | **Autonomic function Tests** | | | | | | | | | |
| 95921 et al. | Perform and interpret autonomic laboratory studies | | | | | | | | | |
| | **Miscellaneous Services** | | | | | | | | | |
| 99075 Thru 99091 | Perform duties of a Medical Review Officer, if selected apply to all locations | | | | | | | | | |

© DO NOT COPY WITHOUT PERMISSION

**BYLAWS:**

I acknowledge that I have been furnished a copy of the current Medical Staff Bylaws, and I hereby agree to abide by them.   I also agree to provide continuous care to patients assigned to me and arrange for the transfer of care as appropriate.

I, ~~John Peterson~~ understand, and acknowledge that, on my separation from service with the Department of Veterans Affairs, whether such separation on my part be voluntary, or as the result of my VA service/appointment not being renewed, and for the purposes of my credentialing and privileging records within the VA, and for the purposes of potential State Licensing Board notification under M-2, Part I, Chapter 34, as well as for potential notification of the National Practitioner Data Bank (NPDB) through an appropriate State Licensing Board, I will have effectively surrendered my clinical privileges to the VA. I understand that my professional obligations can be compromised by financial conflicts of interest; therefore, I will avoid conflicts or seek guidance in their management.

I request approval for the Clinical Privileges indicated on the attached form.

_____                    1/17/18
Signature of Applicant                              Date



**DEPARTMENT OF VETERANS AFFAIRS**
**ILLIANA HEALTH CARE SYSTEM**
**Danville, IL 61832**

I acknowledge that I have been furnished with a copy of the current Medical Staff Bylaws for VA Illiana Health Care System for 2017 and I hereby agree to abide by them.

By signing this, I am also agreeing to provide continuous care to patients assigned to me and arrange for transfer of care as appropriate. I understand that my professional obligations can be compromised by financial conflicts of interest; therefore, I will avoid conflicts or seek guidance in their management.

Print Name: _____John Peterson_____

Signature: _____

Date: ___1/17/18_____

# TAB 67

# Notification of Personnel Action

Standard Form 50
Rev. 7/91
U.S. Office of Personnel Management
FPM Supp. 296-33, Subch. 4

## NOTIFICATION OF PERSONNEL ACTION

| 1. Name (Last, First, Middle) | | 2. Social Security Number | 3. Date of Birth | 4. Effective Date |
|---|---|---|---|---|
| PETERSON, JOHN A | | | | 2/21/2016 |

### FIRST ACTION

| 5-A. Code | 5-B. Nature of Action | 6-A. Code | 6-B. Nature of Action |
|---|---|---|---|
| 170 | EXCEPTED APPOINTMENT | | |
| 5-C. Code | 5-D. Legal Authority | 6-C. Code | 6-D. Legal Authority |
| V8V | 38 U.S.C. 7401(1) | | |
| 5-E. Code | 5-F. Legal Authority | 6-E. Code | 6-F. Legal Authority |
| | | | |

### SECOND ACTION

7. FROM: Position Title and Number

15. TO: Position Title and Number
PHYSICIAN

000000

| 8. Pay Plan | 9. Occ. Code | 10. Grade or Level | 11. Step or Rate | 12. Total Salary | 13. Pay Basis |
|---|---|---|---|---|---|
| | | | | | |

| 16. Pay Plan | 17. Occ. Code | 18. Grade or Level | 19. Step or Rate | 20. Total Salary/Award | 21. Pay Basis |
|---|---|---|---|---|---|
| VM | 0602 | PHYS | 01 | $203,496 | PA |

| 12A. Basic Pay | 12B. Locality Adj. | 12C. Adj. Basic Pay | 12D. Other Pay |
|---|---|---|---|
| | | | |

| 20A. Basic Pay | 20B. Locality Adj. | 20C. Adj. Basic Pay | 20D. Other Pay |
|---|---|---|---|
| $100,957 | $102,539 | $203,496 | $0 |

14. Name and Location of Position's Organization

22. Name and Location of Position's Organization
VA MEDICAL CENTER
PATIENT CARE SVCS SURGICAL SERVICE
DANVILLE IL

### EMPLOYEE DATA

| 23. Veterans Preference | 24. Tenure | 25. Agency Use | 26. Veterans Preference for RIF |
|---|---|---|---|
| 1 — 1 = None  3 = 10-Point/Disability  5 = 10-Point/Other  2 = 5-Point  4 = 10-Point/Compensable  6 = 10-Point/Compensable/30% | 1 — 0 = None  2 = Conditional  1 = Permanent  3 = Indefinite | | YES   X  NO |

| 27. FEGLI | 28. Annuitant Indicator | 29. Pay Rate Determinant |
|---|---|---|
| C0   BASIC LIFE ONLY | 9   NOT APPLICABLE | 0   REGULAR RATE |

| 30. Retirement Plan | 31. Service Comp. Date (Leave) | 32. Work Schedule | 33. Part-Time Hours Per Biweekly Pay Period |
|---|---|---|---|
| KF   FERS FRAE & FICA | 2/21/2016 | F   FULL-TIME | |

### POSITION DATA

| 34. Position Occupied | 35. FLSA Category | 36. Appropriation Code | 37. Bargaining Unit Status |
|---|---|---|---|
| 2 — 1 = Competitive Service  3 = SES General  2 = Excepted Service  4 = SES Career Reserved | E   E = Exempt  N = Nonexempt | 8202.2280 | 1276 |

| 38. Duty Station Code | 39. Duty Station (City – County – State or Overseas Location) |
|---|---|
| 17-2220-183 | DANVILLE IL |

| 40. Agency Data | 41. | 42. | 43. | 44. |
|---|---|---|---|---|
| 550 | | | | |

45. Remarks
ASSIGNMENT: PAIN MANAGEMENT
APPOINTMENT AFFIDAVIT EXECUTED 02-22-2016.
Selected from Merit Promotion Announcement #HI- 15-JHC-1205020-2-BU dated 2/28/15
Board Approved 11/04/15
P & D MARKET PAY IS AUTHORIZED UNDER P. L. 108-445 AND IS BASE PAY FOR RETIREMENT, LIFE INSURANCE, AND
OTHER BENEFITS RELATED TO BASIC PAY.
AMOUNT IN ITEM 20C INCLUDES P&D MARKET PAY OF $102,539.
TOTAL PAY DETERMINED BY P&D PAY TABLE 1
COMPENSATION PANEL APPROVED ON 11/04/2016
AMOUNT IN ITEM 20 INCLUDES P&D MARKET PAY.
FROZEN SERVICE: NONE.
CREDITABLE MILITARY SERVICE:*NONE.
PREVIOUS RETIREMENT COVERAGE: NEVER COVERED.
EMPLOYEE IS AUTOMATICALLY COVERED UNDER FERS-FRAE.
ENTITLED TO ANNUAL LEAVE.
*** REMARKS CONTINUED ON THE NEXT PAGE ***

| 46. Employing Department or Agency | 50. Signature/Authentication and Title of Approving Official |
|---|---|
| DEPARTMENT OF VETERANS AFFAIRS | CONNIE S OHL |
| 47. Agency Code  48. Personnel Office ID  49. Approval Date | CHIEF HUMAN RESOURCES OFFICER |
| VA TA   1224   2/21/2016 | ELECTRONICALLY SIGNED |

5-Part 50-316

2 - OPF Copy - Long-Term Record - DO NOT DESTROY

Editions Prior to 7/91 Are Not Usable After 6/30/93
NSN 7540-01-333-6238
2005

Standard Form 50
Rev. 7/91
U.S. Office of Personnel Management
FPM Supp. 296-33, Subch. 4

## NOTIFICATION OF PERSONNEL ACTION

| 1. Name (Last, First, Middle) PETERSON, JOHN A | 2. Social Security Number | 3. Date of Birth | 4. Effective Date 2/21/2016 |
|---|---|---|---|

### FIRST ACTION

### SECOND ACTION

| 5-A. Code 170 | 5-B. Nature of Action EXCEPTED APPOINTMENT | 6-A. Code | 6-B. Nature of Action |
|---|---|---|---|
| 5-C. Code V8V | 5-D. Legal Authority 38 U.S.C. 7401(1) | 6-C. Code | 6-D. Legal Authority |
| 5-E. Code | 5-F. Legal Authority | 6-E. Code | 6-F. Legal Authority |

| 7. FROM: Position Title and Number | 15. TO: Position Title and Number PHYSICIAN 000000 |
|---|---|

| 8. Pay Plan | 9. Occ. Code | 10. Grade or Level | 11. Step or Rate | 12. Total Salary | 13. Pay Basis | 16. Pay Plan | 17. Occ. Code | 18. Grade or Level | 19. Step or Rate | 20. Total Salary/Award | 21. Pay Basis |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | VM | 0602 | PHYS | 01 | $203,496 | PA |

| 12A. Basic Pay | 12B. Locality Adj. | 12C. Adj. Basic Pay | 12D. Other Pay | 20A. Basic Pay | 20B. Locality Adj. | 20C. Adj. Basic Pay | 20D. Other Pay |
|---|---|---|---|---|---|---|---|
| | | | | $100,957 | $102,539 | $203,496 | $0 |

| 14. Name and Location of Position's Organization | 22. Name and Location of Position's Organization VA MEDICAL CENTER PATIENT CARE SVCS SURGICAL SERVICE DANVILLE IL |
|---|---|

### EMPLOYEE DATA

| 23. Veterans Preference 1 | 24. Tenure 1 | 25. Agency Use | 26. Veterans Preference for RIF YES X NO |
|---|---|---|---|

1 - None  3 - 10-Point/Disability  5 - 10-Point/Other
2 - 5-Point  4 - 10-Point/Compensable  6 - 10-Point/Compensable/30%

24. Tenure: 0 - None  2 - Conditional  1 - Permanent  3 - Indefinite

| 27. FEGLI C0 BASIC LIFE ONLY | 28. Annuitant Indicator 9 NOT APPLICABLE | 29. Pay Rate Determinant 0 REGULAR RATE |
|---|---|---|

| 30. Retirement Plan KF FERS FRAE & FICA | 31. Service Comp. Date (Leave) 2/21/2016 | 32. Work Schedule F FULL-TIME | 33. Part-Time Hours Per Biweekly Pay Period |
|---|---|---|---|

### POSITION DATA

| 34. Position Occupied 2 | 35. FLSA Category E | 36. Appropriation Code 8202.2280 | 37. Bargaining Unit Status 1276 |
|---|---|---|---|

1 - Competitive Service  3 - SES General
2 - Excepted Service  4 - SES Career Reserved

35. FLSA Category: E - Exempt  N - Nonexempt

| 38. Duty Station Code 17-2220-183 | 39. Duty Station (City - County - State or Overseas Location) DANVILLE IL |
|---|---|

| 40. Agency Data 550 | 41. | 42. | 43. | 44. |
|---|---|---|---|---|

45. Remarks
*** REMARKS CONTINUED ***
CONTINUED EMPLOYMENT IN THIS POSITION IS CONDITIONED UPON FAVORABLE ADJUDICATION OF APPLICABLE BACKGROUND
INVESTIGATION OR NATIONAL AGENCY CHECK WITH WRITTEN INQUIRIES (NACI)
SUBJECT TO COMPLETION OF 2 YEAR PROBATIONARY PERIOD COMMENCING *00-00-0000.

| 46. Employing Department or Agency DEPARTMENT OF VETERANS AFFAIRS | 50. Signature/Authentication and Title of Approving Official CONNIE S OHL CHIEF HUMAN RESOURCES OFFICER ELECTRONICALLY SIGNED |
|---|---|
| 47. Agency Code VA TA | 48. Personnel Office ID 1224 | 49. Approval Date 2/21/2016 | |

5-Part 50-316

Editions Prior to 7/91 Are Not Usable After 6/30/93
NSN 7540-01-333-2496

USA2006

1

1          DISCIPLINARY APPEALS BOARD HEARING
              VA ILLIANA HEALTH CARE SYSTEMS
2

3

4

5

6
              IN RE: JOHN PETERSON, M.D.
7                  June 2, 2021
                     9:00 a.m.
8

9

10

11          BE IT HEREBY CERTIFIED AND REMEMBERED
     that the Disciplinary Appeals Board Hearing convened on
12   June 2, 2021, at the VA Illiana Health Care System,
     Building 102, Room 126, 1900 E. Main Street, Danville,
13   Illinois.

14

15

16

17

18

19
          Becky L. Jessup:  CSR # 084-004343
20

21      Area Wide Reporting and Video Conferencing

22        Champaign, Illinois  61820
                (800) 747-6789
23

24

2

```
 1                        CONTENTS

 2                                                Page

 3

 4   VASANTHAN NAIDU, M.D.
     Direct Examination by Mr. Morgan              13
 5   Cross-examination by Mr. Vargas               21
     Redirect Examination by Mr. Morgan            23
 6

 7   BROOKE HECKERSON
     Direct Examination by Mr. Morgan              26
 8   Cross-examination by Mr. Vargas               52

 9
     DOROTHY HOLZUM
10   Direct Examination by Mr. Morgan              60
     Cross-examination by Mr. Vargas               67
11

12   ARAM MARDIAN, M.D. (via WebEx)
     Direct Examination by Mr. Morgan              73
13   Cross-examination by Mr. Vargas               93
     Examination by The Board                      99
14

15   JOHN PETERSON, M.D.
     Direct Examination by Mr. Vargas             107
16   Examination by The Board                     125

17

18

19

20

21

22

23

24
```

3

1                    MR. HAQ:  Good morning, everyone.  I am

2    Dr. Ehtsham Haq, the Chairman of this Disciplinary

3    Appeals Board meeting in the matter of Dr. John

4    Peterson.  This hearing is being conducted virtually

5    using WebEx.

6                    I declare the meeting open at 9:10 a.m. on

7    June 2, 2021.  Let the record show that the following

8    people are present:  Dr. Sara Trigero, Board member;

9    Dr. Pamela Grich, Board secretary; Patricia Miller,

10   Board technical advisor; Mr. Tim Morgan, Agency

11   representative; Anne-Maree Holden, Agency technical

12   advisor; George Vargas, Appellant's representative;

13   Dr. John Peterson, Appellant; and Mrs. Becky Jessup,

14   court reporter.  I apologize for my accent if I am not

15   reading the names correctly.

16                    This hearing has been convened at the request

17   of Dr. Peterson in connection with his removal and

18   revocation of clinical privileges.  In exercising its

19   authority outlined in the VA Handbook 5021, Part V,

20   Chapter 1, the Board has called this hearing in

21   connection with the removal and revocation of clinical

22   privileges of Dr. John Peterson.  This Board was duly

23   appointed pursuant to Title 38 and VA Handbook 5021,

24   Part V, Chapter 1.

4

1          This Board is not a court of law.  Its

2     members are not judges or attorneys.  It is the

3     function of this Board to review and consider evidence

4     and arguments relevant to the charge or charges.  This

5     Board will make a written decision on the evidence of

6     record.

7          This hearing will be conducted with the

8     decorum and in accordance with those procedures

9     described in Title 38 and VA Handbook 5021, Part V,

10    Chapter 1.

11         As chairman I will reside over the hearing

12    and rule on any questions raised concerning procedure

13    and admissibility of evidence.  This Board may engage

14    in a closed session to discuss rulings at the request

15    of any member.

16         When I say closed session, that means we will

17    request all of you to mute or we have to mute and go on

18    a different call.  When the Board goes on the on the

19    record, it will briefly summarize the issue and

20    announce our decision.

21         Except during closed sessions, counsel for

22    Dr. Peterson and Management may be present throughout

23    the hearing.  Both sides have the right to present

24    witnesses who have relevant testimony.

5

1          Each side will be given the right to

2    cross-examine witnesses introduced by the other side.

3    I may exercise my right to limit unduly repetitious

4    testimony once a point or issue appears to have been

5    sufficiently established.

6          Witnesses will be treated with courtesy.

7    This Board will not tolerate harassment or

8    intimidation.  This is a public hearing unless it is

9    moved to close it and the Board finds the motion to be

10   soundly based.  Witnesses who are scheduled to testify

11   will be sequestered prior to their testimony.

12         It is the responsibility of this Board to

13   rule on each charge and each specification, if any.  It

14   is also the responsibility of this Board to rule on the

15   action imposed.  The Board has not reached a conclusion

16   on either of these matters and will not do so until the

17   record is closed.

18         A verbatim transcript of this hearing will be

19   prepared by the court reporter, Mrs. Becky Jessup.  And

20   the final transcripts are the approved official record

21   of this hearing.  We may go off the record for informal

22   discussions and for closed sessions as appropriate.

23         Management has the burden of proof and will

24   go first.  The Board may ask questions of any witness

6

1    after the completion of cross-examination.  Redirect

2    and recross will also be permitted.

3            It is hoped that we can dispose of

4    questioning each witness without the necessity of

5    recall.  Then, Mr. Vargas, on behalf of Dr. Peterson,

6    you may call witnesses that you believe support your

7    position.  And my understanding is you have withdrawn

8    your expert witness.

9            Your witnesses will be under questioning in

10   the same manner as I have previously described.  Are

11   there any questions concerning the conduct of this

12   hearing?

13           MR. MORGAN:  Not from the Agency, Your Honor.

14           MR. VARGAS:  No.

15           MR. HAQ:  I didn't hear, sorry.

16           MR. MORGAN:  No questions from the Agency.

17           MR. HAQ:  Thank you.  Mr. Vargas?

18           MR. VARGAS:  None from Dr. Peterson.

19           MR. HAQ:  The Board has made a determination

20   in accordance with Title 38, that the case is properly

21   before it.  This determination is based on Exhibit B-2

22   (appeal package) and the SF-50 of Dr. Peterson's

23   accepted service appointment on February 21, 2016,

24   found at Tab 67 in the evidence file.

7

1           The evidence is deemed to be a part of the

2   record.  These exhibits show that Dr. Peterson was a

3   full-time permanent appointee under Title 38 U.S.C.

4   Section 7401, and based on his dates of employment

5   there is a presumption that Dr. Peterson successfully

6   completed his probationary period.

7           These exhibits also show that a major adverse

8   action was taken and the charges arose out of or

9   included questions of professional conduct and

10  competence.  This Board also finds that the appeal was

11  filed timely and properly served.

12          I will now ask the Board's technical advisor

13  to read into the record the listing of exhibits

14  currently in evidence with the corresponding

15  alpha/numeric labels.

16          MS. MILLER:  Good morning.  Exhibit M-1 is

17  Management's evidence file.  And as of 7:00 p.m. or so

18  Central Time last night, the Appellant Exhibit A-9, the

19  termination response, addendum and Appellant's A-10 VA

20  termination response, those were received by the Board

21  with a copy to Attorney Morgan yesterday evening and

22  those have not necessarily been accepted into the

23  hearing as exhibits yet because they haven't been

24  discussed.

8

 1          MR. HAQ:  Do you want to say anything about

 2     your email that you sent yesterday?

 3          MR. MORGAN:  Dr. Haq, the Agency objects to

 4     the documents received yesterday by Dr. Peterson being

 5     that the close of record for submissions to the

 6     proposed removal has long passed.

 7          Clearly the documents that are I believe 150

 8     some pages document, it is too late to be submitted to

 9     the Board for consideration.

10          Furthermore, it was received by the Agency at

11     approximately 3 or 4 o'clock yesterday.  It was

12     documents, much of it just testimony that Dr. Peterson

13     could present at hearing if he wants, but for

14     documentation purposes, evidentiary purposes it is

15     totally inappropriate to submit at such a late date.

16          The Agency, myself, I am sorry, in

17     preparation of this case did not have time to wade

18     through the 153 pages.  It was too late in preparation

19     of the hearing and too late for the Board to consider.

20     So the Agency strongly objects to the submission and

21     requests it not be considered by the Board.

22          MR. HAQ:  Thank you, Mr. Morgan.  Mr. Vargas?

23          MR. VARGAS:  Hi, Dr. Haq.  It is my client's

24     right to defend himself.  He will testify.  He will

9

```
 1    subject himself to any cross-examination by the Board

 2    and by Mr. Morgan.

 3         If the Agency has such a big deal with us

 4    submitting a document, that is fine.  Dr. Peterson -- I

 5    would ask that you allow it, No. 1, but if you don't we

 6    will address each and every allegation that the Agency

 7    has brought up against my client if it means that my

 8    client when he testifies reads off of that.

 9         So either which way, we are going to discuss

10    that.  So I thought for background and context it would

11    be easier for the Board to digest, but there is nothing

12    that prevents my client from talking about each and

13    every one of those 155 pages.  If we are here until

14    Friday, we are here until Friday.

15         MR. HAQ:  Thank you, Mr. Vargas and Mr.

16    Morgan.  Thank you.  The Board will make a decision

17    today at some point about this document of 154 pages.

18    However, Mr. Vargas, you should present your testimony.

19         You should include everything, what you want

20    to say during the hearing.  So the decision will come

21    later.  Thank you.

22         MR. VARGAS:  Thank you.

23         MR. HAQ:  I will now ask the Board's

24    technical advisor to read into the record the listing
```

1   of exhibits with the corresponding alphanumeric --

2   unless Dr. Peterson requests to have the charges read,

3   we will proceed with the opening statements.

4          MR. VARGAS:  I am sorry, Doctor, did you say

5   if we want the charges read?

6          MR. HAQ:  Yes, sir.  If you want or want us

7   to proceed.

8          MR. VARGAS:  We can proceed, sir.  We don't

9   need the charges read.

10         MR. VARGAS:  All right.  Mr. Morgan, do you

11  wish to make an opening statement?

12         MR. MORGAN:  Just a short opening statement,

13  Dr. Haq.  Doctor, I have done dozens and dozens of DABs

14  across the country.  This could be the most thoroughly

15  analyzed by the Agency and DAB with the most documented

16  failure of the standard of care for a practicing

17  physician that I have seen in my tenure with the

18  federal government.

19         Dr. Peterson's absolute failure to practice

20  properly and follow the standard of care in his

21  treatment of patients is totally unacceptable.  And has

22  resulted what raised this issue was his treatment of a

23  patient that subsequently died when he was high on

24  drugs in a motor vehicle accident.

1           This has been flushed out by the Agency

2    thoroughly as the Board notes this, the FPPE lasted

3    nine months because of the facts it was thoroughly done

4    by numerous parties and was done -- Brooke Heckerson

5    will testify and go through in detail, but the Agency

6    is extremely satisfied with the presentation of the

7    evidence filed to the Board and in the action taken in

8    removing the privileges of Dr. Peterson and subsequent

9    removal from the Agency.  Thank you, Doctor.

10           MR. HAQ:  Thank you, Mr. Morgan.  Mr. Vargas,

11    do you wish to make an opening statement?

12           MR. VARGAS:  Just briefly, Doctor.  As I have

13    no doubt how experienced Mr. Morgan in these affairs, I

14    would respectfully remind the Board that it is up to

15    you to determine whether or not my client has failed to

16    meet the standard of care that he has provided, that he

17    is required to provide to patients, not in what Mr.

18    Morgan feels the investigation has revealed.  It is for

19    you to determine that.

20           So I kindly remind you once again the burden

21    is on Mr. Morgan and the Agency, not my client.  And I

22    am confident once you -- once you have heard my client

23    address each and every one of the allegations, you will

24    find that the Agency has not met its burden.  Thank

1  you.

2          MR. HAQ:  Thank you.  Mr. Morgan, would you

3  like to call your first witness Dr. Vasanthan Naidu?

4          MR. MORGAN:  Yes, Doctor.

5          MR. HAQ:  We are off the record.

6          (Discussion held off the record.)

7          MR. HAQ:  We will resume our hearing again.

8  Agency has called its first witness.  Dr. Naidu, you

9  have been called as a witness to testify in this

10  hearing convened by this Board in connection with

11  Dr. John Peterson.

12          You must testify freely and honestly.  You

13  will not be subject to restraint, interference,

14  recrimination or reprisal in presenting any testimony

15  you may give.

16          Please answer the questions audibly,

17  especially because we are virtual.  If you do not, the

18  transcript will not show how you answered.  If you do

19  not understand or have not heard the question asked,

20  request to have it repeated or restated.

21          If you answer the question, we will conclude

22  that you understood the question.  Please raise your

23  right hand to take the oath.

24

13

```
 1                    VASANTHAN NAIDU, M.D.,
 2    the witness herein, having been first duly sworn to
 3    tell the truth, the whole truth and nothing but the
 4    truth, was examined and testified as follows:
 5
 6    BY MR. HAQ:
 7        Q.   Please state your full name, title and
 8    placement of employment for the record.
 9        A.   My name is Vasanthan Naidu, M. D.  I am the
10    chief officer for specialty medicine at Illiana VA
11    Health Care System.
12             MR. HAQ:  Thank you.  Agency may proceed now.
13
14    DIRECT EXAMINATION,
15             QUESTIONS BY MR. MORGAN:
16        Q.   Doctor, can you talk a little bit of
17    background, your educational background?
18        A.   I received an M. D. from the University of
19    Illinois in Urbana and completed my residency at Carle
20    Foundation Hospital in Urbana as well.
21             And I am board certified in family medicine
22    and I have practiced mainly as an emergency
23    medicine/urgent care provider within the VA
24    environment.
```

14

1      Q.   Employment wise then once you have done

2  education, your first employment?

3      A.   My first employment was at Christie Clinic.

4  It was brief for a period of one and a half years at

5  which point I decided to come on board within the VA.

6  I worked as a contractor for the VA for a number of

7  years before assuming a full-time position here.

8           Prior after I was here for about 6 to

9  7 years, I took on a position as associate chief of

10  staff in Fort Wayne, Indiana VA and then returned here

11  in July of 2020 as chief officer for specialty

12  medicine.

13           MR. HAQ:  Excuse me.  Doctor, we can here you

14  very clearly, there is no problem.  Mr. Morgan, I think

15  when you speak, the mike is not in front of you or in

16  the right direction.  We can't hear your questions. The

17  Board can't hear the questions.  I am not sure what is

18  the reason, but Dr. Naidu, we can here you very clear.

19           MR. MORGAN:  Very good, Doctor.  Thank you.

20           MR. HAQ:  If you can talk loudly or maybe in

21  the direction of the mike.  We need to make sure we can

22  hear you clear.  Thank you.  So you may proceed.

23  BY MR. MORGAN:

24      Q.   So you stated that you came on board in July?

15

1     A.    That is correct.  July of 2020.

2     Q.    In the capacity you are presently in now?

3     A.    That is correct.

4     Q.    So you have been with the VA for a lengthy

5  period of time?

6     A.    Yes.  For about a decade.

7     Q.    So you know operating procedures for Title 38

8  employees, correct?

9     A.    That is correct.

10     Q.    When you were in Fort Wayne, were you a

11  supervisor?

12     A.    Yes, I was.

13     Q.    And you came here and you are still a

14  supervisor?

15     A.    That is correct.

16     Q.    And you came here July 21, 2020.  And in that

17  period of time did you meet Dr. Peterson?

18     A.    I met Dr. Peterson when, you know, in my

19  administrative capacity, you know, some of the events

20  with Dr. Peterson had preceded me and so but because I

21  was the supervisor, I did get to meet Dr. Peterson to

22  issue different actions as determined by the Board.

23     Q.    Now drawing your attention to what you have in

24  front of you, Doctor, the evidence file before the

1   Board and we are talking Tab --

2           MR. HAQ:  Excuse me.  If you can say the tab

3   number?

4           MR. MORGAN:  Tab 6 of the Management's

5   evidence file.

6           MR. HAQ:  Page number?

7           MR. MORGAN:  Page No. 45.

8           MR. HAQ:  We have Pages 43.  I'm not sure we

9   are reading the same pages.

10          MR. MORGAN:  Is that the Clinical Executive

11  Board Credentialing Committee, Tab 6, of management

12  file?

13          MR. HAQ:  All right.  Thank you.  You may

14  proceed.

15  BY MR. MORGAN:

16      Q.   Doctor, could you explain to the Board what

17  this document is?  Well, first of all, have you seen

18  this document before?

19      A.   I have.

20      Q.   What is this document?

21      A.   This is the Clinical Executive Board and

22  Credentials Committee meeting that was held on

23  September 17 of 2020.

24      Q.   Were you at that meeting?

17

1        A.    Yes, I was.

2        Q.    And what did you do at that meeting?  What was

3    your participation, if any?

4        A.    My participation was as a member of the

5    Clinical Executive Board, I presented the evidence file

6    that is summarized here.  And Dr. Peterson was on

7    summary suspension.

8              And the circumstances that are outlined in

9    the paragraph you will note was presented by Dr. Gerson

10   Teran, the acting chief of staff at the time.  And the

11   recommendation above, in front of the Board was to

12   either restrict, reduce or revoke Dr. Peterson's

13   privileges.

14             And the Board took the action unanimously to

15   revoke Dr. Peterson's privileges because of the 27

16   charts that were sent for review, Dr. Peterson had a

17   78 percent error rate.  And this brought up the issue

18   of safe practice and potential harm to patients.

19       Q.    So there was a vote taken by the CEB members?

20       A.    Yes.

21       Q.    And there was a determination to revoke

22   privileges?

23       A.    That is correct.

24       Q.    And was that vote approved by the chief of

1   staff and the director?

2       A.   Yes, it was.

3       Q.   And drawing your attention to Tab 4 of the

4   evidence file, it is our Page 31.  Okay.  Have you

5   seen that document before?

6       A.   Yes, I have.

7            MR. MORGAN:  Doctor, do you have the document

8   in front of you?

9            MR. HAQ:  We have it in front.  Thank you.

10  BY MR. MORGAN:

11      Q.   What does that document purport to be?

12      A.   It is the proposal for removal and revocation

13  of clinical privileges for the charges that are

14  specified in the document through Page 33.

15           And then following that is the subsequent

16  charge of failure to follow instruction while on

17  summary suspension.  And secondary to that I issued

18  this proposal for removal to Dr. Peterson.

19      Q.   The failure to follow instructions, Doctor,

20  could you explain to the Board a little bit about that?

21      A.   This is his outline by staff members.  So

22  while Dr. Peterson was on summary suspension, part of

23  the requirement was that he not interact with his

24  patients and he was reassigned duties to provide

19

1    screening efforts at one of our front entrances for

2    Covid for anybody who might walk through the area,

3    staff and employees and patients as well.

4              And during one particular date and the

5    circumstances are outlined in a different tab,

6    Dr. Peterson did interact with the patient and gave

7    clinical advice.

8              This was reported through the pharmacy chain

9    of command and directed also to Dr. Shoucair who is the

10   chief of staff and Brooke Heckerson, his health systems

11   specialist, and that was documented.  So that was the

12   failure to follow instructions in interacting with a

13   patient and providing clinical guidance.

14        Q.   Doctor, drawing your attention to Tab 2.

15             MR. HAQ:  What is the page number?

16             MR. MORGAN:  Page number starts at Page 10.

17             MR. HAQ:  Thank you.

18        A.   I see that.

19   BY MR. MORGAN:

20        Q.   Have you seen this document before?

21        A.   Yes, I have.

22        Q.   Who executed this document?

23        A.   This document was executed by our director at

24   the time who has left VA service within the last few

20

1   weeks and this was essentially removal and revocation

2   of privileges.

3       Q.   So the director concurred with your proposed

4   action?

5       A.   He did.  He concurred with the action

6   recommended by the Clinical Executive Board.  And which

7   was forwarded to him.

8       Q.   And did he concur with both of the charges

9   that were in your proposed removal there?

10      A.   Yes, he did.

11      Q.   And as a result of this document, Dr. Peterson

12  was removed from the VA services; is that correct?

13      A.   That is correct.

14      Q.   Okay, Doctor.  You testified Dr. Bransky is no

15  longer in the government system; is that correct?

16      A.   That is correct.

17      Q.   So he is no longer under the VA jurisdiction?

18      A.   No.  He is in the private sector.

19           MR. MORGAN: Thank you very much.  I have no

20  further questions.

21           MR. HAQ:  Mr. Vargas?

22           MR. VARGAS:  Thank you.

23

24

1    CROSS-EXAMINATION,

2         QUESTIONS BY MR. VARGAS:

3         Q.   Dr. Naidu, I just want to clarify.  You never

4    physically had direct supervision over Dr. Peterson,

5    correct?

6         A.   No.  Not at that time.  He was already under

7    summary suspension.

8         Q.   Okay.  Doctor, do you have chronic pain

9    management certification?

10        A.   No, I do not.

11        Q.   You talked about a September 2020 Clinical

12   Executive Board, correct?

13        A.   That is correct.

14        Q.   Would you please tell us who was -- who were

15   the members that comprised that Board?

16        A.   On Tab 6 I believe.

17             MR. HAQ:  Page number?

18        A.   Page number is 4.  The members were Dr. Gerson

19   Teran, Dr. Agustin Bello, Marie DeWitt, Jacob Froerer,

20   Dorothy Kurylo who was not present at the time, was

21   excused, myself, Dr. Tarun Patel, and Dr. Bob Pretto.

22   BY MR. VARGAS:

23        Q.   Thank you, Doctor.  And, Doctor, out of all of

24   these members of the CEB, can you tell us how many of

1   those members have chronic pain management

2   certification do you know?

3        A.   To my knowledge, none of them.

4        Q.   None of them?

5        A.   Yes.

6        Q.   Okay.  Doctor, last question.  Mr. Morgan

7   asked you about the proposal, proposed removal and

8   revocation of clinical privileges that you served on

9   Dr. Peterson.  Do you remember that?

10       A.   That is correct.

11       Q.   Isn't it true that when you gave that to

12  Dr. Peterson, one of the sections specifically outlines

13  right to review evidence?  Do you recall that?

14       A.   I believe I have seen that language there.

15       Q.   And would you agree with me that in that

16  section it specifically states that Dr. Peterson is

17  allowed 8 hours of paid time to review the evidence.

18  Are you aware of that?

19       A.   I don't recall that currently.

20       Q.   But would you agree with me that that would be

21  in that proposal or would you like to look?  Mr. Morgan

22  just referenced --

23       A.   If it is in the language there, then I agree

24  with that.

1      Q.   Do you know if Dr. Peterson was afforded that

2   time?  Do you have any knowledge?

3      A.   Not to my recollection.  That would have been

4   done administratively.

5           MR. VARGAS: Thank you.  I have no further

6   questions for the doctor.  Thank you.

7           MR. HAQ:  Thank you.  Mr. Morgan, any further

8   questions?

9           MR. MORGAN:  I do have one more question.

10

11   REDIRECT EXAMINATION,

12        QUESTIONS BY MR. MORGAN:

13      Q.   You were asked regarding you don't have pain

14   management experience, chronic pain management?

15      A.   That is correct.

16      Q.   And no CEB members do?

17      A.   Yes, probably.

18      Q.   But you supervised Dr. Peterson, don't you?

19      A.   Administratively.  But when I came on board,

20   he was already under summary suspension so I had no

21   clinical oversight over Dr. Peterson, but in cases

22   where there is a specialist for whom there needs to be

23   clinical oversight or review, we usually send these

24   reviews to a board certified pain specialist within the

24

1    VA system for review of the clinical function and their

2    ability to perform the job.

3            And this is done on a quarterly basis.  And

4    it is, you know, can be sent out within our Visn, our

5    integrated service network, so the region we are in or

6    other regions if we can't find them within our region.

7            MR. MORGAN:  No further questions.

8    BY MR. HAQ:

9        Q.   Thank you.  Do you have any additional

10   pertinent information that is not already of record

11   which you feel is essential in reaching a proper

12   decision in this case?

13       A.   Is this being asked of me?

14       Q.   Yes.

15       A.   Can you repeat that please?  There was a

16   slight freeze.

17       Q.   Sorry.  Do you have any additional pertinent

18   information not already of record that you feel is

19   essential in reaching a proper decision in this case?

20       A.   No, I do not.  I believe I have given

21   everything I have.

22       Q.   I must caution you not to discuss your

23   testimony with anyone outside of this room.  Thank you

24   for coming and you are excused now.

USA2030

25

1      A.    Thank you.

2            MR. HAQ:  Agency can call the second witness,

3      Brooke Heckerson.

4            (Discussion held off the record.)

5            MR. HAQ:  Good morning.

6            THE WITNESS:  Good morning.

7            MR. HAQ:  Mrs. Brooke Heckerson, you have

8      been called as a witness to testify in the hearing

9      convened by this Board in connection with Dr. John

10     Peterson.

11           You must testify freely and honestly.  You

12     will not be subject to restraint, interference

13     recrimination or reprisal in presenting any evidence

14     you may give.

15           Please answer the questions orally.  If you

16     do not, the transcript will not show how you answered.

17     If you do not understand or have not heard the question

18     asked, request to have it repeated or restated.

19           If you answer the question, we will conclude

20     that you understood the question.  Please raise your

21     right hand to take the oath.

22

23

24

26

1                    BROOKE HECKERSON,

2     the witness herein, having been first duly sworn to

3     tell the truth, the whole truth and nothing but the

4     truth, was examined and testified as follows:

5           MR. HAQ:  Please state your full name, title

6     and place of employment for the record.

7           THE WITNESS:  Brooke Marie Heckerson.  I am

8     currently the executive officer for the Visn 5 quality

9     management officer.  My previous role was the health

10    systems specialist to the chief of staff here at

11    Danville.

12          MR. HAQ:  Mr. Morgan, you may proceed.

13

14    DIRECT EXAMINATION,

15       QUESTIONS BY MR. MORGAN:

16       Q.   Brooke, a little background information

17    education wise.  Tell us your education background.

18       A.   I have an associate's degree in applied

19    science.

20          MR. HAQ:  Can everybody hear?  Something

21    happened.  Can any of you hear?

22          MS. MILLER:  I think that when Mr. Morgan

23    turns to face the witness, the microphone no longer

24    picks up his voice.  Even though you are talking to the

1    witness, can you please speak towards the microphone?

2         MR. MORGAN:  Yes.

3         MR. HAQ:  The Board can intervene any time if

4    they cannot hear because sometimes I can't hear.  You

5    are welcome to intervene.  Thank you.

6    BY MR. MORGAN:

7         Q.   Brooke, I am going to repeat that so the Board

8    can hear me now.  Background information, your

9    education.  Could you tell us your education

10   background?

11        A.   So I have an associate's degree in applied

12   science.

13        Q.   Let's talk a little bit about your job

14   history.  And I know you are no longer working at the

15   Danville facility.  But what was your first VA job?

16        A.   So I was what they call a pathway student.

17   Back then it was called a co-op student while I was

18   going to school.  And once I completed my degree, I was

19   hired on permanently as a medical support assistant.

20        MS. GRICH:  I can't hear anything she is

21   saying.

22   BY MR. MORGAN:

23        Q.   Talk loud and look that way.

24        A.   So the first job I had at the Danville VA was

1    a co-op student.  They call them pathway students

2    today.  And upon completion of my degree of associate's

3    degree, I was hired on permanently as a medical support

4    assistant.

5           MR. HAQ:  Thank you.  That was better.

6    BY MR. MORGAN:

7       Q.   You advanced to what position at this

8    facility?

9       A.   So I have had multiple promotions at this

10   facility.  I went on to be the compensation and pension

11   coordinator, the administrative assistant in pharmacy,

12   systems redesign coordinator, the health systems

13   specialist to the associate director for patient care

14   services, the group practice manager and then the

15   health systems specialist to the chief of staff and now

16   I am presently the executive officer in Visn 5.

17      Q.   So when you were the health systems specialist

18   for the chief of staff, you were involved with numerous

19   issues regarding the medical practitioners; is that

20   correct?

21      A.   Correct.

22      Q.   Dr. Peterson, who is Dr. Peterson?  Can you

23   tell us a little bit about your knowledge of

24   Dr. Peterson?

29

1  A. So Dr. Peterson worked under surgical service

2 as the pain management physician.

3  Q. And before the DAB today, there was an issue

4 regarding the CEB revoked the privileges and he was

5 subsequently terminated from the VA services.

6   And I noted that there was a rather lengthy

7 DAB process -- I am sorry, not DAB process -- a lengthy

8 timeline regarding a summary suspension.  Is that

9 correct?

10  A. That is correct.

11  Q. First of all, what brought this summary

12 suspension into play?

13  A. So I did do a timeline of this.  I know it is

14 not part of the evidence file because of the delay in

15 everything.  What brought it to our attention is

16 pharmacy service contacted the risk manager in regards

17 to two patients that were of concern that were on high

18 dose medication prescribed by Dr. Peterson.

19   So when we obtained that information, they

20 asked them to be clinically reviewed to determine if

21 there was any cause for concern.  After those

22 clinicians reviewed the case, they felt it warranted a

23 summary suspension of privileges to determine if there

24 was any further cause of concern.  So the summary

1    suspension of privileges I believe began January 17.

2         Q.    That is correct.  Now do you have a

3    recollection of, you know, the pharmacy concerns?  Was

4    that part of the evidence file that is before the Board

5    today?

6         A.    So 2 patients that were reviewed out of the 27

7    were those concerns.

8         Q.    Could you specify specifically?  Do you have a

9    recollection of what patients were of concern?

10        A.    Yes.  I believe it is Patient C and Patient U.

11        Q.    U, okay.  Patient U was Tab 12 of the evidence

12   file.  Can you bring that to your attention, Tab 12?

13            MR. HAQ:  Page number?

14            MR. MORGAN:  64.

15   BY MR. MORGAN:

16        Q.    Sorry.  That is the medical record.  Can you

17   specifically take a look at Tab 10?  Brooke, have you

18   seen this document before?

19        A.    Yes.

20        Q.    What does that document purport to be?

21        A.    It was the autopsy report that we received

22   from the coroner's office in Clark County.

23        Q.    Regarding Patient U?

24        A.    Yes.

31

1      Q.   And what did this involve?  How did Patient U
2   pass away?
3      A.   My understanding is it was an automobile
4   accident early in the morning.
5      Q.   He was a driver of the vehicle?
6      A.   Yes.  I believe it was, he was the only one
7   involved in the crash.
8      Q.   And he passed away?
9      A.   Yes.
10      Q.   And was there a report done on him?
11      A.   That is the only information we received from
12   the coroner's office.  It was in what is in the
13   evidence file.
14      Q.   Was this report submitted to when you were
15   finally doing, finally had a standard of care review
16   done, administrative review of the file, was that
17   presented to the party that did the review?
18      A.   This was scanned into the patient's medical
19   record so it would have been available as part of the
20   review.
21      Q.   Drawing your attention to Tab 11 which is
22   Page 58, that is the administrative review of Patient
23   U; is that correct?
24      A.   Yes.

32

1          Q.    What does that document tell the Board?

2          A.    This is the form that was used by the reviewer

3    to determine if the standard of care was met or not

4    met.

5          Q.    And what was the conclusion of the reviewer?

6          A.    On Page 61 he indicated the standard of care

7    was not met.

8          Q.    Resulting in the patient's death?  And the

9    reviewer was who?

10         A.    I don't know how to say his name, but

11   Dr. Mardian.

12         Q.    Is that Page 62?

13         A.    Yes.

14         Q.    Before these two issues came up when the

15   pharmacy department brought it to the chief of staff's

16   attention which you were involved in, was there a

17   history with Dr. Peterson with the chief of staff's

18   office?

19         A.    The only issue was not necessarily clinically

20   driven, it was more so productivity.  So there was a

21   concern every year that we had to do an action plan as

22   it relates to the total number of patients seen.  So we

23   had to work on an action plan to increase the volume of

24   work.

1        Q.    Was Dr. Peterson a long term employee?

2        A.    I don't know when he began his career.   I

3   don't feel like he was here that long.   Potentially

4   maybe 3, 4 years if I recall.

5        Q.    But there was a question regarding

6   productivity?

7        A.    Correct.

8        Q.    As a result you formed action plans.   And did

9   Dr. Peterson fulfill the action plans?

10        A.    So the action plans were developed by the

11   service.   They were communicated to Dr. Peterson.   Part

12   of this was I believe on his paper performance.

13            The action plans involved restructuring of

14   clinic and to be able to increase patient volume.   It

15   did slightly increase after those measures were in

16   place.   It wasn't dramatic, but they did increase

17   slightly.

18        Q.    Drawing your attention to the summary

19   suspension.   You previously testified the original

20   summary suspension started in January 17, 2020.   Is

21   that correct?

22        A.    Correct.

23        Q.    And drawing your attention to Tab 54 that is

24   before you which is Page 1613?

34

1          MR. HAQ:  What is the page number?

2          MR. MORGAN:  Sorry.  1814.

3    BY MR. MORGAN:

4       Q.   Is that document before you?

5       A.   Yes.

6          MR. HAQ:  Has everybody got it?  Yes?

7    BY MR. MORGAN:

8       Q.   Again, drawing your attention to Tab 54, but

9    specifically Page 1826 dated January 17 of 2020.  Have

10   you seen that document before, Brooke?

11      A.   Yes.

12      Q.   What does it purport to be?

13      A.   This is a document that is issued when a

14   provider is placed on a summary suspension of

15   privileges.

16      Q.   So this was issued to Dr. Peterson?

17      A.   Yes.

18      Q.   And I notice your name is on there, Brooke

19   Heckerson.  Did you draft this document?

20      A.   Yes.  This is a template that is in the

21   national handbook.

22      Q.   Now drawing your attention also to 1828 of

23   Tab 54, have you seen this document before?

24      A.   Yes.

1        Q.    Did you draft this document?

2        A.    Partial.  This is in coordination with human

3    resources.  This is something that they require and was

4    fulfilled by the service chief.

5        Q.    And what does this document purport to be?

6        A.    It places the employee in administrative

7    status therefore removing any clinical

8    responsibilities, removing patient access to the

9    medical system.

10       Q.    I notice on No. 5 it says you are not to have

11   any further contact with patients during this

12   administrative status; is that correct?

13       A.    Correct.

14       Q.    Does this affect Dr. Peterson's salary?

15       A.    No.

16       Q.    He was at full pay at this time?

17       A.    Yes.

18       Q.    And Dr. Naidu previously testified that he was

19   at the door treating patients for Covid; is that

20   correct?

21       A.    He was not treating patients for Covid.  He

22   was screening patients for Covid.  Not just patients,

23   but visitors.  So anyone who walked in the door

24   received a temperature check and was potentially asked

36

1    questions as it relates to Covid.  So it was more or

2    less the entry point into the facility to protect other

3    people.

4         Q.   And, again, he is a doctor and you could have

5    a GS-4 do the same thing?

6         A.   Correct.

7         Q.   Now, again, this is January 17.  And on

8    summary suspension, what happens next when someone is

9    on summary suspension?

10        A.   What is the next step in the process?

11        Q.   Yes.

12        A.   As far as comprehensive review?

13        Q.   Exactly.

14        A.   So the process is the provider's workload is

15   pulled for a designated time frame and then the cases

16   are randomly selected by the risk manager.

17        Q.   Cases?  What do you mean cases?

18        A.   So the patients that were evaluated by the

19   provider.  So in this case Dr. Peterson, his workload

20   was pulled from a January to January date for an entire

21   year.  The printout was given to the risk manager.

22             She randomly selects the number of cases that

23   are being determined to be reviewed.  At that time it

24   was 15.  It was further re-evaluated later on because

37

1  of the delay of getting the reviews done that they

2  recommended 10 percent.

3          So eventually 27 charts were pulled.  They

4  were randomly selected of which 2 were not.  The 2

5  cases of concern were included in that 27 and they are

6  sent to the Visn.

7          The Visn is then required to find a like

8  provider to conduct the review.  So the only thing that

9  is submitted to the Visn is the protected or

10  nonprotected peer review form, that is to be filled out

11  by the viewer along with the patient name.  And then it

12  is sent off from there.  The Visn coordinates that.

13      Q.   And eventually the Visn completes the review

14  and sends it back?

15      A.   So the Visn completed partial and the reason

16  why was because when they sent it off, they actually

17  did not find an addiction board certified physician so

18  therefore we had to re-evaluate how these charts were

19  going to be sent off to identify a like provider.

20          So only half of them were completed back in

21  February, March time frame.  I know it is in the

22  timelines.  I can give you more specific times if that

23  was available.

24          Because of that they decided to send it off

1   to the third party vendors that they use for risk

2   management which they do nonprotected reviews.  So they

3   sent it off to that company.

4          The reviews came back.  Unfortunately they

5   would not give us the clinician's name who did the

6   review so then those reviews were pointless.

7          Q.   So you are telling the Board that you

8   originally had the Visn do a review and they had a

9   difficulty getting an addiction therapist or an

10  addiction physician to review and so they decided to go

11  with a contractor?

12         A.   Yes.  That is used by the VA system.  And they

13  do do nonprotected peer reviews, however going through

14  that process we were not aware that they would not

15  disclose the provider's name who did the review.

16         Q.   So we would subsequently give the information

17  to Dr. Peterson and Dr. Peterson and his counsel

18  wouldn't know who they were so they couldn't call them

19  as witnesses?

20         A.   Correct.

21         Q.   And the Agency couldn't call them as

22  witnesses?

23         A.   Correct.

24         Q.   So what about Covid?  Was that involved in

39

1   this also?

2       A.   Yes.  So Covid was just hitting as we were

3   sending these off to the third party administrator and

4   also with the Visn review.  And at that time they had

5   sent out guidance from national that OPPE and FPPE

6   chart review were on hold.  You were not required to do

7   them if you wanted to delay them.

8           So therefore every facility that was reached

9   out to in Visn 12 said we don't have to do those, we

10  are not required because of Covid.  So we were finding

11  difficulty in finding someone to actually do the

12  management review.

13          And because of that also the other strain to

14  that was the provider that we ultimately ended up

15  finding to do the review was also covering Covid

16  patients so therefore his review was delayed as a

17  result.

18      Q.   I note by the evidence filed there was

19  multiple extensions of the summary suspension; is that

20  correct?

21      A.   Yes.

22      Q.   And so finally the Visn found somebody in the

23  VA system who was, had similar background as

24  Dr. Peterson; is that correct?

40

1       A.    So the Visn did not.  Our medical director at

2   the time, Mr. Shawn Bransky, who had recently worked at

3   the Phoenix VA knew Dr. Mardian.  So he reached out to

4   him to see if he would be agreeable to conduct the

5   review.

6           We had credentialing verify because he is in

7   the VA system verify he is a like provider and

8   possesses the same certification as Dr. Peterson.  And

9   he was agreeable to conduct a review.

10      Q.    And you finally completed his review; is that

11  correct?

12      A.    Yes.

13      Q.    And from your recollection do you recall what

14  Dr. Mardian reviewed, how many cases?

15      A.    He reviewed 27 cases.

16      Q.    Why 27 cases?

17      A.    So based on the workload of Dr. Peterson there

18  was I believe it is in the credentialing minutes how

19  many patients he saw during that time frame.  So they

20  recommended 10 percent of a review as the sample size.

21          So they randomly -- the risk manager randomly

22  selected 27 cases.  However, I will preface that the

23  two cases were not random.  Those were the ones that

24  were brought to our attention by pharmacy.

41

1     Q.   So you are saying 27 cases reviewed by

2  Dr. Peterson or 10 percent so you are saying 270 cases

3  in what was that, a week or something?

4     A.   A year.  It was an entire year.

5     Q.   Dr. Peterson reviewed 270 cases in one year

6  or --

7     A.   He saw 260 some patients, unique patients,

8  within one year.

9     Q.   Was there a concern about his workload

10  productivity?

11     A.   Yes.

12     Q.   Was there any action taken regarding that?

13     A.   There was.  That was part of the recurring

14  action that the facility receive every year based on

15  specialty productivity and pain management was always

16  the category of underperforming.

17          So therefore the actions that I am aware of

18  that were instilled by the service was modifying the

19  clinic grid to allow more capacity in the clinic,

20  increasing the consult referral volume so that patients

21  were scheduled into the clinic.

22     Q.   As a result of Dr. Mardian's review whose

23  similar qualification background to Dr. Peterson, you

24  said there was a 78 percent?  What was the error ratio?

42

1        A.    21 out of 27 did not meet the standard of care
2    based on his review.
3        Q.    And as a result of that review that is
4    performed, Dr. Peterson, his background, do you know
5    him at all or just --
6        A.    Not personally.  Just from working out here.
7        Q.    Director Bransky at the time knew him and that
8    is how this worked out?
9        A.    I don't know if Mr. Bransky knew Dr. Peterson.
10        Q.    I am sorry.  I misspoke.  Director Bransky
11    knew Dr. Mardian?
12        A.    Correct.  He has worked with him when he was
13    employed at Phoenix.
14        Q.    And Dr. Mardian is a Visn pain coordinator who
15    works in the Phoenix facility; is that correct?
16        A.    I believe he is the chair of a pain committee
17    of such for the Visn.
18        Q.    Drawing your attention to Tab 7 -- pardon me?
19            MR. HAQ:  We are fine.
20    BY MR. MORGAN:
21        Q.    You previously testified there should be no
22    patient contact between --
23        A.    Correct.
24        Q.    -- Dr. Peterson while he is on summary

43

1    suspension?

2         A.    Right.

3         Q.    And you testified that is in Tab 7 in the

4    instructions.  And drawing your attention to Tab 7 is

5    an email written by you and signed off -- and I don't

6    understand.  It is signed off by Dean Shoucair.  Dean

7    Shoucair is who?

8         A.    Chief of staff.

9         Q.    And so signed by him, but you wrote it?

10        A.    Correct.  The day that Dr. Shoucair contacted

11   the patient, his access was taken away because he was

12   going on military deployment so therefore he had no

13   means of documenting the conversation.

14              So I served as the witness while he had the

15   conversation with the patient.  I printed off the email

16   to obtain his signature so in fact you could tell that

17   he can attest to contacting the patient.

18        Q.    And who is this patient?  Could you just tell

19   us?

20        A.    It was brought to our attention by pharmacy

21   service I believe that upon this patient entering the

22   clinic he has ran into Dr. Peterson and had a

23   discussion with him.

24              And they got to talking about his care that

44

1    he was receiving here.  And the information we obtained

2    from the patient is that Dr. Peterson communicated to

3    him that he didn't agree with changing his medication,

4    the methadone to Suboxone, and advised him to go to St.

5    Louis.

6              And then as stated in the report of contact,

7    Dr. Shoucair asked the patient if Dr. Peterson informed

8    him that he would not be able to assist him and he said

9    he didn't tell me he couldn't, but I know that he is no

10   longer in the pain clinic and they have assigned him

11   elsewhere.  So he did acknowledge the fact that he was

12   not working out of the pain clinic.

13        Q.   So this was on what date did he have this

14   contact with this patient?

15        A.   August 25, 2020.

16        Q.   And he was on summary suspension since January

17   of 2020?

18        A.   January 17 of 2020.  Now this is when we

19   completed the report of contact.  I believe it is

20   possibly -- it did happen on August 24 is the

21   interaction between the patient and Dr. Peterson.

22        Q.   So approximately 8 months in summary

23   suspension he had this patient contact?

24        A.   Yes.

45

1       Q.   And this was the patient contact that is part

2   of the proposal removal letter and subsequent removal

3   letter?

4       A.   I believe so.

5       Q.   And you were there during the conversation?

6       A.   Yes.

7       Q.   And during the conversation, the patient

8   acknowledged his contact with Dr. Peterson?

9       A.   Correct.

10      Q.   And acknowledged that Dr. Peterson told him to

11  do certain things regarding his medical treatment?

12      A.   Correct.

13      Q.   And drawing your attention to Tab 8, have you

14  seen this document?

15          MR. HAQ:  What is the page number?

16          MR. MORGAN:  This is Tab 8, Page 49.

17  BY MR. MORGAN:

18      Q.   Have you seen this document?

19      A.   Yes.

20      Q.   And what does this document purport to be?

21      A.   This was communicated to us that there was an

22  interaction between Dr. Peterson and this patient.

23      Q.   Who communicated to you?

24      A.   Ted Commons, the chief of pharmacy.

46

1      Q.   And when you say communicated to us, are you

2  talking to chief of staff's office?

3      A.   Yes.  So it was sent to Dr. Shoucair and

4  myself.

5      Q.   Okay.  And as a result of this, you guys

6  contacted the veteran; is that correct?

7      A.   Correct.

8      Q.   When you talk about two unique cases that were

9  not part of the, that were separate from the random

10  selection, you are talking -- was this one of those

11  cases?

12      A.   No.

13      Q.   This isn't?  Patient B?

14      A.   That was not one of the two that was

15  identified that resulted in the summary suspension of

16  privileges.

17      Q.   And we previously testified that Patient U was

18  one of those?

19      A.   Correct.

20      Q.   Now let's talk a little bit about Tab 6.

21  Page 45.  Have you seen this document before?

22      A.   Yes.

23      Q.   I note your name is there.  You were at this

24  meeting?

47

1          A.    Yes.  I supervised credentialing so therefore

2     I am there as an administrative advisor.  The committee

3     discussed the clinical realm.  They are the deciding

4     body.

5          Q.    You don't vote or anything?

6          A.    No.

7          Q.    You recall this meeting?

8          A.    Yes.

9          Q.    Did this take a little while?

10         A.    If I recall, I believe it was a good 45 to  --

11    45 minutes to an hour discussion.

12         Q.    And I note that there was an, the review of

13    the 27 charts resulted in -- the nonprotected peer

14    review of 27 resulted in a finding of 21 out of 27 did

15    not meet the standard of care and note it is a 78 error

16    ratio?

17         A.    Correct.

18         Q.    And as a result were you there during the

19    voting of the CEB members?

20         A.    Yes.

21         Q.    What did they determine?

22         A.    They unanimously voted to recommend revocation

23    of privileges.

24         Q.    Nobody decided it should be looked into this

48

1   further or anything like that?  There was a unanimous

2   vote?

3       A.   No.

4       Q.   And as a result of that, it was approved by

5   the director?

6       A.   Yes.

7       Q.   And the chief of staff?

8       A.   Yes.  So the credentialing committee is a

9   recommending body and the medical center director is

10  the ultimate approving.

11      Q.   I notice the chief of staff, there was an

12  acting person here?

13      A.   Yes.

14      Q.   Is this because of the fact that your

15  supervisor was on military leave?

16      A.   Yes.

17      Q.   And this acting person is Gerson Teran?

18      A.   (Nodding.)

19      Q.   Drawing your attention to Tab 4.

20           MR. HAQ:  Page?

21           MR. MORGAN:  Page 31.

22  BY MR. MORGAN:

23      Q.   The CEB took place when was that?  What was

24  the date?

49

1      A.    September 17, 2020.

2      Q.    And then I see this letter is dated

3  October 13, 2020.  Is that correct?

4      A.    Yes.

5      Q.    And this is a proposed removal and revocation

6  of clinical privileges?

7      A.    Yes.

8      Q.    Is this based upon the CE -- the Clinical

9  Executive Board's review?

10      A.    Yes.

11      Q.    And determination?

12      A.    Yes.

13      Q.    And the approval by the director?

14      A.    Yes.

15      Q.    But that doesn't remove him from employment so

16  Dr. Peterson is still getting paid?

17      A.    Correct.  This is a proposed removal.

18      Q.    So his privileges were suspended in January

19  17, 2020 and he is still getting paid throughout this

20  process?

21      A.    Correct.

22      Q.    And the charges, Charge 1, failure to provide

23  appropriate medical care, is this regarding the review

24  that you talked about with Dr. Mardian?

50

1      A.   Yes.

2      Q.   And then Charge 2, the failure to follow

3   instructions on Page 34, is that regarding the issue

4   with the patient while he was working at the front door

5   of the facility?

6      A.   Yes.  Under the administrative status.

7      Q.   Okay.  Where he inappropriately advised the

8   patient?

9      A.   Yes.

10      Q.   Okay.  And drawing your attention to Tab 2,

11   Page 10, what does this document purport to be?

12      A.   This is a document prepared by human resources

13   and it is the removal.  It is the decision that is made

14   by the medical center director.

15      Q.   Which was Shawn Bransky?

16      A.   Yes.

17      Q.   Who no longer is the director of this

18   facility?

19      A.   Correct.

20      Q.   He is no longer in the VA system?

21      A.   Correct.

22      Q.   Dr. Naidu testified a little while ago about

23   this document.

24      A.   Okay.

51

1        Q.    And so Director Bransky concurred with

2   Dr. Naidu's proposal and made a determination to remove

3   Dr. Peterson for cause?

4        A.    Yes.

5        Q.    And this effectively terminated his employment

6   with the VA?

7        A.    Based on the date that is indicated in the

8   letter, yes.

9        Q.    So finally after the summary suspension of

10  January 17 to this date, he finally was no longer being

11  paid by the VA for not doing clinical duties?

12       A.    Correct.

13       Q.    You were the point of contact between

14  Dr. Mardian and these reviewers for the Visn between

15  the VA, the Danville facility?

16       A.    For administrative purposes, but when a

17  clinical question arises, Dr. Shoucair was brought in.

18       Q.    But for purposes of saying we need a summary

19  suspension based upon this, they were reviewed and

20  updated regularly?

21       A.    Yes.

22       Q.    This took about ten months?

23       A.    Yes.  Per the handbook he is, the provider is

24  required to receive an update every 30 days.

1          MR. MORGAN: I have no further questions.

2    Thank you very much.

3          MR. HAQ:  Thank you.  Mr. Vargas?

4          MR. VARGAS:  Thank you, sir.

5          MS. GRICH:  Could I ask the witness if she

6    could speak up a little bit more?  As the time went on,

7    it got harder to hear.

8          A.   Yes.

9

10   CROSS-EXAMINATION,

11        QUESTIONS BY MR. VARGAS:

12        Q.   Mrs. Heckerson, you testified about an action

13   plan as there were issues with Dr. Peterson's?

14        A.   Yes.

15        Q.   Who created that?

16        A.   The service.  So it would have been surgical

17   service.

18        Q.   Do you know specifically who drafted that or

19   who went over that with Dr. Peterson?

20        A.   So I believe Dr. Murray had been involved at

21   one point.  Kristi King for sure who worked with

22   whoever the chief of surgery was at the time.  We had

23   some acting so I am trying to recall who that might be.

24        Q.   That is okay.

53

```
 1        A.   Chief of surgery and the administrative
 2   officer.
 3        Q.   Thank you.  And the end result of that is Dr.
 4   Peterson's workload increased, correct?
 5        A.   By a few percentage points.
 6        Q.   Ma'am, if you can help me understand, you were
 7   -- who was actually trying to find a like provider
 8   through the Visn?  Whose responsibility was it to do
 9   that?
10        A.   So it is the Visn risk manager.
11        Q.   Who would that be?
12        A.   Marilyn Outbier (phonetic).
13        Q.   I don't want to put words in your mouth.  They
14   couldn't find somebody; is that correct?
15        A.    They found pain management physicians, but
16   when we received the reviews back, it was determined at
17   that time that some of the cases came back with no
18   decision and indicated an addiction medicine specialist
19   needs to review these cases which prompted the
20   discussion of we need to make sure these are like
21   providers.
22             So she went back out to facilities within
23   Visn 12 to try to find a like provider and we -- not
24   that we necessarily couldn't find one, but they were
```

54

1   not willing to do the review.

2       Q.   Okay.  You also talked about there was an

3   outside Agency third party who conducted reviews?

4       A.   Yes.

5       Q.   Did anybody lay eyeballs on those reviews?

6       A.   Yes.

7       Q.   Who?

8       A.   So the reviews came back to the risk manager

9   who then provided them to me and I provided them to the

10  chief of staff.  We also provided them to legal

11  counsel.

12           However, that is when we discovered that the

13  provider's names were not listed on the form as

14  requested.  So we went back to the Visn to inquire you

15  need to help us out, we need the provider's names for

16  these reviews.  They reached out to the contractor and

17  they said we are not required to provide you those

18  names.

19      Q.   Okay.  So let me make sure I understand.

20  Legal for management put eyeballs on those reviews?

21      A.   Yes.

22      Q.   Those reviews have never been disclosed to us,

23  correct?

24      A.   Correct.  They were not used as part of this.

1      Q.    Correct.  We don't know whether or not those

2    reviews would contradict or support Dr. Mardian's

3    reviews, do we?

4      A.    I do because I know how they came back.  And

5    they would have supported a higher error rate.

6      Q.    Okay.  But once again they were never

7    disclosed to us, correct?

8      A.    Correct.  They were not included.

9      Q.    Now going back to Dr. Bransky, I mean Mr.

10   Bransky, could you explain me on his own was it his job

11   to find somebody?

12     A.    No.  He assisted because he was aware of this

13   provider because of the facility he came from so he

14   said let me reach out and see if he might be willing to

15   do the review because I know that he is the chief of

16   pain and possesses these certifications.  So he reached

17   out to see if he would be willing to conduct the

18   review.

19     Q.    Mrs. Heckerson, I understand this may not be

20   in your specific lane, but you are aware there are

21   several Visns throughout the United States, correct?

22     A.    Correct.

23     Q.    And have you ever heard of a doctor by the

24   name of Dr. Adam Gordon out of Visn 19?

56

1        A.    No.

2        Q.    Are you aware he is a like provider to Dr.

3    Peterson?

4        A.    No.

5        Q.    Did Dr. Bransky say, hey, there is another

6    like provider out of Visn 19?

7        A.    No.  I don't know if he was even aware.

8        Q.    Okay.  Thank you, ma'am.  Going back to the

9    unauthorized contact that Dr. Peterson had with the

10   patient, so who made the decision to put Dr. Peterson

11   at the front desk essentially to do Covid checks?  Do

12   you know who made that decision?

13       A.    So it was the service because they had to

14   assign Dr. Peterson tasks to be complete in order to be

15   gainfully employed since he was not able to perform

16   clinical duties.

17            And each service had to assign their

18   employees to rotate coverage through the, for the

19   screening purposes.  So it wasn't unique for an

20   employee to be stationed there.  Every service had to

21   assign their employees to provide coverage because we

22   had multiple points where folks would enter in the

23   building.

24       Q.    Whether you were an MD or whatever, you are

57

1    going to have to do it?

2         A.    Correct.

3         Q.    And there was never any discussion like, hey,

4    might not want to put him on an entry point where he is

5    going to interact with people?  Nobody ever thought

6    about that?

7         A.    I don't know which entry points particularly,

8    but I believe one of the entry paints was primarily

9    used with employees that were walking through the door.

10   Patients would enter the door as well, but there was

11   that risk.

12        Q.    And, Mrs. Heckerson, not to simplify the

13   interaction, but correct me if I am wrong, essentially

14   what Dr. Peterson did was tell this person you can go

15   to the St. Louis VA, correct?

16        A.    He did not agree -- from what the patient

17   conveyed to us is that Dr. Peterson did not agree with

18   the treatment that he was receiving and that he should

19   go to the St. Louis VA.

20             MR. VARGAS: Okay.  Thank you.   I have no

21   further questions.  Thank you.

22             MR. HAQ:  Mr. Morgan?

23             MR. MORGAN:  No further questions, Doctor.

24

58

1   BY MR. HAQ:

2       Q.   All right.  Mrs. Brooke Heckerson, do you have

3   any additional pertinent information not already of

4   record which you feel is essential in reaching a proper

5   decision in this case?

6       A.   I do not.

7       Q.   I must caution you not to discuss your

8   testimony with anyone outside of this room.  Thank you

9   for coming.  You are excused now.  Thank you.  And we

10  can have a pause now.

11          (Discussion held off the record.)

12          MR. HAQ:  I have to apologize to Lindsey

13  Wilkinson for the technical problem and to --

14          MR. MORGAN:  Dr. Haq, the Agency withdraws

15  Dr. Wilkinson.  The witness is Dr. Holzum.

16          MR. HAQ:  I have to apologize to Dr. Holzum.

17  We have a ruling and please excuse us for a few

18  minutes.  We will call you back.

19          THE WITNESS:  Okay.

20          MR. HAQ:  The Board has a ruling on the

21  request of Mr. Vargas about his email of 154 pages

22  which were submitted last night at 7:30 p.m. and Agency

23  has objected to this document and the Board has decided

24  to deny to accept this as an exhibit.

59

1          We welcome Mr. Vargas to make his case during
2     the hearing and we will hear your testimony, your
3     Appellant's testimony as well.  Thank you.  Now we can
4     call back Dr. Dorothy Holzum.
5          Dr. Dorothy Holzum, you have been called as a
6     witness to testify in this hearing convened by this
7     Board in connection with Dr. John Peterson.  You must
8     testify freely and honestly.
9          You will not be subject to restraint,
10    interference, recrimination or reprisal in presenting
11    any testimony you may give.  Please answer the
12    questions audibly, especially because we are virtual.
13    If you do not, the transcript will not show how you
14    answered.
15          If you do not understand or have not heard
16    the question asked, request to have it repeated or
17    restated.  If you answer the question, we will conclude
18    that you understood the question.  Please raise your
19    right hand to take the oath.
20
21          DOROTHY HOLZUM,
22    the witness herein, having been first duly sworn to
23    tell the truth, the whole truth and nothing but the
24    truth, was examined and testified as follows:

60

1    BY MR. HAQ:

2         Q.   Please state your full name, title and place

3    of employment for the record.

4         A.   Dorothy Nicole Holzum.  Clinical pharmacy

5    specialist and pain management at the VA Illiana Health

6    Care System.

7         Q.   I have to apologize.  Sometimes the volume

8    goes up and down.  We request you to speak as slowly as

9    possible and clearly and towards the mike which is in

10   the center of your room so the Board can hear all of

11   you clearly.

12        A.   Okay.

13        MR. HAQ:  Mr. Morgan, you may proceed.

14

15   DIRECT EXAMINATION,

16        QUESTIONS BY MR. MORGAN:

17        Q.   Dorothy, a little background information

18   education wise?

19        A.   Sure.  I went to St. Louis College of Pharmacy

20   and got my PharmD in 2018.  And then I completed a

21   PGY1, post graduate pharmacy residency at the VA St.

22   Louis Health Care System and then completed a PGY2 in

23   psychiatry pharmacy at the Tuscaloosa VA Medical Center

24   in Tuscaloosa, Alabama.

61

1          And I came on board in August 2020 here at

2    the VA Illiana Health Care System as a pain pharmacist

3    and I sat for the board certified psychiatric

4    pharmacist board certification in October of 2020 and

5    then found out the results that I had passed that in

6    November of 2020.

7          Q.    Sorry, could you repeat?  What was that you --

8          A.    Yeah.  It is for to be a board certified

9    psychiatric pharmacist, anyone who completes a PGY2

10   pharmacy residency in psychiatry can sit for that.

11         Q.    Now you are board certified?

12         A.    Um-hum.

13         Q.    Drawing your attention to the documents in

14   front of you, Tab 8.

15         MR. HAQ:  Page number?

16         MR. MORGAN:  Page number is 50.

17   BY MR. MORGAN:

18         Q.    Dorothy, I see your name is on this document.

19   Can you tell us a little background of what is going on

20   here?

21         A.    Sure.  I had just started my employment here

22   and one of our academic detailing pharmacists had

23   alerted me to a patient case.  And the patient's name

24   is listed here in the documents, but there was needed

62

1    some assistance with the patient case.

2              A little bit of his background.  He was

3    treated with Oxycodone through the VA several years ago

4    and he had some no-shows to some appointments.  And

5    then the PCP at the time decided to taper off of his

6    Oxycodone and decided to diagnose the patient with

7    opioid use disorder.

8              And the patient decided to take his care

9    elsewhere to a non-VA methadone clinic.  And then it

10   became too expensive for the patient and he came back

11   to the VA and then was continued on the methadone per

12   Dr. Peterson.

13             But then when Dr. Peterson left, he got

14   discharged then back to his new PCP here at the VA out

15   at the Mattoon clinic.  And that PCP was a little bit

16   uncomfortable with the high dose of the methadone and

17   she had mentioned to the patient wanting to either

18   taper him off or to switch the Suboxone.

19             And then a couple other providers,

20   psychologist, psychiatry was reaching out to him and

21   the patient wasn't interested at the time.

22             And then when I had given him a call, the

23   patient had mentioned to me that yesterday he went to

24   the VA to pick up his methadone and he had talked to

63

1    Dr. Peterson who disagreed with the decision to either

2    taper or switch to Suboxone.

3        Q.   And did the patient talk to you at all

4    regarding the interaction with Dr. Peterson or just

5    mention the fact that he just talked to him?  What

6    happened?

7        A.   Sure.  With me the patient had just mentioned

8    that he had saw Dr. Peterson doing the temperature

9    checks as he entered into the facility near the urgent

10   care entrance.  And he mentioned that Dr. Peterson

11   disagreed with the current VA provider to taper or

12   switch to Suboxone.

13       Q.   Did the patient say what Dr. Peterson

14   specifically told him that he should do?

15       A.   Um-hum.  It sounds like Dr. Shoucair the chief

16   of staff also called the patient later that day and

17   then the patient had told Dr. Shoucair that Dr.

18   Peterson recommended that he reach out to the St. Louis

19   VA for treatment there.

20       Q.   But the patient didn't tell you that?

21       A.   No.

22       Q.   And but he was upset with what was going on?

23       A.   Um-hum.  Correct.

24       Q.   He told you that I think?

64

1        A.    Yes.

2        Q.    And who are these people that were on your

3   email that you wrote on August 25?

4        A.    Michael Ignatovich at the time was the

5   associate chief of clinical pharmacy services.  So he

6   is my direct supervisor.  And then Ted Commons is the

7   chief of pharmacy who still is the chief of pharmacy

8   here at the facility.  So with my direct supervisor and

9   then Ted being his supervisor, I included them just to

10  keep them updated on the situation.

11       Q.    Did you know at this time that Dr. Peterson

12  was on summary suspension and not supposed to have

13  patient contact?

14       A.    I was given that information.

15       Q.    Were you given that information prior to this

16  incident?  Did you know at the time -- strike that.

17  Did you know at the time of your conversation with the

18  patient that Dr. Peterson was on summary suspension?

19       A.    I didn't know the term summary suspension.  I

20  just knew that this patient case was a very sensitive

21  case and to include my supervisors on specific

22  information with that. I wasn't aware of like the

23  supervisory suspension.

24       Q.    And what happened, if anything, with this

65

1  patient afterwards?

2       A.    So I did email, it is the serve, it is through

3  the Visn 1 Echo SME, subject matter expert, at a

4  facility that is based out in Connecticut through a

5  psychiatrist who is also faculty at Yale and then works

6  at the VA in Connecticut.

7            And she has a team of another psychiatrist as

8  well as a pain pharmacist there.  We did a dual VVC

9  appointment or a video appointment with myself, one of

10  the psychiatrists and then the patient.

11            And we did about a two and a half hour intake

12  appointment to really get a good history of does this

13  patient fit into opioid use disorder or is it more of a

14  chronic pain.

15            She did feel like there was some substance

16  use and opioid use disorder opposed to just chronic

17  pain.  We were working on tapering him at 5-milligrams

18  a month of methadone at first.

19            And once we got down to 130-milligrams, the

20  patient said I just really want off the methadone, it

21  is burdensome for me to come and get my refills or

22  worry they are going to be delayed in the mail.

23            So she had consulted like her other

24  psychiatrists, pharmacists, myself and I and we did a

66

1    micro induction to Suboxone that he was on for about

2    six weeks.  After he had his receptors reset for

3    tolerance, he did go back on morphine at 150-milligram

4    doses a day as opposed to the high dose of methadone.

5        Q.   Very good.  Drawing your attention to Tab 9,

6    the following tab there.

7             MR. HAQ:  I didn't hear the page number.

8             MR. MORGAN:  Tab 9, Page 54.

9    BY MR. MORGAN:

10       Q.   Did you put these notes in here in the medical

11   chart?

12       A.   Not this note on Tab 9.

13       Q.   No?

14       A.   This was from like the RN of the patient

15   primary care seen at the Mattoon clinic.

16       Q.   The veteran refused all options, told this

17   writer that he spoke with Dr. Peterson who had placed

18   him on methadone in the first place and left the VA.

19   And states he saw him at the Danville Urgent Care and

20   told him he should be on it.  Okay.  And this was dated

21   -- what date is this note?

22       A.    I think it is the August 28.  So I think it

23   was Friday of that week when I had spoke to him on

24   Tuesday and then it sounds like the patient talked to

1    Dr. Peterson on that Monday that week.

2         Q.   He states that Dr. Peterson who placed him on

3    the methadone in the first place had left the VA and he

4    saw him and said he should be on it.

5         A.   Um-hum.

6         Q.   Okay.  And then it is further noted by the RN

7    there is no note in the chart of this visit with Dr.

8    Peterson; is that correct?

9         A.   Correct.

10          MR. MORGAN:  I have no further questions,

11   thank you.

12          MR. HAQ:  Thank you.  Mr. Vargas?

13          MR. VARGAS:  Thank you.

14

15   CROSS-EXAMINATION,

16          QUESTIONS BY MR. VARGAS:

17        Q.   Dr. Holzum, you read emails about this.  You

18   had contact with this patient, correct?

19        A.   Sure.

20        Q.   And you just testified about you and other

21   doctors came up with a plan for this patient?

22        A.   Um-hum.

23        Q.   Do you know how well the patient has been

24   answering or how the patient has done since you and

68

1    these other doctors recommended a different course of
2    treatment?
3        A.   Um-hum.  Yeah.  Overall he has been doing
4    well.  Was having some ups and downs, but overall he is
5    happy with not requiring the methadone and even now not
6    requiring the Suboxone that he doesn't have to worry as
7    much with the refills and being able to be treated in
8    primary care.
9        Q.   Okay.  Also there is an email where you
10   indicated that the patient said that Dr. Peterson had
11   put him on methadone.
12            Do you know for a fact if Dr. Peterson had
13   put him on methadone or Dr. Peterson inherited the
14   patient who was already on methadone?  Do you know?
15       A.   Sure.  From my understanding was that the
16   patient like once the original PCP tapered off of
17   Oxycodone several years ago, then the patient first
18   took his care elsewhere to that OATP clinic out near
19   the Champaign, Illinois area and was put on methadone
20   up to 130-milligrams.
21            And then he came to the VA because it became
22   too expensive for him and then saw Dr. Peterson and
23   then who continued and then increased to 160 a day.
24            MR. VARGAS: Thank you.

69

1          MR. HAQ:  Any more questions?  All right.
2     Dr. Holzum, do you have any additional pertinent
3     information -- sorry, before I move on, Mr. Morgan, do
4     you have any further questions?
5          MR. MORGAN:  No, I don't, Doctor.  Thank you.
6     BY MR. HAQ:
7          Q.   Sorry, I apologize for that.  Dr. Dorothy
8     Holzum, do you have any additional pertinent
9     information not already of record that you feel is
10    essential in reaching a proper decision in this case?
11         A.   I do not.  No.
12         Q.   All right.  I must caution you not to discuss
13    your testimony with anyone outside of this room.  Thank
14    you for coming.  You are excused now.  Thank you.
15         MR. MORGAN:  Our next witness is Dr. Mardian.
16    But he is not available.  He is with patients until
17    12:00.
18         MR. HAQ:  Does anyone -- do you want to have
19    a lunch break now?
20         MR. VARGAS:  That is fine.
21         MR. HAQ:  Mr. Morgan?
22         MR. MORGAN:  Of course.
23         MR. HAQ:  All of you are on Central Standard
24    Time; is that correct??

70

1          MR. MORGAN:  Correct.  Except Dr. Mardian is

2     Pacific time.

3          MR. HAQ:  What about 12:30 so everybody can

4     have a 1 hour 15-minute break.

5          (Discussion held off the record.)

6          MR. HAQ:  Mr. Morgan, my understanding is

7     your next witness is Aram Mardian, correct?

8          MR. MORGAN:  Yes.  From Phoenix.

9          MR. HAQ:  Is he available now?  We are ready.

10          MR. MORGAN:  He said he would be available at

11     noon so we are expecting him to log on very shortly.

12          MR. HAQ:  That is fine.  Mr. Morgan, after

13     this witness do you have any more witnesses?

14          MR. MORGAN:  No.  That is it.

15          MR. HAQ:  All right.  Dr. Aram Mardian, you

16     have been called as a witness to testify in the hearing

17     convened by this Board in connection with Dr. John

18     Peterson.

19          You must testify freely and honestly.  You

20     will not be subject to restraint, interference

21     recrimination or reprisal in presenting any testimony

22     you may give.

23          Please answer the questions audibly.  If you

24     do not, the transcript will not show how you answered.

1    If you do not understand and have not heard the

2    question asked, request to have it repeated or

3    restated.  If you answer the question, we will conclude

4    that you understood the question.  Please raise your

5    right hand to take the oath.

6            THE WITNESS: I am Dr. Mardian.  I see lots of

7    people in the room and I know no one.  I know maybe

8    niceties aren't what we start with, but it might be

9    helpful if I knew who is talking and who is in the

10   room.

11           MR. HAQ:  Sure.  You want to take the oath

12   first?

13           THE WITNESS:  Sure.  Would you mind just

14   telling me who you are?  I don't know.

15           MR. HAQ:  Dr. Haq, Chairman of the Board.

16           THE WITNESS:  Great.  That is helpful to

17   know.  Thank you.

18                   ARAM MARDIAN, M.D.,

19   the witness herein, having been first duly sworn to

20   tell the truth, the whole truth and nothing but the

21   truth, was examined and testified as follows:

22

23           MR. HAQ:  And as I stated, I am Dr. Haq,

24   chairman of the Board.  My Board members can introduce

72

1    now.

2           MS. GRICH:  I am Dr. Pam Grich, secretary of

3    the Board.

4           MS. TRIGERO:  I am Dr. Sara Trigero.

5           MS. MILLER: I am Patty Miller, Board

6    technical advisor.

7           MR. HAQ:  I am sure you know everybody in

8    Danville --

9           THE WITNESS:  So I had a few emails exchanges

10   and phone conversations, but know no one by appearance

11   so that would be wonderful.

12          MR. HAQ:  Tim?

13          MR. MORGAN:  I'm Tim Morgan.  How are you?

14          THE WITNESS:  Good.

15          MS. COURT REPORTER: I'm Becky Jessup, the

16   court reporter.

17          MR. VARGAS: George Vargas, attorney for

18   Dr. John Peterson.

19          MR. PETERSON: I am John Peterson, the subject

20   of this hearing.

21          THE WITNESS:  Very good.  I appreciate that.

22          MR. HAQ:  Introduce yourself as well.

23          THE WITNESS: Sure.  I am Dr. Mardian.  How

24   much of an introduction would you like me to give?

1          MR. HAQ:  State your full name, title, place

2     of employment for the record.

3          THE WITNESS:  Aram Mardian, I am the chief of

4     the Chronic Pain Wellness Center at the Phoenix VA.  I

5     don't know if you would like any other --

6          MR. HAQ:  Your employment for the VA?

7          THE WITNESS: I am a full-time employee at the

8     Phoenix VA, yes.

9          MR. HAQ:  For how long?

10          THE WITNESS: Just shy of ten years.  So

11    August 2011 is when I started working here.

12          MR. HAQ:  Mr. Morgan, you may proceed.

13

14    DIRECT EXAMINATION,

15          QUESTIONS BY MR. MORGAN:

16          Q.   Dr. Mardian, good to see you finally after our

17    numerous conversations.  Let's talk a little bit about

18    your background.  I have your CV in front of me here.

19    Your educational background, could you fill in, tell

20    the Board a little bit about your education?

21          A.   Sure.  I don't know how far back you want me

22    to go, but I graduated as an undergraduate from

23    Williams College.  Then completed my medical school at

24    the University of Arizona College of Medicine in

1    Tucson.

2            I did my family medicine residency in Seattle

3    at the Cherry Hill residency program there.  And that

4    is really my kind of formal training.  I have other

5    training in integrative medicine pain management and

6    other areas, but maybe I will just pause there.

7        Q.   Let's talk about pain management.  You have

8    training in pain management also?

9        A.   I do.  So you want me to talk about my many

10   certifications or what is the best --

11       Q.   Yeah.  Let's talk certifications.

12       A.   So American Board of Medical Specialties,

13   ABMS, board certified in Family Medicine and Addiction

14   Medicine which is as you may know is a

15   subclassification for the American Board of Preventive

16   Medicine.

17           Also certified by the American Board of Pain

18   Medicine which is a non-ABMS Board, but is recognized

19   as a pain specialty by the VA and multiple other

20   jurisdictions.

21           And then another non-ABMS Board that I'm

22   certified by is American Board of Medical Acupuncture.

23   Also certification in, by the Academy of Integrative

24   Pain Management that would have -- that organization

75

1    closed their doors, I don't know, a few couple years

2    ago, but I carried that certification as well.

3        Q.    Very good.  Now employment wise you said you

4    were at the VA for approximately ten years.  You have

5    been working since how long in the medical field?

6        A.    Graduated from residency in 2005 so have been

7    a physician since 2002.

8        Q.    And academia, teaching.  Have you done any

9    teaching?

10       A.    Yeah.  So I taught in a number of roles over

11   the past 15 years or so.  I have taught, carried

12   teaching roles in family medicine.  Currently I am core

13   faculty for our addiction medicine fellowship at the

14   University of Arizona College of Phoenix and at the VA.

15            I am also a psych director for a pain

16   management rotation for internal medicine residency at

17   the University of Arizona at the Phoenix VA.  I am a

18   frequent lecturer for the medical school and also

19   regionally and nationally as well.

20       Q.    Publications.  Do you write at all?

21       A.    I do.  So I am currently the principal

22   investigator for a study on collaborative opioid

23   tapering with Stanford University.  So I have published

24   a few articles with that project.

1             And I have also been part of a research study
2     looking at resilience approaches to chronic pain and we
3     just had a publication there and have had other
4     publications over the years as well.
5         Q.    Okay.  Now are you -- do you get involved in
6     VA nationally pain management issues?
7         A.    I do.  So, yeah.  So I have been involved in
8     multiple different roles.  I was the -- I was on the
9     work group for the VA DOD clinical practice guidelines
10    that were published in 2017.  So I was part of the,
11    developed those guidelines.
12            I have been part of a variety of educational
13    initiatives nationally with the National Pain Program
14    Office within the VA going back 6, 7 years or so.
15            I have also been involved in the state level
16    in Arizona and have I cochaired the committee that
17    wrote our state opioid prescribing guidelines and also
18    we have a statewide pain and addiction curriculum that
19    has been adopted by all health professional schools.
20    So MBDO, PA, PD, podiatry, I cochair that work group
21    that has developed that curriculum as well.
22        Q.    Very good.  Now do you carry a physician at
23    division level that you work with in Visn 22?
24        A.    I do.  I am the cochair of the Visn 22 pain

77

1    committee.

2         Q.    And have you been requested by the VA previous

3    to this case to review physician's treatment of

4    veterans in pain management?

5         A.    So I have been involved in some reviews, yeah.

6    Certainly locally.  That is, I am the go-to person if

7    there is a question about practice.

8         Q.    Okay.  Drawing your attention to the issue

9    before the Board today regarding Dr. Peterson, you were

10   requested by Visn 12 to review 27 cases; is that

11   correct?

12        A.    Yes.  Yes.  Correct.

13        Q.    Okay.  And do you have those, the file in

14   front of you we talked before about?

15        A.    I am bringing it up as we speak.

16        Q.    Okay.  We can go through these files one by

17   one that you reviewed for Visn 12.

18        A.    Sure.

19        Q.    Did you know Dr. Peterson before this or have

20   you ever met Dr. Peterson?

21        A.    I have not.

22        Q.    You just were asked to review files?

23        A.    That is correct.

24        Q.    Drawing your attention to Tab 12 which is that

1    Page 6 -- sorry, Tab 11 which is at Page 59.

2         A.    Tab 11, I have that.

3         Q.    Okay.  Did you do the administrative review of

4    this document that is written in this evidence file?

5         A.    Sorry?  I didn't hear the full question.

6         Q.    The administrative review of the treatment of

7    the veteran in the case?

8         A.    I did.

9         Q.    And what, if anything, did you find as a

10   result of the treatment of this veteran?

11        A.    Okay.  So I have my notes that I am reading

12   and also just want to point out that, you know, in

13   terms of some of the specifics of the medical record it

14   has been some time since I reviewed the case, but as I

15   see this veteran is on a high dose long term opioid

16   therapy, 150-milligrams per day, MED.

17             We define high dose in a variety of ways, but

18   looking at the VA DOD clinical practice guidelines,

19   certainly doses above 20 to 50 are associated with

20   increased risk, doses above 50-milligrams is, for one,

21   kind of a caution threshold and doses above

22   90-milligrams is an additional caution threshold.

23             I will just briefly say, this will come up

24   multiple times, the CDC guidelines which are well known

79

1    and when we were writing the VA DOD guidelines, we were

2    instructed by Congress to incorporate and sort of build

3    off of the CDC guidelines.

4            The CDC guidelines say we should avoid

5    increasing beyond 90-milligrams a day or carefully

6    justify if doses are increased.  It is not a hard stop,

7    you know, the guidelines are well written in that they,

8    you know, indicate clinical discretion needs to be, is

9    acceptable, but it is very clear that clear

10   justification needs to be documented.

11           So as I point out here this is high doses and

12   there were really no discussion of risks of continuing

13   long term opioid therapy.  And in this situation it was

14   also in conjunction with the benzodiazapine.

15           Both the CDC and VA DOD guidelines

16   essentially say avoid that combination except if

17   absolutely necessary to not avoid it.  And in that

18   situation should be very significant discussion about

19   why that high risk combination is being used.  So

20   really no discussion of those risks or justification of

21   that.

22           Tapering also comes up.  Both of these sets

23   of guidelines recommend that essentially all patients

24   on long term opioid therapy, risks and benefits should

80

1    be reviewed at a minimum of every three months.

2              And that risk and benefit as we are looking

3    at that, we really should be considering if tapering is

4    appropriate or needed.  And certainly above doses of

5    90, the VA DOD guidelines specifically say that

6    tapering should be considered.

7              There is no discussion of that in the chart.

8    There is no discussion of prescription of naloxone.

9    Again, naloxone is a, we put in the category of routine

10   safety practices.  The CDC guidelines recommend that

11   anyone at potential risk of overdose naloxone should be

12   considered.

13             As stated earlier, the dose, the risk

14   increases with dose and so the CDC guidelines say, for

15   example, for patients above 50-milligrams MED, naloxone

16   should be considered.

17             Now in the VA now it is, there is also

18   consideration that just about anybody on long term

19   opioid therapy we should be considering naloxone.  So

20   there is no discussion of that.

21             And then, let's see, so there was results of

22   the PDMP and UDS that were documented here, but then

23   opioid doses increased from an already high dose of 115

24   MED to a higher dose of 165 MED.  Again without clear

1   discussion of risks.  So I think I will just stop

2   there.

3        Q.   Okay.  So, Doctor, in your review of this

4   case, did you determine that the treatment of this

5   veteran was within the standard of care?

6        A.   I determined it was not within the standard of

7   care.

8        Q.   Very good.  Moving along to Tab 13, Patient T

9   which is at Page 162.

10        A.   Okay.  That is a different -- just pull that

11   up.

12        Q.   Did you review this patient also?

13        A.   Let me just -- yes, I did.  Let me make sure I

14   have been pulling up -- okay.  I have T up now.

15        Q.   Would you take a look at, refresh your

16   recollection please?

17        A.   Okay.  Yes, I have it.

18        Q.   After your review of this patient in the

19   records, the treatment of the veteran, did you make a

20   determination that the treatment of the veteran was

21   within the standard of care of pain management?

22        A.   I did.  And determined that this was not

23   within the standard of care.

24        Q.   Drawing your attention to Page 230.  That is

82

1    the Patient S.  Did you review this file also?

2         A.   I did.

3         Q.   What did you determine?  Was the treatment

4    within the standard of care?

5         A.   This was also determined to not be within the

6    standard of care.

7         Q.   So the veteran's treatment was outside the

8    standard?  Okay.  Drawing your attention to Tab 17,

9    Page 342.

10        A.   Okay.  If you could just give me just a

11   minute.  It is on a different PDF file.  Sorry, what

12   was the page number?

13        Q.   342.

14        A.   Okay.  I am at 342.

15        Q.   Okay.  Did you review the medical treatment of

16   this veteran also?

17        A.   Yes.  The cutoff here is right at the file so

18   I have to open up another file.  Okay.  Yes.  So I

19   reviewed this as well.

20        Q.   And what did you determine about the medical

21   treatment provided by Dr. Peterson to this veteran?

22        A.   So I also determined that this case was not

23   within the standard of care.

24        Q.   Okay.  Drawing your attention to Tab 21,

83

1    Page 456.  I am sorry.  Tab 19, 456.

2        A.    Okay.  Again, this is right at the cutoff

3    file.  So this is Patient Q?

4        Q.    Correct.

5        A.    Okay.

6        Q.    Did you review the treatment provided by Dr.

7    Peterson to the veteran on this case?

8        A.    I did.  Yes.

9        Q.    And what did you determine, if anything, about

10   the treatment?

11       A.    So, yeah, also determined that this case was

12   outside of the standard of care.  So I don't know if

13   you want me to review any of the specifics on any of

14   these, but --

15       Q.    No.  I don't believe it is necessary.  If the

16   Board has any questions, they will ask you.  Okay.  And

17   I am sure Mr. Peterson's attorney will also ask you.

18   Drawing your attention to Page 547?  Patient P.

19       A.    Okay.

20       Q.    Did you review the treatment that Dr. Peterson

21   provided this veteran?

22       A.    I did.

23       Q.    What did you determine about that?

24       A.    Also determined that this did not meet the

84

1    standard of care.

2         Q.    Very good.  Okay.  Drawing your attention to

3    Tab 23, Page 581.

4         A.    Okay.

5         Q.    Did you review the treatment provided to the

6    veteran by Dr. Peterson?

7         A.    I did.

8         Q.    And what did you determine about the

9    treatment?

10        A.    Also determined that this did not meet the

11   standard of care.

12        Q.    Drawing your attention to Tab 25 which is at

13   656.

14        A.    Okay.  I am there.  This is Patient N.

15        Q.    That is correct.  Did you review the treatment

16   provided the patient by Dr. Peterson?

17        A.    I did.

18        Q.    And what did you determine about the

19   treatment?

20        A.    I determined that this did not meet the

21   standard of care.

22        Q.    Drawing your attention to Tab 27 which is at

23   Page 755, Patient M.

24        A.    Okay.

85

1        Q.    Did you review the treatment provided the

2    patient by Dr. Peterson?

3        A.    I did.

4        Q.    What did you determine, if anything, Doctor?

5        A.    Also determined that this did not meet the

6    standard of care.

7        Q.    Doctor, drawing your attention to Tab 29 which

8    is at Page 831.

9        A.    Okay.

10       Q.    Did you review the treatment provided by Dr.

11   Peterson to the veteran in this case?

12       A.    I did.

13       Q.    What, if anything, did you determine?

14       A.    Determined that this did not meet the standard

15   of care.

16       Q.    Okay.  Doctor, drawing your attention to

17   Tab 31, Page 877.  Patient K.

18       A.    Okay.

19       Q.    Did you review the treatment provided by Dr.

20   Peterson to this patient?

21       A.    Yes, I did.

22       Q.    And what, if anything, did you determine about

23   the treatment?

24       A.    I determined that this was not within the

86

1    standard of care.

2         Q.    Drawing your attention to Tab 33 which is at

3    Page 947.  Patient J.

4         A.    Okay.

5         Q.    Did you review the medical treatment provided

6    by Dr. Peterson to this veteran?

7         A.    I did.

8         Q.    And what, if anything, did you determine about

9    the treatment?

10        A.    Also determined that this did not meet the

11   standard of care.

12        Q.    Doctor, drawing your attention to Tab 35 at

13   1003.

14        A.    Okay.

15        Q.    Did you review the treatment provided this

16   patient by Dr. Peterson?

17        A.    I did.

18        Q.    And what, if anything, did you determine about

19   that treatment?

20        A.    Also determined that this did not meet the

21   standard of care.

22        Q.    Doctor, drawing your attention to Page 1120,

23   Patient H.

24        A.    Okay.

87

1      Q.   Did you review the treatment provided the

2   veteran by Dr. Peterson?

3      A.   I did.

4      Q.   What, if anything, did you determine about the

5   treatment?

6      A.   Also determined that the standard of care was

7   not met.

8      Q.   Doctor, drawing your attention to Patient G,

9   Tab 39 at Page 1205.

10     A.   Okay.

11     Q.   Doctor, did you review the treatment provided

12  Dr. Peterson to this patient?

13     A.   I did.

14     Q.   What, if anything, did you determine about the

15  treatment?

16     A.   I also determined that the standard of care

17  was not met.

18     Q.   Doctor, drawing your attention to Tab 41,

19  Page 1299.  Patient F.

20     A.   Okay.

21     Q.   Doctor, did you review the treatment provided

22  by Dr. Peterson to this patient?

23     A.   I did.

24     Q.   And what, if anything, did you determine?

88

```
 1          A.   I determined that standard of care was not
 2     met.
 3          Q.   Doctor, drawing your attention to Tab 43 at
 4     Page 1378.
 5          A.   Okay.  Opening up -- so what was the page
 6     number again?
 7          Q.   1378.  Patient E.
 8          A.   Okay.  I have that patient.
 9          Q.   Did you review the treatment by Dr. Peterson
10     for this veteran?
11          A.   I did.
12          Q.   What, if anything, did you determine about the
13     treatment?
14          A.   Determined that the standard of care was not
15     met.
16          Q.   Doctor, drawing your attention to Page 1444,
17     Tab 45.  Patient D.
18          A.   Okay.
19          Q.   Doctor, did you review the treatment by Dr.
20     Peterson to the patient?
21          A.   I did.
22          Q.   What, if anything, did you determine about the
23     treatment?
24          A.   Also determined that standard of care was not
```

1    met.

2         Q.   Doctor, drawing your attention to Page 1515,

3    Patient C.

4         A.   Okay.

5         Q.   Doctor, did you review the treatment provided

6    by Dr. Peterson to this patient?

7         A.   I did.

8         Q.   And what, if anything, did you determine about

9    the treatment?

10        A.   I also determined that the standard of care

11   was not met.

12        Q.   Doctor, drawing your attention to Tab 49 at

13   Page 1550.  Patient B.

14        A.   Okay.

15        Q.   Doctor, did you have a chance to review the

16   treatment provided by Dr. Peterson to this patient?

17        A.   I did.

18        Q.   And what, if anything, did you determine about

19   the treatment?

20        A.   Also determined that the standard of care was

21   not met.

22        Q.   Doctor, last but not least, Page 1641, Patient

23   A.

24        A.   Okay.

90

1        Q.    Doctor, did you have a chance to review the

2    treatment provided by Dr. Peterson to the patient?

3        A.    I did.

4        Q.    And what, if anything, did you determine about

5    the treatment?

6        A.    Also determined that the standard of care was

7    not met.

8        Q.    Doctor, you reviewed 27 cases.  We just went

9    through 21 where you found that the standard of care

10   was not met.  That is an error ratio of 78 percent of

11   medical treatment.  Are you a little stultified by that

12   percentage?

13       A.    It is clearly a pattern of practice that is

14   not meeting the standard of care.

15       Q.    Do you know what the acceptable error ratio is

16   for pain management doctors?

17       A.    You know, I can't necessarily give you a

18   statistic, but I would expect that to be certainly well

19   under 10 percent.  Probably under 5 or 3 percent.

20       Q.    As a result of your reviews, are you aware

21   that the local facility had a CEB meeting and made a

22   determination to revoke his privileges?

23       A.    So, yes.  I have reviewed the evidence file

24   with that documentation.

1        Q.   Are you aware that there was a proposed

2   removal issued to Dr. Peterson?

3        A.   Yes.

4        Q.   Are you aware that Dr. Peterson while he was

5   on, his privileges were suspended for approximately

6   eight months, he was getting paid in the position but

7   not doing clinical work and he was at the facility one

8   day monitoring for Covid and he saw one of his

9   patients.  Were you aware of that?

10       A.   I saw that email exchange, yes.

11       Q.   And he advised the patient -- the patient was

12   upset he wasn't getting methadone and he advised the

13   patient to go to another facility to get methadone.

14   Were you aware of that?

15       A.   I did see that.  Yes.

16       Q.   So in the proposed removal letter there was a

17   charge for interaction with patients that he was barred

18   from doing?

19       A.   I saw that.

20       Q.   And as a result of that in the treatment to

21   patients that are outside the acceptable standard of

22   care, that separate charge with the specifications that

23   you addressed here, the director of the facility

24   decided to sustain the removal.  Were you aware of

92

1    that?

2          A.    Can you repeat that last part?

3          Q.    Okay.  As a result including the

4    specifications that we talked about, the treatment of

5    the veteran when he was not supposed to be involved

6    with veterans or patients as that is a separate charge

7    and then this charge of inappropriate treatment of

8    veterans by the specifications that we read, the 21

9    specifications, there was a separate charge, the

10   director sustained the removal of Dr. Peterson which

11   gave the Board jurisdiction based upon Dr. Peterson's

12   appeal of the jurisdiction.  Were you aware of that?

13         A.    Yeah.  I guess I am not completely clear on

14   all of the details of the timeline, but I am aware that

15   those events happened and then, yeah, the removal was

16   sustained.

17         MR. MORGAN: Doctor, I have no further

18   questions.  Thank you very much.

19         MR. HAQ:  Mr. Vargas?

20         MR. VARGAS:  Thank you.

21

22

23

24

93

1   CROSS-EXAMINATION,

2       QUESTIONS BY MR. VARGAS:

3       Q.   Dr. Mardian, how did you go about getting the

4   call to review these Dr. Peterson's case files?

5       A.   Well, let's see.  I believe it was an email

6   and I am trying to remember the specifics that came

7   through our chain of command.  I believe it came

8   through our chain of command locally here at Phoenix

9   and they asked me to assist with a review of another VA

10  facility.

11      Q.   Doctor, would it surprise you that there was

12  testimony before the Board today that stated that it

13  was Dr. Bransky who reached out to you and requested

14  you do the review?  Would that surprise you that a

15  witness testified to that earlier?

16      A.   It doesn't surprise me, no.  And I guess just

17  to clarify, Mr. Bransky is out of position as far as I

18  am aware.

19      Q.   Which one is it, Doctor?  Who reached out to

20  you?  Was it Mr. Bransky or chain of command?  Who

21  reached out to you?

22      A.   As I said, it was our chain of command.

23      Q.   So, okay.  You never received a specific call

24  or request from Mr. Bransky to review this file,

94

1    correct?

2         A.    Correct.

3         Q.    Doctor, also I want to make sure I understand.

4    Is this the first time you have actually done a case

5    review that the VA has requested you do a case review

6    on a large scale because you previously testified you

7    have done local stuff, but that is all you had

8    testified to?

9         A.    Right.  So the question is have I done

10   reviews, physicians at other facilities?

11        Q.    At the VA level, yes, correct.

12        A.    At the VA?  I don't believe I have.

13        Q.    So is this the first time you have done a

14   review for another physician's work?

15        A.    No.  As I have -- I think your question was is

16   this the first time I have ever done a review at

17   another facility, an outside facility.  As I said, I

18   believe it is.  And as I said before this is not the

19   first time that I have reviewed another physician's

20   work.

21        Q.    Can you approximate how many times you have

22   reviewed another provider's work for this particular --

23        A.    How many times I have read another physician's

24   work?

95

1          Q.    As it relates --

2          A.    Probably hundreds of times.  That is part of

3     my, you know, daily or weekly activities.  I am asked

4     by my leadership to discuss other physicians.

5          Q.    Sure.  Let me rephrase that, Doctor.  As it

6     relates to chronic pain management, how many times have

7     you done a review?

8          A.    So multiple times.  Again, that is part of my

9     work.  I am the chief of the Chronic Pain Wellness

10    Center here at the Phoenix VA and frequently involved

11    if there is a question about another physician's

12    practice --

13         Q.    And, Doctor --

14         A.    -- in pain management.

15         Q.    And, Dr. Mardian, out of all of those reviews

16    that you have done, how many times have you found that

17    the provider's treatment did not meet the standard of

18    care?

19         A.    So, well, so your question is more officially

20    I think in terms of doing a review as say either a peer

21    review or an unprotected process.  I would say it is

22    pretty rare.

23              You know, it is fairly common that there are

24    kind of small, you know, learning points that

1   physicians have, but in terms of clearly, you know,

2   well outside of the standard of care, that is more

3   rare.

4        Q.   Doctor, in reviewing Dr. Peterson's files,

5   were you able to -- you have blanket access to review

6   these files.  And by that, correct me if I am wrong,

7   you had access to Vista, correct?

8        A.   Correct.  I am trying to remember.  So I used

9   the JLV system.  And I don't know how familiar you are

10  with the VA system, but yes, VA Vista is sort of the

11  background.  The database and JLV is a system that is

12  able to pull all of that data.

13       Q.   Okay.  And you were also able to access

14  primary care provider notes, pharmacy records, drug

15  screens?  All of that, correct?

16       A.   Yes, sir.  Correct.

17       Q.   Doctor, in your review of Dr. Peterson's

18  cases, it looks like, and correct me if I am wrong,

19  your emphasis was a lot into risk management, correct?

20       A.   That is one component certainly.

21       Q.   How much emphasis did you put into function?

22       A.   So these are not mutually exclusive so I

23  certainly when I am reviewing will look at

24  documentation of a risk vs. benefit analysis.

1          So that, you know, either one of those should

2    not occur in isolation.  It is always a weighing of

3    risks vs. benefit.  And so certainly I looked for that.

4    And, you know, function can be assessed in a variety of

5    ways.

6          There are validated measures of function and

7    I don't believe I saw any validated measures of

8    function used.  But to answer your question, absolutely

9    I include a review of risks vs. benefit and function is

10   certainly a primary subset of that benefit analysis.

11        Q.   Thank you, Doctor.  Doctor, Mr. Morgan asked

12   you whether or not you were aware of Dr. Peterson

13   having contact with a patient and you had indicated

14   that you were aware.  You had seen that email, correct?

15        A.   Correct.

16        Q.   Who sent you that email?

17        A.   So that was included in the evidence file.

18        Q.   Okay.  And so when you were reviewing Dr.

19   Peterson's files, you were aware that he had contact

20   with a patient?  That was provided to you?

21        A.   No.  No.  So the reviews of the patients

22   occurred over the Summer of 2020 and I don't know the

23   exact date that I received the evidence file, but

24   didn't really review the evidence file until more

1    recently.  So after the review, the patient reviews

2    were completed.

3         Q.   Doctor, in hearing your background, you are

4    very accomplished.  You have cochaired this, you have

5    cochaired that.  You have written publications.

6              Are you aware with other providers in the, in

7    other Visns that do chronic pain management or like

8    have your type of expertise, are you aware of other

9    doctors kind of like yourself?

10        A.   Do I know?  Sure.  I know multiple other

11   doctors in the field.  I think I have a unique kind of

12   set of background, but yeah, I know multiple doctors if

13   that is your question.

14        Q.   Sure.  It is actually.  Doctor, are you aware

15   of -- do you know a Dr. Adam Gordon out of Visn 19?

16        A.   I know of Dr. Gordon.  I think I am assuming

17   it is the same one you are referencing.

18        Q.   Okay.  Are you aware that Dr. Gordon has

19   actually disagreed with some of your publications?

20        A.   I am not aware of that.

21             MR. VARGAS: Thank you.  I have no further

22   questions for you , Doctor.  Thank you very much.

23             MR. HAQ:  Mr. Morgan, do you have any

24   additional questions?

1           MR. MORGAN:  No, Doctor, I do not.  Thank

2    you.

3           MR. HAQ:  Board members?  Any questions?

4    BY MS. GRICH:

5       Q.   This is Dr. Grich.  I have a question.  You

6    said you helped draft the VA guidelines in 2017 I think

7    is what you said.

8             And is it fairly specific in those

9    guidelines, is it important when you are prescribing

10   chronic opioid therapy to discuss potentially tapering

11   or at least assess whether tapering is reasonable and

12   also to document at pain visits discussion?

13            Is that sort of the expectation that the VA

14   has in terms of documentation in their national

15   guidelines?

16      A.   Yes.  So that, so in terms of discussing risks

17   and benefits, that is both weighing risks and benefits

18   and discussing that with patients, that is across the

19   board in essentially every, any guideline that you will

20   see.

21            But very clearly documented in the CDC

22   guidelines and VA DOD guidelines.  And I believe we

23   could pull it up, but I believe there is a line in the

24   VA DOD guidelines that basically says that certainly

1   anyone over a higher dose we should be discussing

2   tapering, but really anyone on long term opioid therapy

3   we need to be considering is this a treatment we should

4   continue, do benefits outweigh risks or is this a

5   treatment that risks outweigh the benefit.

6           And if risks outweigh benefits, then we

7   should be considering either tapering or moving to a

8   different pathway such as medications for opioid use

9   disorder if that is present.

10          MS. GRICH:  Thank you.

11  BY MR. HAQ:

12      Q.   I have questions for you.  In these 21 cases,

13  do you believe the treatment given to the patients was

14  harmful and dangerous to the veteran?

15      A.   What I saw was a pattern of prescribing that

16  did not utilize the standard review of risks and

17  benefits, did not discuss those with patients.  And,

18  yes, was absolutely potentially harmful in several of

19  those cases.  You know, particularly some of them are

20  more egregious than others.

21          You know, a case that I recall of a patient

22  that was on a Fentanyl patch and methadone, two highly

23  potent opioids.  And there was, it looked like there

24  was intent to rotate from one opioid to the other and

1   that is a very complex rotation from a Fentanyl patch

2   to methadone.

3          Those are two -- methadone has very complex

4   pharmacokinetics and pharmacodynamics and Fentanyl as a

5   patch has complexities to it.  That is a complex

6   rotation.  And so I saw that rotation there with not a

7   lot of follow up.  That would have been something that

8   really should have a follow up.

9          And then the patient had both of those agents

10  at the same time which doesn't look like it was the

11  original intent, but the patient sort of somehow I

12  assume from misunderstanding or what ended up on both

13  agents and both agents were discontinued which would be

14  an unsafe regimen, two long acting opioids and

15  particularly those two particular long acting opioids

16  is really not a good combination.

17      Q.   In your opinion when you reviewed these

18  specifically 21 cases, what is your opinion on Dr. John

19  Peterson's care for the patient?  Was it negligent,

20  oversight or can you describe in your own words how do

21  you describe his care to these veterans?

22      A.   So I would I guess it is hard to speculate on

23  the intent, but what I saw was a pattern of unsafe

24  opioid prescribing that really occurred just over and

1   over.  And it was clear that that was sort of a

2   pattern.

3           You know, in the VA we have focused a lot on

4   opioid safety over the last several years.  And, you

5   know, there is clinical practice guidelines,

6   directives, requirements to, you know, VA directives to

7   check the state prescription drug monitoring program,

8   the PDMP.

9           So there is multiple directives and VA

10  policies and guidelines that specify how we should be

11  doing safe care.  And unfortunately those were really

12  missing, you know, consistently throughout these cases.

13          And to me, that is clearly an unsafe

14  situation.  I wouldn't have been surprised if there

15  were bad outcomes on several of these patients.  Again,

16  I also recall several cases with patients with alcohol

17  use disorder or prior problems with a specific opioid

18  and then continuing to prescribe opioids in those

19  situations.  And those, they are very high risk for an

20  overdose event.

21      Q.   Let me be clear.  PDMP recommendations, the

22  state, how often is it expected and how often Dr. John

23  Peterson was documenting --

24      A.   Yeah, so it is a VA directive that that is

1    checked at a minimum of once a year.  So that is an

2    absolute minimum.

3           The standard of care is that that is

4    performed more frequently as often as every visit or

5    every prescribing episode.  The VA DOD clinical

6    practice guidelines recommend most of these safety

7    monitoring at least quarterly or more frequently.

8           And what I saw is essentially that wasn't

9    happening in any sort of regular way.  It seemed to

10   happen -- there were PDMPs in the chart.  Those were

11   usually checked by other providers, sometimes a

12   pharmacist, sometimes another pain provider.  So they

13   were checked by other providers.

14          And when they were present they were almost

15   never documented by Dr. Peterson that they were

16   present, that they were reviewed.  I think occasionally

17   they were checked by Dr. Peterson and I think very,

18   very rarely if ever were actually documented that they

19   were reviewed.

20   Q.    PDMP and urine drug screens, what is your

21   understanding of how often it should be done and how

22   often Dr. John Peterson did?

23   A.    So urine drug screening -- with PDMPs there

24   are directives and in some cases state laws and very

1  clear recommendations.  With urine drug screening it is

2  a little less.

3          The data is a little less clear about how

4  often they should be checked, i.e., the benefits.  And

5  but the VA recommends at least annually.  And again

6  they were checked infrequently.

7          And some of the concerns that I saw were when

8  they were checked, there were a couple of episodes they

9  were checked and the results were nonconcordant,

10  meaning not what you expect.

11          So either nonconcordant meaning you prescribe

12  a substance and the substance isn't there or you find a

13  substance that you are not prescribing.  And I recall

14  at least a couple of instances where the results were

15  nonconcordant and were not followed up on.

16          So there wasn't -- you know, the standard

17  followup would be to get a confirmatory test and then,

18  you know, kind of weigh the risks and benefits and try

19  to determine what is happening in a situation and then

20  make a clinical determination.  So I didn't see that

21  happening.

22          Q.   So, Dr. Mardian, I will be asking you the same

23  question in a different way.  In your opinion do you

24  believe Dr. John Peterson is safe as a provider in the

105

1    VA system?

2         A.   No.  From the prescribing practices that I

3    saw, that was not a safe pattern practice.

4              MR. HAQ: Board, one more time, do you have

5    any questions?

6              MS. GRICH:  No, sir.

7              MR. HAQ:  Sara?

8              MS. TRIGERO:  No.

9    BY MR. HAQ:

10        Q.   All right.  Dr. Mardian, do you have any

11   additional pertinent information not already of record

12   which you -- I am sorry, since there was a

13   disruption --

14        A.   I can hear you.  I basically heard do you have

15   any pertinent information  and then we cut out.

16        Q.   Okay.  Do you have any pertinent information

17   not already of record which you feel is essential in

18   reaching a proper decision in this case?

19        A.   No.  I think I have documented pretty clearly

20   my concerns and they are in the record.

21        Q.   I must caution you not to discuss your

22   testimony with anyone.  Thank you for coming.

23        A.   Okay.

24             MR. HAQ:  We will have a five-minute break.

1          (Whereupon a break was taken and the hearing

2          continued as follows:)

3          MR. HAQ:  We are on the record.  Welcome

4    back, everybody.  My understanding is from the Agency

5    Mr. Morgan has called his last witness and now it will

6    be Appellant's attorney Mr. Vargas will call his

7    witness.

8          MR. VARGAS:  Thank you, Doctor.  I call

9    Dr. John Peterson as a witness.

10          MR. HAQ:  Will he be sitting where he is or

11    go to the witness stand?

12          MR. VARGAS:  I think it will be easier if he

13    sits here so the microphone can pick it up.

14          MR. HAQ:  Dr. John Peterson, you have been

15    called as a witness to testify in the hearing convened

16    by this Board in connection with your case.  You must

17    testify freely and honestly.

18          You will not be subject to restraint,

19    interference, recrimination or reprisal in presenting

20    any testimony you may give.  Please answer the

21    questions audibly.  If you do not, the transcript will

22    not show how you answered.

23          If you do not understand or have not heard

24    the question asked, request to have it repeated or

107

1    restated.  If you answer the question, we will conclude

2    that you understood the question.  Please raise your

3    right hand to take the oath.

4

5                    JOHN PETERSON, M.D.,

6    the witness herein, having been first duly sworn to

7    tell the truth, the whole truth and nothing but the

8    truth, was examined and testified as follows:

9

10        MR. HAQ:  Dr. Peterson, state your full name,

11   title, place of employment for the record.

12        THE WITNESS: John Austin Peterson.  I was

13   formerly of the VA.  I have a private practice in

14   addiction medicine as well.

15        MR. HAQ: Thank you.  Mr. Vargas, you may

16   proceed.

17

18   DIRECT EXAMINATION,

19        QUESTIONS BY MR. VARGAS:

20        Q.   Dr. Peterson, please tell the Board about your

21   educational background.

22        A.   I came to medicine a little later than some.

23   I graduated chemistry and philosophy in 1968 and '9

24   from the University of Illinois in Urbana-Champaign.

1  And worked in the social service field among other

2  things until about 1982.

3          I actually ran an auto shop during that

4  period and worked with the AFL-CIO on several projects.

5  Really had kind of a varied and busy day.  And also an

6  elected city official for the City of Urbana for

7  12 years.

8          1982 I made the decision to close the shop

9  along with a couple of the other principals all which

10  were interested in moving on.  And I applied to medical

11  school was accepted into an MD/PHD program at the

12  University of Illinois in Urbana-Champaign.

13          Graduated the medicine portion of it in '89

14  and did a four-year investigative clinical internal

15  medicine residency two years in Urbana-Champaign and

16  two years at the School of Public Health in Chicago.

17          I worked most of the time clinically early on

18  as an ER physician even though I was boarded in

19  internal medicine and took up addiction work again in

20  2000 at the request of the Public Health Department to

21  develop a risk profile, basically methadone program, to

22  try to cut down on HIV and hepatitis C transmission.

23          I have done addiction work during my

24  premedical school years as a social service agency

1    administrator in what is basically a street clinic for

2    five years.  And so I had a background in the

3    philosophy of the program, but now was a doctor.

4         And so I did the preliminary work for

5    developing a methadone clinic.  I worked in a methadone

6    clinic in Downers Grove from 2002 to 2012.  Downers

7    Grove, Illinois.

8         And I was an early adopter of

9    Buprenorphine/Suboxone.  Really was certified even

10   before it came out into the pharmacy in 2001.  And then

11   was actually the 37th exwaivered physician in the

12   country in October of 2002.

13        I am boarded in internal medicine and

14   addiction medicine just like the other physicians who

15   just testified.  And I work currently as an addiction

16   medicine specialist with the second largest

17   buprenorphine practice in the State of Illinois.

18   Q.   Dr. Peterson, there have been two charges

19   levied against you and specifically I want to deal with

20   the first charge, failure to provide appropriate

21   medical care.

22        I would like to draw your attention to

23   Specification 1 which deals specifically with Patient

24   A.  Can you please tell the Board about your care for

1    Patient A?

2         A.   I would like to step back a little bit.  Some

3    portion that the Board did not take my written response

4    because this was going to be an efficient --the, I will

5    start with my approach to every patient that I saw and

6    then we will talk specifically about these 21 that are

7    referenced.

8              I came to the VA here in Danville with the

9    intention of developing an addiction medicine

10   residency.  That was my main focus.  That was later in

11   life.  I am currently 74 years old.  So about five

12   years ago, 69, leaving the ER medicine and using my

13   addiction background to develop an addiction medicine

14   residency here at the VA.

15             I trained for the VA as an internist in the

16   late 80s and early 90s.  So I was familiar with the

17   facility.  When I came here, it wasn't the same as I

18   had left it.  It was a lot less clinical activity here

19   than there had been in the late 80s when I was training

20   as an internist.  Are we breaking up somehow?

21             MR. HAQ:  We can hear you.

22        A.   Okay.  I am getting breakups here that sound

23   like interference.

24             MR. HAQ:  Is the Board able to hear?  Yeah,

1    the Board is able to hear.

2         A.   Okay.  I came here into the, was recruited by

3    the surgical chief and occupied the position of the

4    chronic pain management position and the position that

5    was empty at that time on the departure of the previous

6    director.

7              The group had a pain psychologist, a pain

8    physical therapist and a pharmacist.  We also had a

9    physician assistant out of Peoria.  And Peoria is the

10   largest CBOC of the Illiana system, even larger than

11   Danville which is the second largest.

12             And we often had a nurse practitioner who had

13   been a long standing member of the Danville staff when

14   she got her advanced practice credentials.

15             When we started the service, I indicated to

16   the primary care staff that I would take on the high

17   dose people and also the methadone people and I

18   expected them to manage the patients on veterans on

19   opioids that were on smaller doses.

20             This was a time which the CDC guidelines came

21   out that year and most of the primary care staff was

22   absolutely frightened of any association with opioid

23   prescribing, frankly even in acute cases.

24             The expectation of the primary care staff was

1   that I was going to handle, directly myself handle 2300

2   patients.  The director of primary care indicated to

3   his staff that if there was a stable patient on less

4   than 70-milligram equivalence of opioids that --

5           MR. MORGAN:  Dr. Haq, I'm sorry, the Agency

6   has to object.  Dr. Peterson is just rambling on a

7   narrative.  There is no question being posed by his

8   counsel or the Board.

9           And so are we going to sit here and have a

10  narrative that goes on and on and on regarding no

11  relation to what is before the Board.  And that is what

12  is happening now.  And he is sitting there just

13  reviewing his notes and stuff.  It is just totally

14  inappropriate.  This is an actual quasi court setting.

15  And we are not following --

16          MR. VARGAS:  Dr. Haq --

17          MR. HAQ:  Let Mr. Morgan finish.  Are you

18  finished?

19          MR. MORGAN:  Yes.  I finished.

20          MR. HAQ:  Mr. Vargas?

21          MR. VARGAS:  Last time I checked throughout

22  this whole proceeding we are not following the rules of

23  evidence had I not certainly been objecting to former

24  questions, leading questions.

1          So I don't know where counsel is saying that.

2    You know, there is nothing wrong with my client giving

3    a background before he goes into talking about Patient

4    A.

5          So I would ask that you deny counsel's

6    objection.  I think it is completely appropriate if my

7    client wanted to get up here and read this as I

8    indicated we could.  That is my opinion.

9          MR. HAQ:  We will go into executive session

10   and go on mute.

11          (Discussion held off the record.)

12          MR. HAQ:  We are on the record.  All right.

13   Objection sustained.  Mr. Vargas, your client can make

14   a brief summary, offer brief summary.  You can ask him

15   questions specific to the charges.  And then we will

16   have a cross-examination.  Thank you.  You may proceed,

17   Mr. Vargas.

18          MR. VARGAS:  Yes.  Please note -- I

19   understand.  It seems -- please note my objection to

20   your ruling because for Management's case there

21   certainly were no rules applied to it, but I will do my

22   best within the constraints that you have laid out.

23          MR. HAQ:  If the Appellant wants to consult

24   the evidence file which is next to our court reporter,

114

1    he can consult the evidence file.  And he can --

2              MR. VARGAS:  Well, at this point, Doctor,

3    just to clarify because otherwise this is -- this would

4    essentially be a sham, I just want to clarify.

5              So since counsel is going to raise objections

6    to this, when my client has to address a specific

7    allegation, he has to refer to his notes.  He cannot

8    nor anybody in this room unless you have a photographic

9    memory refer to case notes.  You have to have notes

10   just like I have notes, just like counsel has notes, he

11   is going to do that.

12             So I just want to cut that off if counsel is

13   going to object he is reading off of -- well, yes, we

14   have notes for Patient A, for patient and so forth.  So

15   I just want to make sure if that is going to be the

16   case, let's have it right now because that is what it

17   is going to be.  When I ask him a question, he is going

18   to have to refer to notes that he has prepared.

19             MR. HAQ:  Mr. Morgan, do you want to say

20   anything?

21             MR. MORGAN:  Yes.  That is totally

22   unacceptable.  Witnesses --

23             MR. HAQ:  We can't hear.

24             MR. MORGAN:  Sorry.  That is totally

1   unacceptable.  Witnesses can't have notes sitting

2   there.  They collude with their attorneys, let me ask

3   you this, got to prepare, write it out, down, then they

4   sit there and respond to the question by reading a

5   note.  That is not the courtroom setting that we

6   practice before the Board.  And no --

7            MR. VARGAS:  Doctor --

8            MR. MORGAN:  Excuse me.  The fact of the

9   matter is they didn't bring a copy of the evidence

10  file, they don't have anything in front of them.  And I

11  am sorry, it is the way the Board conducts their job.

12           We have an evidence file.  Everybody else has

13  documents sitting everywhere.  There is a pile of them

14  sitting here that are for the witnesses if they want to

15  review it, but you can't sit there and respond to

16  questions by having them all written down and saying,

17  oh, here is my answer to the question.  That is not how

18  this is set up.

19           And you are given -- if they want to appeal

20  this decision by the Board, it goes to federal court.

21  Well, federal court will see this.  They will have a

22  travesty.  This is totally unacceptable.

23           MR. HAQ:  Thank you, Mr. Morgan.  Mr. Vargas,

24  do you have anything to say?

1          MR. VARGAS:  Counsel, as you know rules of

2     evidence don't apply here.  But if that is what we are

3     going to do, you and I know where the next step is

4     after this.

5          This is not over after we are done here and

6     then we will be in a court of law and then you can try

7     lead witnesses and then I will hold you to that burden.

8     Sir  --

9          MR. HAQ:  Wait, wait.  We will refrain from

10    any kind of indirect or direct threatening to anyone.

11    It should not be taken lightly.  So we will move on.

12          Mr. Vargas, you can ask your Appellant

13    questions you want to ask and once you are done, Mr.

14    Morgan has an opportunity to cross-examine.  Let's move

15    forward and we can have the evidence file which was

16    used for this action and I will remind everybody this

17    is not a court of law and we are physicians, not

18    attorneys or judges.  Just want to remind everybody.

19    Mr. Vargas, you may proceed.

20    BY MR. VARGAS:

21     Q.    Doctor, thank you.  Dr. Peterson, I would like

22    to address specifically Specification 1 of the charge

23    failed to provide appropriate medical care.  It reads

24    between January 25, 2019, and January 24, 2020, you

117

1   prescribed Fentanyl, Hydrocodone for Patient A who had

2   a documented history of alcohol use, dependency and

3   recurrence.  The opioid dosage was high in creating

4   risk for adverse events.

5           The recommendation of, well, the finding of

6   Dr. Mardian was that your treatment did not meet the

7   standard of care.  Do you remember, can you please tell

8   the Board your treatment of Patient A to the best of

9   your knowledge?

10      A.   The point that I have documented the evidence

11  file in my notes.  So what I did because the reviews by

12  Dr. Mardian were summary and in many cases missing

13  pieces of the record that I have put together the

14  record from the evidence file and I may be able to

15  refute some of the charges, in fact most of them.

16          This Specification 1, Dr. Mardian in his

17  critique which then resulted in Specification 1

18  indicates that the patient is on a relatively high dose

19  of 130 MED.

20          He indicates there was no discussion of

21  changing treatment or opioid tapering.  He does note as

22  I did that the patient had at risk alcohol consumption.

23  And Dr. Mardian indicates there was no action to add

24  with mitigation strategy. The record documents the --

1    clearly documents the alcohol consumption.

2              This was consistently addressed in multiple

3    encounters with this patient as is indicated in the one

4    year window that the review took place, but also this

5    is an existing patient who I had been seeing for at

6    least two additional years.

7              I on the first encounter attempted to reduce

8    this gentleman's Fentanyl.  He was on 25 micrograms

9    along with an additional 12.5.  And very first

10   encounter I recommended taking the 12.5 off  --

11             MR. MORGAN:  Dr. Haq, the Agency objects

12   again.

13             MR. HAQ:  Can you speak louder?

14             MR. MORGAN:  The Agency objects once again.

15   The witness is reading documents that he prepared for

16   this testimony and tried to submit in his response to

17   the proposed removal that he just did today clearly

18   months after as you recall that we sat and delayed this

19   case for 5, 6 months based upon their attempt to get an

20   expert witness.

21             This should have been done months ago so the

22   Agency could have responded to that, but no, it is

23   being done today with no preparation and no notice. It

24   is totally unacceptable.

1          If his counsel wants to ask him questions, he

2     should close his file and sit and ask him questions

3     based on the evidence file and his notes.  Not Dr.

4     Peterson's notes.  This is totally unacceptable.

5          MR. VARGAS:  That is the same standard that

6     counsel wants to use when Dr. Mardian was clearly

7     testifying and he said let me look at my notes.  He had

8     stuff that he was looking at.

9          If that is the way the Board is going to

10    rule, please let us know now.  We will not waste your

11    time, counsel's time, definitely not our time.  I will

12    ask my client a couple of questions and we will recess

13    this.

14         MR. MORGAN:  May I respond, Doctor?

15         MR. HAQ:  Sure.

16         MR. MORGAN:  When Dr. Mardian said he was

17    looking at his notes, he was looking at his notes in

18    the evidence file.  That is what he was addressing.  He

19    didn't have side notes there.

20         He was addressing his notes in the evidence

21    file that was before the Board, before you and sitting

22    right here and I have here.  There was no side notes.

23    No, there is a misconception here.  It is totally

24    improper to have side notes in preparation for a Board

120

1    hearing.  We don't do that.

2            We have Brooke Heckerson testify regarding

3    the timeline and she says if I had my timeline here, I

4    could give you more specific information.  I have it

5    right here, but I'm not going to ask her about it and

6    not let her sit and read it because the fact is it is

7    not in the evidence file.  I just got it this past

8    week.  It is not how this is done.

9            MR. HAQ:  Mr. Vargas, do you want to say

10   something?

11           MR. VARGAS:  If we are going to be a stickler

12   for rules of evidence, Counsel, all kinds of hearsay,

13   all kinds of leading questions, all kinds of

14   foundation, you don't get to have it both ways.

15           So, Doctor, if this is -- if you are going to

16   not allow my client to be able to look at notes he has

17   prepared in order to respond to questions, let us know

18   right now.

19           I will ask my client one question and we can

20   recess this Board and we will move forward from here to

21   save everybody's time, not to aggravate, not to cause

22   threats.  It is just -- I'm not making any threats.  I

23   am just please rule one way or another and then we can

24   proceed.

121

```
 1           MR. HAQ:  We will be in a closed session on

 2    mute.

 3           (Discussion held off the record.)

 4           MR. HAQ:  We will resume.  Everybody can hear

 5    and see us?  All right.  Good.  So the Board has

 6    discussed and we are giving a full opportunity to

 7    Appellant to present his side of the case.

 8           As noted Dr. John Peterson can read from the

 9    evidence file which is right next to the court

10    reporter.  If he will not be reading from his notes, he

11    can refer but he will not be reading from his notes.

12    He can refer and read from evidence file.

13           And we strongly recommend that Dr. John

14    Peterson will be sitting at the witness station which

15    will make it easier for him to refer to the evidence

16    file.  Our decision will be made based on the testimony

17    which we receive in this hearing.  And after this, I

18    will ask Dr. Pamela Grich if she will go ahead.

19           MS. GRICH:  Thanks, Doctor.  I agree with

20    everything Dr. Haq said.  The Board obviously wants to

21    hear everything that Dr. Peterson has to say.  And it

22    is important as we write out a Board action that we

23    refer between Dr. Peterson's testimony and the actual

24    evidence file so that if there is something in the
```

122

1    evidence file that Dr. Peterson wants to refute, then

2    we need to actually write that in our Board action

3    because what we are directed to do is to write what the

4    testimony is and how that relates to specific pages.

5            So as a Board we have to go through and

6    actually reference every single piece of testimony to a

7    page in the evidence file.  So we just want to make

8    that really clear.

9            But obviously, yes, we have devoted all this

10   time.  We have read the evidence file multiple times

11   ourselves and certainly want to give Dr. Peterson every

12   opportunity to present his position.

13           MR. HAQ:  Doctor, thank you.  Dr. Sara

14   Trigero?

15           MS. TRIGERO:  Yes.  I concur with that and

16   your statements.

17           MR. HAQ:  Mr. Vargas, you may proceed.

18           MR. VARGAS:  Doctor, can I have a five-minute

19   recess to discuss what the Board just stated with my

20   client?  My understanding is he is only to refer to

21   Management's file, correct?

22           MR. HAQ:  That is correct.  He can reference

23   notes.  He can refer to his notes, but can't read it.

24   He can read from the evidence file because that is the

1    place where we make the decision.  We refer to the

2    evidence file.

3            MR. VARGAS:  Can I have a five-minute recess,

4    sir?

5            MR. HAQ:  Sure.  We will be back at 2:10.

6            (Discussion held off the record.)

7            MR. HAQ:  We are waiting for Sara and Pam.

8    All right.  Everybody is back.  Yes, Mr. Vargas?

9            MR. VARGAS:  Thank you, Doctor.

10   BY MR. VARGAS:

11       Q.   Dr. Peterson, based on the objections that

12   Management counsel has raised and the constraints that

13   have been set by the Board, can you answer all 21

14   specifications against you today?

15       A.   I can't.  I cannot answer them completely and

16   with context because the evidence file is only good for

17   one year.  That includes the context only for one year.

18   Many of the patients in this record has been seen for 2

19   or 3 years and I did not have access to any of those

20   prior to 2020 records.

21            I was denied that.  I was denied computer

22   access.  I was denied access to Vista which is where

23   the confirmations are and also outside physician

24   records and testing.  Denied access to drug screens.

1          Any drug screen results that I was able to

2     obtain were in the midst of the pharmacy notes.  All my

3     access to the state prescription drug records are not

4     present.

5          I tended to in the beginning document those

6     in my progress notes and did not use the VA template.

7     And so it looks as though I didn't do it.  Later on in

8     2019 I started doing both.  I would document in the

9     progress note and also cut and paste the state template

10    into the VA template.

11         The confirmation came through, that went into

12    Vista were all in drug screens were all, I was given

13    copies of all of those so I did review those

14    automatically.

15         I don't have any documentation available to

16    me for the multiple sleep studies that I ordered.  So

17    what I had done with this 154 page supplement was in

18    fact rely on the VA record and indexed it and include

19    every encounter that I had over that year period.

20         But I didn't have the complete records so the

21    complaints that I haven't done risk management

22    assessment, there is nothing in here that you can tell

23    what I am treating, what pain I am treating.

24         MR. VARGAS:  Thank you, Doctor.  That is all

1    we have.

2              MR. HAQ:  Mr. Morgan?

3              MR. MORGAN:  Dr. Haq, the Agency chooses not

4    to cross-examine Dr. Peterson.

5              MR. HAQ:  This is our last witness so we will

6    have a five-minute recess again and the Board will meet

7    again.

8              (Discussion held off the record.)

9    BY MR. HAQ:

10       Q.   All right.  Everybody is back.  Becky, we can

11   resume.  Now the Board will have some questions for

12   Dr. John Peterson.

13             Dr. Peterson, my first question is between

14   January 25, 2019 and January 24, 2020, you prescribed

15   Fentanyl Hydrocodone to Patient A who had a documented

16   history of alcohol use, dependency and recurrence.  The

17   opioid dosage was high creating risk for adverse

18   events.  Your treatment did not meet the standard of

19   care.  Can you explain?

20       A.   Patient A -- let me try to get at it this way.

21   Patient A was the -- let's see, I am actually

22   without --

23       Q.   You are welcome to look at the witness station

24   and you can pull up the chart.  We will let you know

126

1    what page the Patient A is.  If you want to go on to

2    the evidence file.

3        A.   Yeah.

4        MR. VARGAS:  Dr. Haq, based on my client's

5    testimony and information he has been provided, he is

6    going to be unable to answer that question or any

7    further questions you are going to have.

8        A.   If it is just based on the record that is

9    provided because there is no background.

10       MR. HAQ:  So, Mr. Vargas, you are saying he

11   is unable to answer when the evidence file is on the

12   table even to look at?

13       MR. VARGAS:  Doctor, respectfully my client

14   testified that there is more to that that was not

15   provided to them.  The Board is not going to allow him

16   to access his notes in order to be able to answer that.

17   So he cannot answer your questions as to Patient A

18   through Z, so.

19       A.   The background on all of these patients.

20       MR. HAQ:  Okay.  So I will clarify.  You are

21   saying if I ask this question, can he refer to the

22   notes?  Not just by reading it, look at the notes and

23   answer my question.  Not reading it.  He can look at

24   his notes and close the note and answer my question.

1         MR. VARGAS:  Can I have a moment?  We can try

2    that.

3         A.   I will have to read my notes first before I

4    answer it.

5         MR. HAQ: You can have 30 seconds to look at

6    your notes.

7         A.   Yeah, it is really tough to do that.

8         MR. VARGAS:  Doctor, we appreciate your time,

9    but 30 seconds is not enough.  So my client, we will

10   stand with our previous response.

11        A.   Well, if you would have taken the evidence,

12   the file I wrote, we would muddy ahead here.

13        MR. HAQ:  So if we give you more than 30

14   seconds to look at his notes to refer to the note, but

15   not to read it and he can explain it.

16        A.   Let me explain, Doctor, in terms of this one

17   on A which has the initial encounter in it.  Initial

18   encounter includes a lot of the elements that

19   Dr. Mardian said I didn't do.  Particularly with risk

20   analysis and substance adherence, substance use

21   analysis.

22            And it is typically, typically went eight

23   pages for initial encounter.  I can't give you a

24   background of this patient that is meaningful at all to

1    understand what I am treating here when you are not

2    accepting what took me several months to put together.

3              And on top of that, I mean, a lot of what is

4    in this case I had the record, but in the cases that

5    are going to come up, I don't have the record so I was

6    going off of memory.

7              And a lot of these patients I knew pretty

8    well.  I had been seeing them for a while.  But you

9    refused to take the records, the more enhanced record

10   in terms of background.

11             And you are asking me to do, to give an

12   analysis based on one year when many of these patients

13   I had seen for three.  And they have histories in the

14   military, a better understanding of what we are

15   treating, what their level of function is.

16             All that is contained when the patient was

17   seen within that year period, but by my recollection it

18   is contained in my notes.  Denying me access to the

19   entire records makes it quite difficult to defend

20   myself in this hearing.  As it would you, Doctor, if

21   you get put on this, you have a patient you have been

22   seeing for five years, you know, and then you ask,

23   someone asks you to defend yourself over a period of

24   one year, all that background is not available to you

129

 1   with that stipulation.

 2       Q.   Dr. Peterson, let me clarify for the record.

 3   These 154 pages were emailed by your attorney Mr.

 4   Vargas last night, 7:30 p.m. to the Board and Agency.

 5            Agency has objection, 154 pages I am not sure

 6   what time they seen it, but they have a relevant

 7   objection they could not read before the hearing last

 8   night.  So Board made a decision that this is not part

 9   of the evidence file which you are referring to.  If it

10   was part of the evidence file, we would let you discuss

11   and talk.

12            Evidence file is right there.  You are

13   welcome to refer for any answers to your evidence file

14   and you can let us know.  I will ask Dr. Pamela Grich,

15   you have a question?

16   BY MS. GRICH:

17       Q.   Yeah.  So regarding Specification 2 and based

18   on your notes and the evidence file that is right there

19   on the table, between January 25, 2019 and January 24,

20   2020, you failed to conduct urine drug testing for

21   Patient B within the 90-day window or 30 days prior to

22   dispensing.  Your treatment did not meet the standard

23   of care.

24            I wondered if you could use your notes and

1    give us referable pages in the evidence file so that we

2    can have a little bit more in depth understanding of

3    your view of this case.

4              MR. VARGAS:  Doctor, respectfully the same

5    answer that was provided to Dr. Haq will be the same

6    answer my client would provide to you.  Furthermore any

7    other questions, it is still going to be the same

8    answer.  We can have the court reporter read the same

9    answer that my client gave to Dr. Haq.

10   BY MS. GRICH:

11        Q.   Can I ask a follow-up question?  As I

12   understood in the initial request for the, to allow the

13   150 page document into the evidence or as an exhibit,

14   we were told that it was my understanding we were told

15   at the beginning of the hearing that that 150 page

16   document did reference the evidence file.

17             And if that is the case, then we would like

18   to hear about regarding Specification 2, what part of

19   the evidence file we should be referring to when we

20   write our report because we want to give Dr. Peterson

21   every chance to give us his side of the story regarding

22   Specification 2 on Charge 1.

23        A.   I will reference the return visit of

24   02/20/2019, Book 14.  Book 14 is these PDF files.  It

131

1    is Page 1577.  Last UDS June of last year.  This is

2    February.  A UDS was done in June of 2018.  They were

3    talking about February of 2019.

4            Dr. Mardian is incorrect and this is one of

5    multiple incorrections in his analysis.  Now I

6    understand he did not do the primary review.  And so it

7    is understandable that he would miss a lot.  But this

8    goes on and on through all 27 patients.

9            She is on buprenorphine.  For me, this is an

10   incredible objection.  I do 240 buprenorphine patients

11   actively.  And I am the second largest provider in the

12   State of Illinois.  This is a low dose person who was

13   able to get her opioid use disorder under control.

14           She became a supervisor at her, at a care

15   home and actually went through pregnancy.  And he he is

16   finding trouble with this.  The low dose buprenorphine.

17   Pretty much trying to hang me on technicalities which

18   are incorrect.

19           Now I don't have the urine drug screen

20   because it was denied me, but I referred its existence,

21   referred to its existence in a return visit.  And the

22   file that I gave you which is a little late for you to

23   read, possibly, yes, is full of it.

24           So the essay, the analysis that I put

1   together goes through every progress note that I wrote

2   on patients.  And I converted it to a Word document and

3   pasted it down, but you don't get the whole picture

4   here because I was seeing her outside of that year

5   window.  And that is true of the majority of these

6   patients here.

7            MR. HAQ:  Thank you.  Sara?

8   BY MS. TRIGERO:

9        Q.   With regard to Specification 3 on Charge 1, it

10   states between January 25, 2019 and January 24, 2020,

11   you increased the dose of methadone from 15-milligrams

12   a day to 20 milligrams a day to Fentanyl to Patient C.

13            Your documentation and rationale are

14   insufficient to justify the use of this medication and

15   the treatment regimen of the patient.  Your treatment

16   did not meet the standard of care.  Can you comment on

17   the care for this patient?

18        A.   This, and I explained in the essay was frankly

19   an administrative error on my part.  I was converting

20   the patient from Fentanyl.  He came in initially on

21   methadone as I recall.  Low dose methadone.  For me low

22   dose methadone.

23            I have 5,000 patient years of methadone.

24   Methadone doesn't frighten me.  He came in on methadone

1   and didn't seem to be working.  He indicated in the

2   past he was on Fentanyl.  We went ahead and rotated him

3   to Fentanyl.  Fentanyl was turned out not working for

4   him.  This is multiple encounters.  I rarely miss

5   seeing a patient every three months.

6          And in this case in the file you will see

7   that I was seeing them more frequently than that.  So

8   we decided to go back to methadone.  So we titrated the

9   Fentanyl down and titrated the methadone up

10  simultaneously.

11         And what happened is that he ended up calling

12  pharmacy in the middle of the month requesting a refill

13  on his Fentanyl.  This is not something he should have

14  done and I made the mistake of signing.

15         At the end of this encounter, I indicated to

16  him that we were going to titrate him off of Fentanyl,

17  Fentanyl was not working that well for him, and we were

18  going to rely on methadone.  That is the point at which

19  I got suspended.

20         So, no, I recognize this was an

21  administrative error on my part.  This is a farmer who

22  farms over 2000 acres.  He had war related injuries

23  that his analgesia was allowing him to cope with.  Very

24  active individual.  Walked nine miles a day in the

134

1    process of work.  All of this you didn't get from

2    Mardian.

3              And this allowed him to continue.  Again, we

4    are looking at function here.  The word function

5    doesn't appear anywhere in Mardian's analysis.  Not a

6    single place.  The needle isn't in that haystack

7    anywhere.  And function is a very big piece of what I

8    did.  So that I made a mistake and I was going to

9    correct it.  I admit to that.

10             I made a mistake because pharmacy in putting

11   a refill order that went through that should not have

12   gone through.  I made the mistake of signing it.  But I

13   was intending to decrease that because it wasn't

14   working for him that well it turned out.

15             When I talked to him, it wasn't working that

16   well.  So in the repeat, the followup visit that I

17   would have had with him, we would have taken him down

18   off of that and taken a look at the methadone dose.  I

19   did methadone for opioid use disorder for ten years in

20   2002 to 2012.  I had 580 patients on methadone for

21   opioid use disorder.

22             I felt very comfortable with that, with

23   methadone, but very highly respective of it as well.  I

24   feel comfortable with methadone.

1   BY MR. HAQ:

2       Q.   Dr. Peterson, when you gave -- can you answer

3   the next question please?  Focus on the question about

4   the patient, not a general statement.  Thank you.

5       A.   Yes.

6       Q.   All right.  Thank you.  Dr. Peterson, from

7   January 25, '19 to January 24, 2020, you increased the

8   dose of clonazepam for Patient D.  Your documentation

9   and rationale were insufficient to justify the use of

10  this medication in the treatment regimen of the

11  patient.  Your treatment did not meet the standard of

12  care.  Please do not read, just you can reference the

13  note and make your presentation.

14      A.   Well, I did not increase -- I did not -- to my

15  analysis, I did not prescribe benzodiazapine at the

16  pain clinic at all.  That is done by psychiatry.  We

17  had only five percent or so of co-benzodiazapine and

18  narcotics.  And almost exclusively benzodiazapine came

19  out of psych.  There is a lot of factual errors.

20      Q.   All right.  Thank you.  Dr. Peterson, at the

21  VA you mentioned that your patient population,

22  narcotics and benzo's was less than five percent.  Is

23  that correct I heard?

24      A.   The combination of benzo's and narcotic for

136

1    Danville, five percent.

2         Q.    And benzo's were exclusively prescribed by

3    psychiatry, not by you?

4         A.    Yes.

5               MR. HAQ: Thank you.  Dr. Grich?

6    BY MS. GRICH:

7         Q.    I just have a followup to that question since

8    we are there.  On Page 1451 of the evidence file in

9    your notes it says continue Clonazepam.  So was that --

10        A.    It is a reference for psych.

11        Q.    So you were telling psychiatry in that note to

12   continue the Clonazepam?

13        A.    I was agreeing to continue it again.  Low dose

14   Clonazepam.

15        Q.    Is that what that is on Page 1451?

16        A.    This one here is 1462.  2019.

17        Q.    That is, okay.  Yeah.  1462, 1463.  So you are

18   agreeing to continue clonazepam?  Is that what you mean

19   to say in that note?

20        A.    Right.

21        Q.    All right.  Regarding Specification 5 which is

22   Patient E I believe, between January 25, 2019, and

23   January 24, 2020, you failed to conduct a urine drug

24   testing on Patient E within a 90-day window or 30 days

1   prior to dispensing who had a prior positive urine drug

2   screen for cannabis.  You failed to document methadone.

3   Your treatment did not meet the standard of care.

4   Would you give us an explanation of that?

5        A.   What I see here is an established patient

6   prior to review period again.  And it doesn't include

7   the more complex review of what I would do on the first

8   encounter which includes risk assessment and

9   prescription monitor and UDS.

10            I did more prescription monitor and UDS than

11   any other physician in the facility.  I do 150

12   prescription monitoring accesses monthly in my combined

13   practice.  I am looking here just to find out where

14   this because I was addressing this in the rebuttal.

15            I think we missed it because we missed the

16   documentation because we are picking up a patient in

17   the middle of their care. I always did UDS on every new

18   patient.

19            And I did, I ran a deficiency report and I

20   was doing primary care because they were not doing it.

21   Deficiency report that was given to primary care based

22   on every single provider and every single patient under

23   that provider and what the deficiency was.

24            I ran that for myself and I had one in the

138

1  middle of January of 2020.

2      Q.  So in addressing that charge, is it true or

3  not true that between those days you did not give a

4  urine drug screen?

5      A.  I can't tell you because I don't have access

6  to them.

7      Q.  Do you recall reviewing the evidence file

8  where they --

9      A.  There is nothing in the evidence file.  I have

10  no way of getting -- there are no drug screens in the

11  evidence file.  If there is a drug screen that I can

12  reference is through a pharmacy note.

13     Q.  Would you agree that they gave the order

14  details for the lab and that that would be a way to see

15  if there was a drug screen?

16     A.  I am going to read my note right here.  If the

17  order was prior to the start of January, it wouldn't be

18  in that evidence file.  They are pretty picky.

19         But if there was one there, the attitude of

20  the reviewer with these veterans is that they are

21  criminals until proven otherwise.  People that I had

22  very stable relationships with were not highly in

23  suspicion because I had already worked with them for a

24  matter of time.

139

1          I have got a pretty good picture, very good
2    picture of how well, how stable they were.  This
3    gentleman, you know, I am trying to -- it is difficult
4    to remember who they are without spending as little
5    time  --
6          Q.   You have access to the evidence file sitting
7    next to the court reporter.
8          A.   I have access to the evidence file.  That
9    doesn't mean I know who the patient is.  Ma'am, I am
10   picking up -- I got to look at this.  I don't have
11   names.
12          So I just got to get in sync with my
13   remembrance of this guy.  I do now remember who he is.
14   He always came in with his wife.  And he had inoperable
15   foot difficulties that developed.  We worked a lot with
16   his oxygen status.
17          I would need access to the UDS, but it may
18   not have been repeated by the, let's say, the late Fall
19   of 2020.  So it very well might have fallen slightly
20   outside.  This wasn't anybody that I had trouble with.
21   Very on program the whole time I dealt with him.
22          Q.   Okay.  Thank you.
23          A.   If it was ordered by another physician,
24   another practitioner , I wouldn't know that.  I wasn't

140

 1   the only one ordering them.  I was the major one

 2   ordering them, but not the only one.  I have no access

 3   to other orders by other practitioners.  I have no

 4   access to results.

 5           MR. HAQ:  Dr. Sara Trigero?

 6   BY MS. TRIGERO:

 7       Q.   Specification 6 reads between January 25, 2019

 8   and January 24, 2020, you failed to conduct urine drug

 9   testing for Patient F within the 90-day window or in

10   the 30 days prior to dispensing.

11           You failed to document and update the written

12   informed consent when opiate therapy was switched to

13   sublingual buprenorphine.  Your documentation was

14   insufficient to justify the medication use and

15   treatment regimen of this patient.  Your treatment did

16   not meet the standard of care.  Do you have any

17   comments about this patient case?

18       A.   The consent was completed and the document is

19   completed.  And that would have been documented in the

20   initial encounter.  This is a patient who was on

21   buprenorphine.  Low dose buprenorphine.  And the drug

22   screen is in confirmation on Vista which I can't

23   access.

24           MR. HAQ:  Sara, anything?  All right.  Thank

1    you.

2    BY MR. HAQ:

3        Q.    Dr. Peterson, between 01/25/19 and 01/24/20

4    you prescribed 60-milligrams a day of morphine to

5    Patient G but failed to document the risks of adding

6    Ambien.

7            Your documentation and rationale were

8    insufficient to justify the use of this medication in

9    the treatment regimen of the patient.  Your treatment

10   did not meet the standard of care.  Can you clarify

11   this?

12       A.    I would have to -- what I have got here on

13   rebuttal is I, again, as I recall and I documented in

14   my notes that Ambien was taken off by primary and I did

15   not put it back on.  I thought he might benefit from

16   it, but I did not put it back on.  The Ambien was never

17   restarted.  Again, there is a lot of factual inaccuracy

18   in this file.

19           MR. HAQ:  Thank you.  Dr. Grich?

20   BY MS. GRICH:

21       Q.    Between January 25, 2019, and January 24,

22   2020, you failed to conduct a urine drug testing on

23   Patient H who had a documented history of alcohol

24   abuse, dependence and recurrence within the 90 days

142

1    prior to dispensing.

2           Your treatment did not meet the standard of

3    care.  I wondered if you could reference us the pages

4    in the evidence file when you give us your rebuttal.

5        A.   Well, it is not always going to be able to do

6    that.  But in this case, 1135 is the copy of the drug

7    screen that pharmacy referenced.

8        Q.   Give me one second.  What was the date of the

9    drug screen?

10       A.   05/14/2019.

11       Q.   So was that within the 90-day window or

12   30 days prior to dispensing?

13       A.   This individual is an established patient.

14   First encounter was some significant time before.

15       Q.   So just to clarify, you don't agree with the

16   30 days prior or previous 90-days?

17       A.   I don't have any way to know if that was done,

18   but it is, typically was a part of my standard

19   operating procedure and probably was done.  Probably

20   done the first day I saw him.  But this is an

21   established patient.  You don't have that record here.

22       Q.   Okay.  Thank you.

23           MR. HAQ:  Dr. Sara Trigero?

24

143

1   BY MS. TRIGERO:

2       Q.    Regarding Specification 9 which reads between

3   January 25, 2019, and January 24, 2020, you increased

4   the usage of Hydrocodone from 7.5-milligrams 120 per

5   month to 7.5-milligrams 180 per month for Patient I who

6   had a documented history of alcohol abuse, drug abuse,

7   dependence and recurrence.

8           The opioid dose was high creating risk

9   factors for adverse events and did not meet the

10   standard of care.  Do you want to comment on that case?

11      A.    So 6 a day times 7.5, 45, under 50.  And even

12   Mardian indicated that 50 was -- this is 45.  I

13   followed his drug screen including alcohol and it was

14   consistent with therapy as far as I recall.

15          Basically what we have here is a guy that

16   basically is going to be is a life sentence of not

17   getting his pain treated because he had a previous

18   alcohol problem.  So I am trying to see if I have an

19   early note.  That is always addressed.

20          Patient had a serious problem -- this is on

21   Page -- this is in the file on page -- starting on

22   Page 1045.  Actually, okay.  Maybe I moved that up.  I

23   have got -- let me give you a -- I think I might have

24   put two references there looking at it.

144

```
1          The return visit on 03/28/2019 is 1032 and
2   the initial visit was 02/12/2019.  Again, one month.
3   And so we are somewhere close to that.  And I think I
4   just in terms of my page reference here, I screwed
5   something up.
6          So what I say with respect to the substance
7   use history which is a category I address in every
8   patient I started with, patient had a serious problem
9   with alcohol until seven years ago when he got a
10  driving under the influence.
11         He joined Alcoholics Anonymous, went to
12  meetings and has not had a drink since.  Patient quit
13  smoking at the same time.  Does not have an elicit drug
14  history.  That is my response to that.
15  BY MR. HAQ:
16      Q.   Thank you.  Dr. Peterson between 01/25/19 and
17  01/24/20 you prescribed buprenorphine in combination
18  with alcohol, benzodiazapine for Patient J who had a
19  documented history of alcohol use, abuse, dependence
20  and recurrence.  The medication combination did not
21  meet the standard of care.  Can you --
22      A.   That is Patient J?  Okay.  Specification 10.
23  I am going to read the rebuttal which is short.  At the
24  time frame, this patient was already established once
```

145

1   again.

2           Initial encounter are not included as they

3   were initially.  The reviewer, but not his treating

4   physician has diagnosed this patient as having an

5   alcohol use disorder.  I indicated to him that his

6   alcohol consumption placed him at risk.  Very low dose

7   benzodiazapine prescribed by psychiatry, not by myself.

8           The complaint is I am treating an opioid

9   addict who is at risk alcohol consumption, dependence

10  and cocaine abuse with buprenorphine for documented

11  opioid use disorder.

12          Currently interpretation of standard of care

13  is to place the patient in harm's way of the opioid

14  epidemic rather than providing a significant level of

15  protection against an accidental overdose due to

16  Fentanyl contamination of drug supply.  It is very

17  difficult to respond to life --

18          MR. HAQ:  Um --

19      A.   I am the second largest buprenorphine provider

20  in the State of Illinois.  I have a lot more

21  complicated patients than this.

22          MR. HAQ:  Thank you.  Pamela Grich?

23  BY MS. GRICH:

24      Q.   Dr. Peterson, between January 25, 2019, and

146

1    January 24, 2020, you failed to recognize the high risk

2    category of aberrant substance use due to high SOAPR-R

3    scores for Patient K.  However, you prescribed the

4    patient Hydrocodone.

5              Your documentation was insufficient to

6    justify the medications used in the treatment of this

7    patient.  Your treatment did not meet the standard of

8    care.  I wondered if you could take us through that and

9    reference the pages in the evidence file.

10    A.    Well, I will go with the rebuttal.  There are

11    a couple of references there.  Another very significant

12    factual inaccuracy.  I admitted SOAP R for every new

13    consultation.  It is clearly stated in my documentation

14    the patient does not smoke.  He indicates stopping

15    alcohol 20 years ago.  He denies any elicit drug

16    history except for marijuana and that is in Page 890.

17    Q.    Sorry, what page is that?

18    A.    890.  So let's see what 890 says.  I can look

19    through my evidence file as well as the other one.  890

20    is the initial consultation.  10/03/2019.  The screen

21    in May of 2019 was consistent with therapy.  No

22    surprise in the prescription monitor.  The patient was

23    not evidencing addictive behaviors.  This gentleman --

24              MR. HAQ:  Thank you.

```
 1      A.   -- okay.  I don't know if I am getting

 2  anywhere with this.  The presumption here is that you

 3  shouldn't prescribe opioids to veterans who are in

 4  chronic pain.  Life sentences for previous alcohol

 5  abuse and dependence in remission.

 6           MR. HAQ:  Dr. Sara Trigero?

 7  BY MS. TRIGERO:

 8      Q.   Regarding Specification 12, between

 9  January 25, 2019, and January 24, 2020, you increased

10  the prescribed dosage of Hydrocodone to Patient L who

11  had a documented dependency of Gabapentin.

12           Your documentation was insufficient to

13  justify the medication use and the treatment regimen of

14  the patient.  Your treatment did not meet the standard

15  of care.  Can you comment on this case?

16      A.   I -- actually on this patient I actually seen

17  him prior to the, not on a regular basis, but prior to

18  the one year period in review in 2019.  I did not have

19  that note available to me of course.

20           When I saw him initially again so that

21  initial encounter was 09/25/2019, Page 843.  There was

22  no lack of understanding on this patient's part that he

23  had a primary Gabapentin problem.  And we did not

24  continue the Gabapentin.
```

148

1              He denied Hydrocodone disorder upon direct

2     questioning and this allowed him to keep working.  He

3     had a chronic ankle pain, was nonsurgical.  He worked

4     junk yards.  He was a refuse collector.

5              This allowed him to continue to work.  What I

6     found to be amazing, this guy was in Paris, Illinois,

7     which is an importation site for methamphetamine and he

8     did not have a methamphetamine problem.

9              When I drug screened him, I sent the

10    Gabapentin out since it is not on our regular panel.

11    So I was willing to work with this guy and I saw him

12    frequently.

13             And again I have a lot more patients more

14    serious than this guy in my private practice.  This

15    isn't a stretch for me at all.  Kept him working.  We

16    wouldn't want to have that, would we?

17    BY MR. HAQ:

18        Q.   Thank you.  Dr. Peterson, between 01/25/19 and

19    01/24/2020, you prescribed Hydrocodone to Patient M,

20    but failed to conduct urine drug testing within the 90

21    day window or 30 days prior to the dispensing.  Your

22    treatment plan did not meet the standard of care.  Can

23    you clarify?

24        A.   Again, established patient.  The drug screen

149

1   would have been done the first time I saw him.  It was

2   routine.  Part of the routine.  Part of the template.

3   I was also told I didn't do functional assessment.  I

4   had four functional assessments on the template.  All

5   of them available at that point.  The drug screen would

6   have been done.  I didn't have access to it.  You don't

7   either.  And I did a subsequent drug screen on

8   08/14/2019.

9           DR. HAQ:  Thank you.  Dr. Grich?

10  BY MS. GRICH:

11      Q.  Regarding Specification 14, between

12  January 25, 2019, and January 24, 2020, you prescribed

13  75 milligrams of oxycodone Patient N who had a

14  documented history of alcohol use, abuse, dependence

15  and recurrence.

16          Your documentation was insufficient to

17  justify the medications used in the treatment regimen

18  of this patient.  Your treatment did not meet the

19  standard of care.  I wondered if you could comment and

20  reference the pages in the evidence file, thanks.

21      A.  Well, again when I picked him up, that is

22  Patient N, right?  Is that patient N or M?

23      Q.  It is patient N like in Nancy.

24      A.  Yes.  Patient N.  Okay.  So the Patient N was

```
 1   given a psychiatric consultation inquiry on 03/12/2019,
 2   Page 679.  And a response to that 03/14/2019 on
 3   Page 681 in the evidence file.
 4          What I have written in terms of rebuttal is
 5   that there was no secret this gentleman had, was high
 6   risk for substance abuse disorder.  He was being
 7   referred from an inpatient substance abuse program and
 8   had a history of active alcoholism.  Did not have a
 9   history of problematic opioid use, but he admitted that
10   it could be an issue.
11          He did smoke marijuana.  Marijuana for me was
12   not a problem.  And the VA permits individual
13   practitioners to make that decision.  His sister
14   dispensed the Oxycodone to him.  He did not have
15   control of it himself.
16          In fact his sister brought him to the clinic
17   every time.  I screened this guy quite frequently
18   including ethanol, Lucrin and sulfate.  He remained
19   negative for alcohol on the screens and he was not
20   using the entire prescription of Oxycodone.  Frequently
21   -- he was able to use it less frequently.
22          This gentleman has, chronic condition was
23   squamous cell carcinoma of the tongue and throat.  He
24   had reconstructive surgery and radiation, yet was in
```

151

 1   persistent pain despite that.  He also had neural

 2   radiculopathy confirmed by MRI.  This gentleman was in

 3   chronic pain.

 4            He was a cancer patient.  Although it

 5   appeared that one followup that it might be in

 6   remission, we didn't know how long that was going to

 7   take.  And the pain to the jaw and the mouth was

 8   persistent along with the back.

 9            So the attitude of the reviewer towards

10   patients like this is that screw them.  That is what

11   the attitude is here.  And that is not the approach I

12   took.  I monitored him closely.  And he did well.

13   Whether he is still alive or not, I don't know.  A

14   majority of my squamous cell carcinoma patients of the

15   jaw and tongue and throat die within a year and a half.

16            MR. HAQ:  Thank you.  Dr. Sara Trigero?

17   BY MS. TRIGERO:

18       Q.   Regarding Specification 15, between

19   January 25, 2019, and January 24, 2020, you continued

20   to prescribe Hydrocodone to Patient O.  Your

21   documentation and rationale were insufficient to

22   justify the medication used in the treatment regimen of

23   the patient.  Your treatment did not meet the standard

24   of care.  Can you comment on your care of this patient?

152

1      A.    Okay.  I got a call in clinic and so that is

2   -- see me turning pages how long the initial encounter

3   takes.  And they said I didn't have an adequate work

4   record.  This is 05/29/2019, Page 609 of the initial

5   encounter.

6           Background on this is that this guy had been

7   cut off his Hydrocodone by his primary because he had a

8   marijuana positive urine.  He had been given to

9   understand a year earlier that marijuana was not going

10   to be a problem, yet when he came to primary care on

11   this date, it is the same date that I saw him, he was

12   told that they were not going to continue the

13   Hydrocodone.

14           He pitched a hissy, shall we say, and so I

15   got a call from them to see this patient emergently

16   from the chief of primary care.  I thought I made it

17   clear that I was not going to take this patient into my

18   panel based on his history.

19           He agreed to stop the marijuana and in order

20   to continue the Hydrocodone which would help him.  He

21   stopped the marijuana and the primary, the nurse

22   practitioner continued to refuse to prescribe him the

23   Hydrocodone.

24           She refused to put her name on any of the, on

1   any of the refill orders and continued to abandon this

2   patient.  I had not intended to pick him up.  This was

3   a very simple straightforward issue.  I hate to do

4   chart wars.  We had a chart war.  You will see there is

5   a lot of it in here.

6          If you accepted the file that I produced, you

7   would see it, but you didn't.  That is why I ended up

8   doing refills on this guy when I was trying to get him

9   back in primary care.  I realize at the end of the year

10  that I was probably going to have to pick him up.

11  Because he was abandoned.

12         This is patient abandonment.  You don't get

13  this picture off of these specifications, do you?  I

14  know I am going uphill with you folks and this is kind

15  of a done deal, but I will defend my actions.

16         I think I am better at it than a lot of

17  people and I certainly have a lot more sympathy and

18  commitment to my patients than these guideline writers

19  do.  I go the extra mile.

20  BY MR. HAQ:

21     Q.   Thank you.  Dr. Peterson, between 01/25/19 and

22  01/24/2020 you failed to document risk strategies,

23  obtain consent and document query PDMP for Patient P.

24  You failed to meet the standard of care.  Can you

154

1    clarify?

2        A.    PDMP is documented for 08/29/2019, Page 553.

3    In the initial assessment, 564, evaluation.  The

4    patient has a signed chronic opioid agreement.  The

5    requesting practitioner also documents a signed

6    agreement.

7            MR. HAQ:  Thank you.  Dr. Grich?

8    BY MS. GRICH:

9        Q.    Dr. Peterson, regarding Specification 17,

10    between January 25, 2019, and January 24, 2020, you

11    prescribed Oxycodone to Patient Q.  Your documentation

12    and rationale was insufficient to justify the use of

13    this medication in the treatment of this patient.

14            Your treatment did not meet the standard of

15    care.  I wondered if you could comment and reference

16    the page in the evidence file?

17        A.    Well, I can't reference the pages in the

18    evidence file because this guy was with me for three

19    and a half years.  And of course I don't have access to

20    the record, but the background is that this patient had

21    inoperable upper radicular pain, both upper

22    extremities, secondary to a construction accident where

23    he fell from the third floor flooring joists injuring

24    both arms and shoulders.

1       He also had hip pain which became more

2   significant as a result of parachute jumping in the

3   service.  Hold on.  Maybe I can give you something.

4   The September encounter is Page 473.  The gentleman

5   performed quite safely on the Oxycodone.  He never

6   asked for an increase.

7       In much of my tenure with him he was able to

8   pull back some of his doses and come to see me before

9   his time and a week or two after.  There is some

10   concern about some absentmindedness.  He is an older

11   gentleman.  Not hugely old.  He is a chicken farmer.

12   Well known for it.  Won prizes for it in high school

13   and 4H.

14       His major problem was he lived with his

15   sister and she died suddenly of lymphoma.  And that

16   very substantially disoriented him and he really became

17   something of a recluse for a period of 2, 3 months.  He

18   came in on the regimen that I continued.

19       MR. HAQ:  Dr. Sara Trigero?

20   BY MS. TRIGERO:

21     Q.   Regarding Specification 18, it states between

22   January 25, 2019, and January 24, 2020, you failed to

23   obtain a urine drug screen during the one year window

24   for Patient R.

156

1          You failed to discuss with Patient R and

2    document risks associated with long term opioid therapy

3    and tapering.  Your treatment did not meet the standard

4    of care.  Can you comment on your care for this

5    patient?

6        A.    I am saying in my rebuttal here is I assume

7    analgesic maintenance early on.  The detailed history

8    is not available.  It is outside the year of time

9    frame.

10          So I am remembering this.  This is one of my

11   favorite patients actually.  This gentleman's chronic

12   pain is due to a service connected fall from a

13   helicopter from 50 feet up.  It caused major damage to

14   his back and neck.  He had radiculopathy, particularly

15   on the neck which was causing neural compromise.

16          And this gentleman is on morphine.  When I

17   started with him, he was attempting to get surgical

18   intervention which was going nowhere.  And it was going

19   nowhere because primary care wasn't following through.

20          He had a surgical surgeon at Northwestern

21   interested in doing the surgery, but he wanted an ENT

22   evaluation, whether the patient would tolerate

23   intubation.  And attempting to get that from care in

24   the community with three contract changes over a period

1   of four years proved to be exhausting.  I saw this

2   gentleman every three months rather than six.

3          I would see that an order that I made for

4   care in the community had been cancelled repeatedly.

5   We finally got the ENT recommendation.  When we did, he

6   had thrush.  That slowed things up.  Needed an MRI

7   again on the outside because the care in the community

8   was rewriting contracts multiple times.

9          And several of my previous orders had been

10  timed out.  During this whole time everything is

11  deteriorating.  Patient R at one point told me that I

12  was the only one that got anything done.  And frankly

13  he was right.  I was the only one that got anything

14  done.

15         And it is because I saw him frequently and

16  didn't wait for six months to find out that something

17  had been screwed up.  Now, morphine is -- he is on a

18  significant dose of morphine.  However, morphine is

19  very poorly absorbed.  Poorly.  Only about a third of

20  it gets into the system.

21         So relatively looking high doses of morphine

22  are really not that high.  He did very well with this,

23  allowing to continue activity at home.  And this was

24  not a problematic patient for me.  The urine drug

1    screen was done 03/13/2019.  It is documented and

2    prescription monitor was also completed.  He rarely

3    drove.  His wife did all the driving.

4            This gentleman had debilitating pain and had

5    for years.  You could tell when he walked out of the

6    room.  So what does a reviewer expect us to do with

7    this gentleman.

8            Well, we were having trouble getting to

9    surgery because of the VA decision to outsource as much

10   as possible and then putting together a contractor that

11   would work with them.  As I was able to at least make

12   things tolerable for him.  And, again, this was one of

13   my favorite patients.

14   BY MR. HAQ:

15       Q.   Thank you.  Specification 19, between

16   01/25/2019 and 01/24/2020 you failed to discuss the

17   risks of long term opioid therapy with Patient S.  Your

18   treatment did not follow the standard of care.  Please

19   clarify.

20       A.   Again, this is an existing patient.  I first

21   saw him as a hospital consult for right upper quadrant

22   abdominal pain.  At the time I was consulted he was

23   being completely undertreated because everybody was

24   afraid to do inpatient, treat him.

1            I was able to get him over the acute event.

2    With my consultation I picked him up as a clinic

3    patient.  This gentleman works with a gunsmith on his

4    own property.  He was grossly overweight.

5            And his abdominal pain was in my analysis was

6    due to two surgeries.  He had a right right partial

7    nephrectomy following some month like later by a

8    cholecystectomy.

9            He was able to retain adequate kidney

10   function, but my impression of intermittent and often

11   severe pain was adhesive disease.  Gallbladder was gone

12   at that point.  Also ended up in emergency rooms in

13   pain on an every other month basis for acute treatment.

14           That is how he ended up here in Danville.  He

15   was transferred from emergency room to Danville.

16   Admitted to the hospital three times in my association

17   with him.

18           He was admitted private sector and he had a

19   left renal stone, not right side which was cleared by

20   lithotripsy.  The analgesic regimen kept him out of the

21   emergency rooms.  Successfully.  Nonsteroidals were a

22   bad idea on this guy.

23           I spoke with him about adenolysis at every

24   encounter and he initially wanted to try to pursue this

1   through the existing surgeon.  And as you may know,

2   adenolysis is a surgery that is quite limited.  A lot

3   of surgeons don't go into it.  I happen to work with a

4   bariatric surgeon in Champaign who would have taken

5   this on.

6          He went on to a very large very aggressive

7   weight loss program.  I thought he was losing too much

8   weight to tell you the truth.  This guy was a very

9   stable patient whose drug screens were on target.  I

10  don't have any access to his earlier workups that I had

11  at the time.

12         This patient was not a candidate for taper.

13  I kept him out of the emergency room and out of the

14  hospital with the regimen that I had.  Tapering would

15  have put him right back in it.

16         MR. HAQ:  Thank you.  And Dr. Grich?

17  BY MS. GRICH:

18    Q.   Thank you.  Specification 20.  Between

19  January 25, 2019 and January 24, 2020, you failed to

20  discuss the risks of long term opioid therapy with

21  Patient T.  Your treatment didn't support the standard

22  of care.  I wondered if you could comment on that with

23  reference to the pages in the evidence file.

24    A.   Well, again, this is an established patient.

161

1   I don't have that record.  No access to it.  I am

2   catching up right here.  I am reading right now since

3   you like numbers, 180.  So I don't have the original

4   records.

5            What I intended to do was the first encounter

6   that is in the record is I would copy a larger portion

7   of it.  He had -- where did we get that.  L3, lower

8   back pain.  We were referring him to interventional

9   anesthesia.  And that didn't work.  Which very little,

10  didn't find it worked very well, but we did give it a

11  try.

12           He used the medication closer to evening.  He

13  woke up in the morning quite stiff, took an hour and a

14  half to get moving.  He indicated without the

15  medication he would be sitting around a lot.

16           He has six -- here we go.  This gentleman is

17  mid 30s, upper 30s individual with six children at

18  home.  He is a detective on the Danville police force.

19  Danville is a knife and gun club.  It is one of the

20  worst, has got one of the worst murder rates in the

21  State of Illinois and it is absolutely exploding in

22  elicit drugs.  It is a busy shift.

23           And at several points his wife wanted to move

24  him out of here because his work was too dangerous.  He

162

1    talked to me that in that Fall of 2019 he had a gun

2    pulled on him by a 16-year old.  This allowed him to

3    keep working.

4            He had a chronic lumbar compression fracture.

5    Low, relatively low dose Hydrocodone.  Always on time.

6    Allowed him to keep working.  He tried physical

7    therapy.  He tried.  That didn't work for him very

8    well.

9            He got massage and at that point trying to

10   expand some of the service offerings here which the way

11   they basically destroyed this campus I don't think that

12   we ultimately would have made any headway.  Because it

13   was cutting it like crazy.

14           This gentleman had chronic traumatic low back

15   pain secondary to a compression fracture and started

16   having trouble with the neck too.  Referred him to

17   physical therapy.  That tended to help a little bit.

18           That was the best service in our department

19   was physical therapy.  And we also had pain psych which

20   was helpful for some of the recalcitrant patients.

21   This allowed him to work in a dangerous profession.

22   40-milligrams of Vicodin.  Under the 50 I might add.

23           MR. HAQ: All right.  Thank you.  Sara

24   Trigero?

163

1   BY MS. TRIGERO:

2      Q.   Specification 21.  Reads between January 25,

3   '19 and January 24, 2020, you increased the dose of

4   naloxone from 150 milligrams to 165 milligrams in

5   combination with morphine SR 30 TID, morphine IR

6   15-milligrams TID and Hydrocodone 10 for Patient U.

7           The opioid dosage was high creating the risk

8   for adverse events.  This medication combination did

9   not meet the standard of care.  Do you have any

10  comments?

11     A.   This was the fellow that the opposing attorney

12  referenced.  I will refer you to the plan that was in

13  place for him -- I can actually do that on the patient

14  file.  Documented on Page 71.

15          He had outside psychiatry which was giving

16  him the Lorazepam and Adderall.  I was not.  He was

17  being withdrawn from Ativan by his psychiatrist.  I

18  modified his morphine prescription from too much IR --

19  I rationalized it by small change going from the

20  immediate release to extended release.

21          And I indicated to him that we were going to

22  pull him off the Hydrocodone.  He asked me at the last

23  encounter -- I believe he was climbing roofs.  This guy

24  is a storm damage guy.  And that he was, agreed to take

164

1    it off at our January followup.  This is the fellow

2    that had the early morning head-on collision.

3           And the assumption of course is even though

4    it is not in the coroner's report, that he was on too

5    many drugs.  I doubt that.  He was on this for ten

6    years.  And he was young.

7           What this guy did was a heavy texter and he

8    would average five phone calls in my half hour

9    encounter with him.  We had a major hailstorm come

10   through Danville in the Summer of 2019.  And he was a

11   forensic estimator particularly for roof damage.

12          He was in the process of developing his own

13   company.  And he indicated to me that he would be doing

14   a lot less physical work in January and that is the

15   point at which we could reduce him.  I don't think this

16   patient died of too many drugs.  He was being taken off

17   the Ativan.

18          He has been on much higher doses for a long

19   time.  This guy was texting at the time this happened.

20   Although we can't -- at this point, the record, we

21   can't document that.  Early morning going to work.

22   Obviously on the phone.

23   BY MR. HAQ:

24          Q.   All right.  Thank you.  And the last

1    specification charge, failure to follow Specification

2    1.  On August 24, 2020, while screening at entrance of

3    Building 98, you spoke with Patient B regarding his

4    medication regimen that was provided by another

5    provider.

6         You proceeded to tell the patient that you

7    did not agree and advised him to go to St. Louis to

8    seek treatment.  On January 17, 2020, you received a

9    memorandum which changed to administrative status in

10   which you were instructed to not have any further

11   contact with any VA patients during your administrative

12   status.  Please explain.

13        A.   This is in the essay.  You are going to have

14   to listen to it.  There is no book to refer to it

15   really.  When Covid hit here, the facility rather

16   initially incompetently developed a screening procedure

17   for employees and patients.

18        Employees and patients were sequestered so

19   that employees came through this Building 102.  They

20   needed to show their badge and they got a temp screen

21   and they were asked symptomatic questions.

22        Patients were markedly limited first in terms

23   of in face encounters so there was overall reduction in

24   patient contact.  But the ones that were required to

166

1    come here or needed to come here were screened through

2    Building 98 in the southwest corner of 98 which is

3    where urgent care typically is located.

4         I was -- because I was captured body, fair

5    assessment, I was put into Building 102 and given

6    fairly long shifts screening patients.  Parenthetically

7    it was a complete waste of time.  I never had an

8    elevated temperature the whole time.

9         And I did that extended shifts because nobody

10   liked doing this, but since I was in jail so to speak I

11   was one of them that got extended duty.  Now into

12   August the patient window lost one of their nurse

13   screeners due to retirement.  And the person doing the

14   scheduling at that time was out of Peoria.  She put me

15   on that duty at that door and moved me from 102.

16        I called her and I indicated to her that,

17   No. 1, the difference in the door at 98 from 102 is

18   that I needed computer access to document that patients

19   coming in had an appointment.  We weren't taking

20   walk-ins at that point.  And the other thing is that I

21   was going to be, you know, screening patients.

22        So at the time that I was put there, they

23   denied my request to be -- didn't say I didn't want to

24   do it, I said put me back at 102.  They denied that.

1   The patient out of Peoria, you know, I think would be

2   fairly described as something of an airhead.

3           So I got put in the Building 98.  And guess

4   what, I had a fairly large patient panel and these

5   people came through.  So Patient B was one of them that

6   did.  And he came to me and asked me a direct question.

7           And basically what I told him to do was to

8   look for a second opinion in St. Louis.  I think some

9   of the record here might have been embellished by his

10  anger.  He was doing very well.  This guy had chronic

11  lumbar impingement.  No secret that he had an opioid

12  use disorder or at least had developed one over time.

13  Methadone was working very well for him and it allowed

14  him to continue to work.

15          Without it he could not do the overhead work.

16  We found a level for him that did the job.  He wasn't

17  going into withdrawal.  And in terms of pain, methadone

18  needs to be split dose.  Very difficult to do out of

19  methadone clinics.

20          He was attending a methadone clinic at one

21  point because the VA wouldn't give him methadone.  And

22  he came to me on an existing methadone regimen.  What I

23  cite here is the I care commitment that we all had in

24  the VA to not talk with him would have been violating

168

1    that mission.  Particularly the advocacy.

2              So after 5 days, 5 days later after that

3    encounter with him which was impossible to avoid, I was

4    called in the early afternoon working at 98 and told to

5    leave that duty immediately.  "There is no way that you

6    can work at that entrance and not see some of your

7    former patients."

8              I indicated I wanted to finish the afternoon

9    since I was going to leave the staff that were working

10   there short.  And they said I should depart anyway.

11   Made my apologies and again was returned exclusively to

12   Building 102.  I am not going to apologize for

13   advocating for a patient.  Maybe some of you do, I am

14   not.

15             MR. HAQ:  Thank you very much, Dr. Peterson.

16   We are going to take a five-minute break and then we

17   are going to resume, the Board will resume.

18             (Discussion held off the record.)

19             MR. HAQ:  We can resume.  Mr. Morgan, do you

20   have any questions to Dr. Peterson?

21             MR. MORGAN:  No.  I don't believe it is

22   necessary.  Thank you.

23             MR. HAQ: Mr. Vargas, do you have any

24   questions for Dr. Peterson?

1          MR. VARGAS:  No, Doctor, thank you.

2          MR. HAQ:  Dr. Peterson, do you have any

3    additional pertinent information not already of record

4    which you feel is essential in reaching a proper

5    decision in this case?

6     A.   I made one observation.  The reviewer

7    Dr. Mardian is one of the guideline writers.  Very high

8    level, the highest level academic physicians in the VA,

9    Dr. Adam Gordon and Stephan Kersik (phonetic) have

10   taken direct exception in writing to the perspective

11   that the guideline writers adopted and in particular

12   the focus on dose rather than function.

13          I make reference to that in my written

14   statement with references.  So that the standard

15   practice that Dr. Mardian claims is not a consensus

16   statement of VA physicians.  And so if this has to go

17   further, which it might, we are going to call on that

18   perspective.

19          MR. HAQ:  Are you done?

20   A.   Yes.  Thank you.

21          MR. HAQ: Board members, do you have any

22   questions for Dr. Peterson?

23          MS. GRICH:  No Thanks.

24          MR. HAQ:  I must caution you not to discuss

1  your testimony with anyone outside of this room.  You

2  are excused from testifying.  Thank you.

3          Now before closing the hearing, Mr. Morgan,

4  is there anything further you would like to present to

5  the Board in the form of pertinent testimony or

6  exhibits?

7          MR. MORGAN:  No, Dr. Haq.  No further

8  testimony.  I think the information presented to the

9  Board by Dr. Mardian and Brooke Heckerson was very

10  succinct and very poignant and clearly lays out the

11  specification.

12          MR. HAQ:  Sorry, I have to apologize.  The

13  volume is not enough.  If you can speak louder.

14          MR. MORGAN:  Sorry.  No, I have no further

15  information to present to the Board.  I believe the

16  information provided by Dr. Mardian and Mrs. Heckerson

17  was very, very, very succinct and very, very, very

18  clear of the issues before the Board that Dr. Peterson

19  clearly has some functionality issues and has perhaps

20  overspent his time in his field of medicine and the

21  information before the Board is succinct enough for you

22  to make a clear decision on what needs to be done.  And

23  that is why the action was taken by the facility.

24  Veterans were dying.

1          MR. HAQ:  All right.  Anything else?

2          MR. MORGAN:  No.  Thank you.

3          MR. HAQ:  Mr. Vargas, anything you would like

4    to present to the Board in the form of pertinent

5    testimony or exhibits?

6          MR. VARGAS:  No other exhibits, just a

7    clarification there.  Counsel, was that your closing

8    statement too or it sounded like you were kind of --

9          MR. HAQ:  There will be closing statements.

10   Just let me repeat the question actually.  Mr. Vargas,

11   anything further you would like to present to the Board

12   in the form of pertinent testimony or exhibits?

13         MR. VARGAS:  No.

14         MR. HAQ:  Mr. Morgan, do you care to make a

15   closing statement?

16         MR. MORGAN:  Yes.  I will.  Doctor, the

17   issues before the Board are very clear and the

18   information presented by Dr. Peterson was extremely

19   unclear.

20         As pointed out the Board received something

21   late last night as the Agency did that they wished to

22   present it as evidence which clearly is inappropriate.

23   He had time to present it at an earlier date and it

24   wasn't.

172

1              As you recognize and fellow Board members

2      recognize, this case was originally set to go to

3      hearing many months ago, but it wasn't because of the

4      fact that they wanted to retain an expert witness to

5      testify on Dr. Peterson's behalf and it was delayed and

6      delayed again and the witness was withdrawn this

7      morning.

8              Well, it allowed them to present this

9      document if they wanted to do so much sooner so we

10     could have reviewed and the Agency could have prepped

11     it and had other people testify to obviously the

12     misnomers and misleading statements made by Dr.

13     Peterson over the last two hours.

14             With that in mind, the Agency believes the

15     case is very succinct.  Dr. Mardian is a national

16     expert in this field.  He testified very astutely, very

17     poignantly.

18             And the way Dr. Peterson has claimed to go

19     around it is, well, my patients have been my patients

20     for many years, and you know, they, the information

21     wasn't in the evidence file regarding when they walked

22     in the door and I saw them originally.

23             That is contrive, I am sorry.  The fact of

24     the matter, it is not true.  What we do know from

1    Mrs. Heckerson's testimony was the fact that Dr.

2    Peterson did not see a lot of patients.  He did not do

3    a lot of encounters and he was repeatedly requested by

4    action plans every year for him to get his performance

5    pay to increase his action plan to increase his patient

6    encounters because of the fact that he didn't do

7    anything.  He was not around.

8            What did he do, we don't know.  But the fact

9    is he was not doing productive work and as a result

10   there were problems.  What happened here is he had

11   clearly some dysfunction.  He wasn't doing what he was

12   supposed to be doing.  He as Dr. Mardian testified, he

13   was operating outside the acceptable standard of care.

14           And, again, the Agency apologizes for the

15   fact that it took ten months to get the case concluded

16   after the initial suspension, but it was no issue with

17   Dr. Peterson because the fact is he was getting paid

18   and life was wonderful for him and he didn't have to

19   deal with patients, but the fact of the matter is the

20   evidence reflects he did deal with one patient and he

21   acknowledged he did, but he said his I Care capability

22   allowed him to do that.  That is not true.

23           He clearly misspoke to a veteran patient

24   after he was instructed not to in violation of his

174

1    suspension.  The suspension of privileges.  Now the

2    information was presented to the CEB and there was a

3    unanimous vote for his privileges to be revoked.  Those

4    people knew, they know this man.

5            We don't know this man.  They did and they

6    took immediate action to revoke his privileges.

7    Subsequently a proposed action letter was issued and he

8    was subsequently removed.  It was better for the Agency

9    that Dr. Peterson is no longer practicing medicine at

10   this facility.  If he continues to practice medicine,

11   it is not our issue.

12           I would like to thank you, the Board members

13   for the longevity that they put into this over the long

14   period of time that this case has been before you.

15   Thank you again.

16           MR. HAQ:  Do you care to make a closing

17   statement?

18           MR. VARGAS: Yes, Doctor.  Counsel indicates

19   life was wonderful for Dr. Peterson while he was

20   getting paid and not practicing medicine.  Well, let's

21   think about how wonderful that would be.

22           And I will put myself in that situation.  I

23   get paid, but I can't practice law for ten months.  I

24   highly doubt that life would be wonderful for me, for

175

1   you, for anybody in this room if you were told you

2   couldn't do what you have been trained to do, No. 1.

3           No. 2, counsel indicated veterans were dying.

4   I heard of one person who died in a car accident.

5   There has been no indication nor can anybody make the

6   assumption that it was because of drug use.

7           You don't know if he was on the phone, you

8   don't know if he was texting, you don't know what he

9   was doing.  That is a huge leap to make and try to pin

10   that on Dr. Peterson.

11           As far as the CEB, if I were a physician, if

12   I were a doctor, it would cause some concern that not a

13   single people -- not a single one of those doctors who

14   made the CEB counsel says they all knew him had a

15   chronic pain management certification.  That to me and

16   I am not a physician would kind of cause some concern.

17           So you have to determine whether or not as

18   counsel has indicated Dr. Peterson is feeding you a

19   bunch of malarkey or what he has done is do the best

20   job you can.

21           And I respectfully remind the Board that Dr.

22   Peterson was denied access to a lot of things.  A lot

23   of information that the reviewers had access to.  We

24   know that because I specifically made a request to the

1   Board and the Board responded we don't deal with

2   discovery issues.

3          So what Dr. Peterson did today was tell you

4   to the best of his knowledge and his recollection with

5   what he could cobble together.  He answered each and

6   every one of your questions.  And as far as the patient

7   contact, he told you why he did that.  He is not

8   denying that.

9          And so it is for you to determine whether or

10  not that rises to the level of he should have been, his

11  clinical privileges should have been suspended because

12  of those.  And I would argue that they don't.

13         If you give Dr. Peterson the same amount of

14  credibility and weight to his testimony that you give

15  Dr. Mardian who, you know, would have you think that it

16  was through the chain of command when you had testimony

17  of Mrs. Heckerson say no, the medical director

18  Dr. Bransky reached out to him because he knew him.

19         So if you give him the same courtesy that you

20  are going to give Dr. Mardian, then you have to

21  determine who is lying, who is telling the truth or the

22  truth is somewhere in the middle.  And I would ask that

23  you after you have had time to digest this, you find

24  that the Agency has not met its burden.  Thank you.

1          MR. HAQ:  Thank you, Mr. Vargas.  Mr. Morgan,

2     do you feel you have had a full opportunity to present

3     your side of the case?

4          MR. MORGAN:  Yes.  We had a full opportunity

5     to present the evidence.

6          MR. HAQ:  Mr. Vargas, do you feel you have

7     had a full opportunity to present your side of the

8     case?

9          MR. VARGAS:  No.

10          MR. HAQ:  Can you explain?

11          MR. VARGAS:  Yes.  Doctor, from the start the

12     VA has denied my client.  We made a request for Vista

13     access.  The requests we made, we made to the Board.

14     So that we didn't have access to a lot of the things

15     that we would have needed.

16          MR. HAQ: Is there any other objections you

17     have?

18          MR. VARGAS:  No, sir.

19          MR. HAQ:  Thank you for your cooperation.

20     The Board will meet and make its findings and decision.

21     The secretary shall cause to be executed the decision

22     of the Board in a timely manner.  I now declare this

23     hearing closed at 4:10 p.m. on June 2, 2021.  Thank

24     you, all of you, especially all of you for

178

1    participating all day long and we can now conclude.

2    Thank you.  We are off the record now.

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

179

```
 1                    REPORTER'S CERTIFICATION

 2

 3        I hereby certify that the foregoing is a true and

 4   accurate transcript of the DISCIPLINARY APPEALS BOARD

 5   HEARING taken on June 2, 2021, stenographically

 6   recorded by me and reduced to typewriting at my

 7   direction.

 8

 9

10

11                    Becky L. Jessup, CSR

12

13

14

15

16

17

18

19

20

21

22

23

24
```

*put in file in office*  *533680*

# Department of Veterans Affairs | BOARD ACTION

INSTRUCTIONS - Prepare one copy for Field Station and one copy for Central Office for all employees for whom Board Action is forwarded to Central Office for review or filing in Board Action Folder.

| 1. EMPLOYEE/APPLICANT'S NAME | 1A. EMPLOYEE'S POSITION |
|---|---|
| John A. Peterson | Physician (Regular FT) |

| 1B. EMPLOYEE'S GRADE AND STEP | 1C. NAME OF STATION |
|---|---|
| PHYS, Step 03 | VA Illiana Health Care System - Danville, IL |

## INITIATING BOARD

| 2. NAME OF BOARD (Check one) | 3. STATION OF BOARD | 4. DATE |
|---|---|---|
| ○ PROF. STD. BOARD  ● DISCIPLINARY  ○ PHYSICAL STANDARDS | Danville, IL - virtual | Jun 2, 2021 |

**5. FINDINGS**

### I. Introduction

A Disciplinary Appeals Board (DAB)was convened regarding a major adverse action in the form of a removal and revocation of privileges of John A. Peterson, M.D., effective November 9, 2020. Dr. Peterson submitted a written appeal that included a request for a DAB hearing that was received by the VA Central Office on November 10, 2020, meeting the deadline for filing an appeal. Upon review of the Agency Evidence File (Exhibit M-1) the Board determined that there was no indication of due process error in the disciplinary procedures or with the notification of appeal rights. On December 9, 2020, the Appellant submitted a Waiver of Statutory Time Frames. The DAB Hearing was rescheduled a number of times at the request of the Appellant, and held on June 2, 2021 at the VA Illiana Health Care System - Danville, IL - virtually.

A proposal for removal and revocation of privileges (Exhibit M-1, Tab 4, p.30-36) for John A. Peterson, M.D. at the VA Illiana Health Care System, Danville, IL, was issued on October 14, 2020, by the Chief of Specialty Service, Vasanthan Naidu, for the Charges of 1 - Failure to Provide Appropriate Medical Care with (21 Specifications)and 2 - Failure to Follow Instruction (1 Specification).

On October 16, 2020 Dr. Peterson's attorney, Mr. Vargas, submitted a notice of representation and requested a 90 calendar day extension to the response period to conduct an outside review of the charges against Dr. Peterson (M-1, Tab 3, p. 29 and B-2 p. 20). On October 29, 2020 the Deciding Official denied the request, citing the requirement to issue a decision within 15 business days of the proposal being issued according to statutory requirements (B-2 pg. 19). No response was tendered by the Appellant.

Both charges, all specifications, and proposed penalty of removal and revocation of privileges was sustained by the then Medical Center Director, Mr Shawn M. Bransky, and effected November 9, 2020 (M-1 p.10).

### II. Jurisdiction

a. Employee status: Dr. Peterson began employment at the Illiana Health Care System, Danville, IL, on February 21, 2016 when he was appointed as a full-time physician, hired under 38 USC 7401(1) (M-1, p. 2006). As there is no evidence to the contrary, it is established that Dr. Peterson completed his probationary period on February 20,

USA2186

Continuation of VA Form 10-2543     John A. Peterson, M.D          Board Action

## II. Jurisdiction (continued)

b.  Action Being Appealed:  Dr. Peterson was removed, and his privileges revoked which, per VA Handbook 5021, is a Major Adverse Action (MAA).  Charge 1 in this case is a matter of professional conduct or professional competence (PCC) as they involve Dr. Peterson's delivery of appropriate medical care to patients.

### III. Facts and Analysis

**Note:  The patient files in this case were reviewed by Dr. Mardian, co-chair of the VISN 22 Pain Committee. Dr. Mardian was also on the workgroup for the VA DOD Clinical Practice Guidelines published in 2017.  He is certified in Family Medicine and Addiction Medicine by the American Board of Medical Specialties as well as the American Board of Pain Medicine, American Board of Medical Acupuncture, and the Academy of Integrative Pain Management.**

### CHARGE 1: Failure to Provide Appropriate Medical Care

**Specification 1:** <u>Sustained</u>. Between January 25, 2019, and January 24, 2020, you prescribed fentanyl and hydrocodone to Patient A, who had a documented history of alcohol use, dependency, and recurrence. The opioid dosage was high, creating risk for adverse events. Your treatment did not meet the standard of care.

**Finding:** The chart for Patient A is in the Evidence File (M-1, p. 1635-1812). The Board reviewed this documentation and considered the hearing testimony (HT) of Drs. Mardian and Peterson. There were no other documents submitted of record. The review of Dr. Mardian (M-1, p. 1643) notes high dose fentanyl plus hydrocodone (130 mg morphine equivalents) as well as mention of alcohol consumption (M-1, p. 1646).  Dr. Peterson's note on November 25, 2019 indicates "Still consuming #30 bottles of beer weekly. I once again suggested at risk drinking.  He denies it is a problem" (M-1, p. 1646). The Board verified the dosing of Fentanyl and Hydrocodone by Dr. Peterson (M-1, p. 1646) and the Ambien prescription (M-1, p. 1647), as well as Dr. Peterson's plan "I will renew the fentanyl 25ug, 12/ug and hydrocodone for 30 days" (M-1, p. 1647), and the renewal of these medications on September 26, 2019 (M-1, pp. 1649 – 1651), and August 28, 2019 (M-1, pp. 1652-1654), despite his own comment "I have renewed his medication today.  Remain concerned about his alcohol consumption".  Dr. Peterson also renewed these medications on July 25, 2019 (M-1, pp. 1655 – 1657) and June 27, 2019 (M-1, pp. 1658 – 1659), In his note of a May 23, 2019 visit, Dr. Peterson remarked "I am not convinced that the alcohol issue is all that improved.  This place the narcotics issue further up the concern pole as it had been in the past" and closes the note with "I will follow at a distance.  See him in three months" (M-1, p. 1660).  Dr. Mardian stated that the Appellant failed to meet the standard of care (HT, p. 89, line 22 -p. 90, line 7). When questioned by his counsel, Mr. Vargas, Dr. Peterson agreed that he documented alcohol consumption (HT, p. 117, line 21- p. 118, line 1) but stated that this was an existing patient. He further stated he did a risk/benefit analysis at the initial encounter which was not during the review period (HT, p. 127, lines 16 - 21).

The Board sustains this specification. The facts do support the specification as written. The opioid dose prescribed by Dr. Peterson was high. There was documentation of alcohol use as well as minor opioid withdrawal, creating a risk for adverse events. Treatment did not meet the standard of care.

**Specification 2:** <u>Not Sustained.</u> Between January 25, 2019 and January 24, 2020, you failed to conduct urine drug testing for Patient B within the 90-day window or 30 days prior to dispensing. Your treatment did not meet the standard of care.

Continuation of VA Form 10-2543        John A. Peterson, M.D                    Board Action

**Finding:** The chart for Patient B is in the Evidence File (M-1, p. 1549-1634). The Board reviewed this documentation and considered the hearing testimony (HT) of Drs. Mardian and Peterson. There were no other documents submitted of record. There was a urine drug screen completed on September 27, 2019 (M-1, p. 1601) after the initial consultation of August 26, 2019 (M-1, p. 1568). The results of the drug screen are documented in a medication renewal request on December 10, 2019 (M-1, p 1559). There is notation in a progress note reflecting the urine drug screen results (M-1, p. 1577). Dr. Mardian testified that this file failed to meet the standard of care but did not elaborate (HT, p. 89, lines 12-21). When questioned directly by the Board, Dr. Peterson referred to page 1577 of the evidence file and stated that this was an existing patient (HT, p. 131, lines 1-3).

The Board determined that the urine drug testing was found in the Evidence File and thus, this specification was not sustained. The Board did note that Dr. Mardian's review states "The standard of care of documenting review of the state PDMP was not met" (M-1, p. 1552). The Board thoroughly read and took the reviewer's concerns seriously but the specification as written does not accurately reflect the reviewer's concerns and thus the Board could not comment on those concerns further.

**Specification 3:** <u>Sustained</u>. Between January 25, 2019 and January 24, 2020, you increased the dose of methadone from 15 mg/d to 20 mg/d to fentanyl to Patient C. Your documentation and rationale were insufficient to justify the use of this medication in the treatment regimen of the patient. Your treatment did not meet the standard of care.

**Finding:** The chart for Patient C is in the Evidence File (M-1, p. 1514-1548). The Board reviewed this documentation and considered the hearing testimony (HT) of Drs. Mardian and Peterson. There were no other documents submitted of record. Dr. Mardian's review (M-1, p. 1517) indicates the increase in methadone and his testimony (HT, p. 89, lines 2-11) reflects that the appellant did not meet the standard of care. Dr. Peterson admitted to an administrative error (HT, p. 132, line 8 – p. 134, line 14) and that he should not have signed the order. The order is documented with the increased dose of methadone from 5 mg five times a day to four times a day on March 7, 2019 (M-1 p. 1539). On September 12, 2019, Dr. Peterson indicates a plan of "opioid rotation to fentanyl" and prescribes fentanyl patches, titrating up to 50 mcg/hr every 72 hours and "Discontinue methadone. I will recycle unopened prescription into Blue Bin" (M-1, p. 1529). On October 11, 2019, Dr. Peterson sees Patient C, the methadone 5 mg four times a day is listed as an active medication and renews the fentanyl at 50 mcg/hr (M-1 pp. 1526 - 1527). At a December 2, 2019 visit, Dr. Peterson's note indicates the patient would like to go back on methadone. "He had been on 20mg in divided doses for a long time, he believes that 30mg would work better" (M-1 p. 1522). Dr. Peterson indicates his plan is to "transition from fentanyl" and he prescribes methadone 10mg titrating up to three times per day (M-1 p. 1523). On December 30, 2019, Dr. Peterson sees the patient, notes that the patient maintained the fentanyl along with the 30 mg methadone. His note indicates "will coordinate the fentanyl and the methadone. See again March 23, 09:00" (M-1 pp. 1520 – 1521) Also on December 30, 2019, Dr. Peterson signed an override on the pharmacy's duplicate opioid medications warning which indicated methadone 10 mg three times a day, naloxone, and fentanyl patch 50 mcg/hr (M-1 p. 1541). The Board further notes that there is no discussion of why the dosing was changed, merely that it was changed.

The appellant does admit to the error. The Board sustains this specification as the methadone dose was increased twice and ultimately the patient was prescribed 30mg per day of methadone along with fentanyl 50 mcg/hr. There was insufficient rationale to justify the treatment. The treatment did not meet the standard of care.

Continuation of VA Form 10-2543      John A. Peterson, M.D                    Board Action

**Specification 4:** <u>Not Sustained.</u>  Between January 25, 2019 and January 24, 2020, you increased the dose of clonazepam for Patient D. Your documentation and rationale were insufficient to justify the use of this medication in the treatment regiment (regimen) of the patient. Your treatment did not meet the standard of care.

**Finding:** The chart for Patient D is in the Evidence File (M-1, p. 1443-1513). The Board reviewed this documentation and considered the hearing testimony (HT) of Drs. Mardian and Peterson. There were no other documents submitted of record. The patient records repeatedly note that the patient is on clonazepam (M-1, p. 1449, 1452, 1459, 1462, 1464, 1468, 1473). Dr. Mardian noted that this failed to meet the standard of care but did not elaborate (HT, p. 88, line 16 – p. 89, line 1). When questioned directly by the Board, Dr. Peterson noted that benzodiazepines in this case were prescribed exclusively by psychiatry although he notes that "I was agreeing to continue it again" (HT, p. 135, line 6 – p. 136 line 4). There were no orders signed by Dr. Peterson for clonazepam.

The Board does not sustain this specification. There was no evidence that Dr. Peterson was prescribing clonazepam for this patient. The Board notes that Dr. Mardian's review (M-1, p. 1446) contains other concerns (No documentation of safety concerns, no documentation of risk mitigation strategies). The Board thoroughly read and took the reviewer's concerns seriously but the specification as written does not accurately reflect the reviewer's concerns and thus the Board could not comment on those concerns further.

**Specification 5:** <u>Not Sustained.</u>  Between January 25, 2019, and January 24, 2020, you failed to conduct urine drug testing for Patient E within the 90-day window or 30 days prior to dispensing, who had a prior positive urine drug screen for cannabis. You failed to document methadone. Your treatment did not meet the standard of care.

**Finding:**  The chart for Patient E is in the Evidence File (M-1, pages 1377-1442). The Board reviewed this documentation and considered the hearing testimony (HT) of Drs. Mardian and Peterson. There were no other documents submitted of record. There is a urine drug screen completed October 4, 2019 (M-1, p. 1415). Prior urine drug screen was November 10, 2018 (M-1, p. 1390). This is an established patient and Dr. Peterson does document that the patient is on methadone (M-1, p. 1403). Dr. Mardian testified that this did not meet the standard of care (HT, p. 88, line 7 - 15) but did not elaborate in his oral testimony. When questioned directly by the Board, Dr. Peterson believes that he did order the urine drug screen and testified that this was an established patient (HT, p. 136, line 21 – p. 140, line 4).

The Board does not sustain this specification. There is evidence of a urine drug screen approximately 11 months after the prior test, notation is made in the medication list of methadone and this is an established patient, so the 30-day/90-day recommendation does not apply. The Board does note that in Dr. Mardian's review (M-1, p. 1380), he felt that the standard of care was not met based on no discussion of a positive urine drug screen and based on no discussion of methadone tapering. The Board thoroughly read and took the reviewer's concerns seriously but the specification as written does not accurately reflect the reviewer's concerns and thus the Board could not comment on those concerns further.

**Specification 6:** <u>Sustained.</u>  Between January 25, 2019 and January 24, 2020, you failed to conduct urine drug testing for Patient F within the 90-day window or 30 days prior to dispensing. You failed to document and update the written informed consent when opioid therapy was switched to sublingual buprenorphine. Your documentation was insufficient to justify the medications used in the treatment regimen of the patient. Your treatment did not meet the standard of care.

Page **3** of 16

Continuation of VA Form 10-2543        John A. Peterson, M.D                    Board Action

**Finding:** The chart for Patient F is in the Evidence File (M-1, p. 1298-1376). The Board reviewed this documentation and considered the hearing testimony (HT) of Drs. Mardian and Peterson. There were no other documents submitted of record. This was an established patient (M-1, p. 1317). The patient chart fails to document any urine drug screens during the review window (M-1, p. 1300). Dr. Peterson did change from buprenorphine to suboxone but there is no documentation or related consent, he simply notes "Buprenorphine for pain management:  Transition back to Suboxone 2mg, one-half twice a day" (M-1, p. 1318). Dr. Mardian's review states "There is no documentation of assessment for high risk behaviors or routine monitoring. There is no documentation of updating the written informed consent when opioid therapy was switched to sublingual buprenorphine for pain management.  Consent for long-term opioid therapy for pain was originally documented in 2015 by a different provider for the use of Vicodin and tramadol" (M-1, p. 1301). Dr. Mardian felt that this failed to meet the standard of care (HT, p. 87, line 18 – p. 88, line 2). When questioned directly by the Board, Dr. Peterson stated that the urine drug screen would have been documented at the initial encounter (HT, p. 140, lines 6 - 23). Dr. Peterson also stated that he would have done a consent (HT, p. 140, line 18).

The Board sustains this specification.  No urine drug screens are documented during the review timeframe. Dr. Mardian mentions a consent from 2015 by another provider for other medications in (M-1 p. 1301).  On February 20, 2019 Dr. Peterson did prescribe buprenorphine for pain management "Transition back to suboxone 2mg, one-half twice a day" (M-1 p. 1318).  There are no informed consents present in the evidence file associated with the change in opioid therapy to sublingual buprenorphine. The Board finds that a change in opioid should result in a new consent.  The Appellant's assertion that he would have done a consent is not consistent with the documentation in the evidence file. The Board finds that the Appellant did not meet the standard of care in this case.

**Specification 7:** <u>Not Sustained.</u>  Between January 25, 2019, and January 24, 2020, you prescribed 60 mg/d of morphine to Patient G but failed to document the risks of adding Ambien. Your documentation and rationale were insufficient to justify the use of this medication in the treatment regimen of the patient. Your treatment did not meet the standard of care.

**Finding:** The chart for Patient G is in the Evidence File (M-1, p. 1204-1297). The Board reviewed this documentation and considered the hearing testimony (HT) of Drs. Mardian and Peterson. There were no other documents submitted of record. The patient record documents consideration of renewing Ambien (M-1, p. 1228) but there are no orders written by Dr. Peterson for Ambien in the patient record. Dr. Mardian stated that this did not meet the standard of care (HT, p. 87, lines 8 - 17) but did not elaborate. When questioned directly by the Board, Dr. Peterson stated that he never wrote for Ambien (HT, p. 141, lines 3 - 18).

The Board does not sustain this specification. There is no evidence presented by the Agency that Dr. Peterson wrote for Ambien. The Board does note that Dr. Mardian's review (M-1, p. 1207) states that the standard of care was not met based on "No documentation of routine safety monitoring/risk mitigation strategies. 10/7/19: Patient on 60 mg/d morphine equivalent dose with documentation of "wife says he stops breathing at night"; no discussion of opioid tapering or potential risk of respiratory depression". The Board thoroughly read and took the reviewer's concerns seriously but the specification as written does not accurately reflect the reviewer's concerns and thus the Board could not comment on those concerns further.

Page **4** of **16**

Continuation of VA Form 10-2543        John A. Peterson, M.D                    Board Action

**Specification 8:** <u>Not Sustained.</u>  Between January 25, 2019, and January 24, 2020, you failed to conduct urine drug testing for Patient H, who had a documented history of alcohol use, abuse, dependence, and reoccurrence, -within the 90-day window or 30 days prior to dispensing. Your treatment did not meet the standard of care.

**Finding:** The chart for Patient H is in the Evidence File (M-1, p. 1119-1203). The Board reviewed this documentation and considered the hearing testimony (HT) of Drs. Mardian and Peterson. There were no other documents submitted of record. Review of patient chart shows a urine drug screen done May 14, 2019 (M-1, p. 1135). Another urine drug screen was ordered December 6, 2019 (M-1, p. 1201). Dr. Mardian testified that this did not meet the standard of care but did not elaborate (HT, p. 86, line 22 – p. 87, line 7). When questioned directly by the Board, Dr. Peterson testified that this was an established patient and that urine drug screens were performed (HT, p. 141, line 21 – p. 142, line 21).

The Board does not sustain this specification. There is evidence of urine drug screens being ordered and performed. There is evidence of this being an established patient and thus the 30-day/90-day recommendation does not apply. The review by Dr. Mardian (M-1, p. 1122) notes "there is documentation of EtOH use and alcohol use disorder, mild-moderate. No subsequent documentation of questions about alcohol use, risk mitigation strategies, or intensification of risk mitigation due to alcohol use/alcohol use disorder. No discussion of opioid tapering or shifting to safer therapies". The Board thoroughly read and took the reviewer's concerns seriously but the specification as written does not accurately reflect the reviewer's concerns and thus the Board could not comment on those concerns further.

**Specification 9:** <u>Sustained.</u>  Between January 25, 2019, and January 24, 2020, you increased the usage of hydrocodone from 7.5mg 120/month to 7.5mg 180/ month for Patient I, who had a documented history of alcohol use, drug abuse, dependence, and recurrence. The opioid dosage was high, creating risk factors for adverse events. Your treatment did not meet the standard of care.

**Finding:** The chart for Patient I is in the Evidence File (M-1, p. 1002-1118). The Board reviewed this documentation and considered the hearing testimony (HT) of Drs. Mardian and Peterson. There were no other documents submitted of record. The February 12, 2019 initial note in the patient file states, "This is a legacy patient who is not asking for much of an increase." (M-1, p. 1042). Note that same date states "reinitiate Norco 10 mg. taken #6 times a day.  Adjustment made today" (M-1, p. 1042). Notation in the prescription order documents the last fill "lf" was #120 on 2/11 and to increase to 6/day (M-1, p. 1071). Dr. Mardian's review notes alcohol and cocaine use (M-1, p. 1005). The past medical history includes both cocaine and alcohol abuse (M-1, p. 1038). Dr. Mardian felt that this case did not meet the standard of care but did not elaborate further (HT, p. 86, lines 12 -21). When questioned directly by the Board, Dr. Peterson stated that the patient was going to AA and not currently drinking (HT, p. 143, line 2 – p.144, line 14).  Regarding morphine equivalents per day (MED), Dr. Peterson noted "So 6 a day times 7.5, 45, under 50.  And even Mardian indicated that 50 was – this is 45" (HT p. 143, lines 11-12).

The Board sustains this specification. The dose of opioids was increased by the Appellant in a high-risk patient, creating potential risk. Treatment did not meet the standard of care.

**Specification 10:** <u>Sustained.</u>  Between January 25, 2019, and. January 24, 2020, you prescribed buprenorphine in combination with EtOH, benzodiazepines for Patient J, who had a documented history alcohol use, abuse, dependence, and recurrence. The medication combination did not meet the standard of care.

Page **5** of **16**